## UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

| | |
|---|---|
| **Sacred Heart of Jesus Parish, Grand Rapids**; **Jerry** and **Robin Hatley**; **Joseph** and **Renee Boutell**; and **Peter** and **Katie Ugolini**, <br><br> Plaintiffs, <br><br> v. <br><br> **Dana Nessel**, in her official capacity as Attorney General of Michigan; **John E. Johnson, Jr.**, in his official capacity as Executive Director of the Michigan Department of Civil Rights; **Portia L. Roberson**, **Zenna Faraj Elhason**, **Gloria E. Lara**, **Regina Gasco-Bentley**, **Anupama Kosaraju**, **Richard Corriveau**, **David Worthams**, **and Luke R. Londo**, in their official capacities as members of the Michigan Civil Rights Commission, <br><br> Defendants. | Case No. 1:22-cv-1214 <br><br> **Verified Complaint** |

## Introduction

Sacred Heart of Jesus Parish has been serving the spiritual needs of the Grand Rapids community for more than a century. In all its years of ministry, Sacred Heart has never had a problem operating consistent with both the teachings of the Catholic Church and the laws of the State of Michigan. Until now.

On July 28, 2022, the Michigan Supreme Court reinterpreted the prohibition on discrimination "because of . . . sex" in Michigan's Elliot-Larsen Civil Rights Act and penal code to include sexual orientation and gender identity, without providing an exemption for religious institutions. Now, the State has forced Sacred Heart to make an unconstitutional and unconscionable choice: Either cease teaching and practicing the Catholic faith or close its doors forever.

To comply with Michigan's re-understood laws, Sacred Heart Parish and its school, Sacred Heart Academy, would be forced to hire faculty and staff who lead lives in direct opposition to the Catholic faith, speak messages that violate Church doctrine, and refrain from articulating Catholic beliefs in teaching its students and when advertising the school to prospective students or job applicants. All of this violates Sacred Heart's free speech and free exercise rights. Rather than defy Catholic doctrine in these ways, Sacred Heart would shut down.

But if Sacred Heart cannot operate consistent with its Catholic faith, the parental and free exercise rights of its families are also implicated. Parents have explicitly opted out of public schools in favor of sending their children to Sacred Heart for an authentic Catholic education where their children would never be exposed to harmful ideas and ideologies that contradict the Catholic faith. When Michigan prevents Sacred Heart from operating its school consistent with its Catholic beliefs, it also necessarily violates the fundamental parental and free exercise rights of Sacred Heart families.

Together, Sacred Heart and its families ask this Court to vindicate their constitutional rights and for relief from Michigan's recently reinterpreted law.

## Jurisdiction and Venue

1.     This civil-rights action raises federal questions under the First and Fourteenth Amendments to the United States Constitution and 42 U.S.C. § 1983.

2.     This Court has original jurisdiction under 28 U.S.C. §§ 1331 and 1343.

3.     This Court has authority to award the requested (1) declaratory relief under 28 U.S.C. § 2201–02 and Fed. R. Civ. P. 57; (2) injunctive relief under 28 U.S.C. § 1343 and Fed. R. Civ. P. 65; and (3) costs and attorneys' fees under 42 U.S.C. § 1988.

4.     Venue is proper under 28 U.S.C. § 1391(b) because the events and omissions giving rise to the claims substantially occur within the Western District of Michigan; the effects of the challenged laws are felt here; Defendants can and do perform official duties here; and Defendants reside here.

## Plaintiffs

5.     Sacred Heart of Jesus Parish, Grand Rapids, is a corporation organized under the Michigan Nonprofit Corporation Act with its principal place of business in Grand Rapids, Michigan. Sacred Heart Academy is an apostolate (or "ministry") operated by Sacred Heart of Jesus Parish.

6.     All Sacred Heart Academy ("Sacred Heart") employees work at its Grand Rapids school. Sacred Heart currently has 48 employees.

7.     Plaintiffs Jerry and Robin Hatley are parents of children at Sacred Heart and one alumna. They have six children currently enrolled at Sacred Heart ranging from kindergarten to eleventh grade. Jerry, Robin, and their children are Michigan residents and United States citizens.

8.      Plaintiffs Joe and Renee Boutell are parents of children at Sacred Heart. They have five children currently enrolled at Sacred Heart ranging from second grade to ninth grade. Joe, Renee, and their children are Michigan residents and United States citizens.

9.      Plaintiffs Peter and Katie Ugolini are parents of three children at Sacred Heart and one alumnus. Their children who are currently attending Sacred Heart range from eighth grade to eleventh grade. Peter, Katie, and their children are Michigan residents and United States citizens.

10.     Plaintiffs challenge the unconstitutional application of provisions of the Elliott-Larsen Civil Rights Act, M.C.L. § 37.2101 *et seq.*,[1] and Michigan's criminal laws, including the penal code, M.C.L. §§ 750.146–47,[2] 761.1(r), 767.40.

## Defendants

11.     Defendants are Michigan government officials responsible for enforcing the state laws that infringe on Plaintiffs' constitutionally protected rights.

12.     Dana Nessel is the Michigan Attorney General and has authority to administer, enforce, and prosecute Michigan's criminal laws, including the penal code, M.C.L. § 750.146–47. M.C.L. §§ 761.1(r), 767.40.

13.     Defendant Nessel also has authority to administer, enforce, and prosecute Michigan's Civil Rights Act because she represents the Michigan Department of Civil Rights (Department) and Michigan Civil Rights Commission (Commission) in any lawsuit filed under Michigan's Civil Rights Act. M.C.L. § 37.2602(b).

---

[1] Plaintiffs refer to the Elliott-Larsen Civil Rights Act as Michigan's Civil Rights Act or "the Act" throughout this complaint.
[2] This complaint refers to M.C.L. § 750.146–47 as Michigan's penal code or "the penal code." It criminalizes certain offenses in the provision of public accommodations.

4

14.     The Department and Commission have authority to administer, enforce, and prosecute the Michigan Civil Rights Act.

15.     John E. Johnson, Jr., is the Executive Director of the Department and is responsible for executing the Commission's policies. M.C.L. § 37.2602(a).

16.     Director Johnson has authority to receive, initiate, investigate, and file complaints alleging violations of Michigan's civil rights law and administers, enforces, and prosecutes the law. *See, e.g.*, M.C.L. § 37.2602, 37.2603; MDCR Rules 37.4(2), 37.12, 37.16.

17.     Portia L. Roberson, Zenna Faraj Elhasan, Gloria E. Lara, Regina Gasco-Bentley, Anupama Kosaraju, Richard Corriveau, David Worthams, and Luke R. Londo are members of the Commission.

18.     The Commissioners have authority to initiate and file complaints alleging violations of Michigan's Civil Rights Act and administer, enforce, and prosecute the law. *See, e.g.*, M.C.L. § 37.2601.

19.     The Attorney General, Department, and Commission have offices in Grand Rapids.

20.     All defendants are sued in their official capacities.

Factual Background

## I.     Sacred Heart Academy exists to support parents in forming their children in the Catholic faith.

21.     Sacred Heart of Jesus Parish was founded on Grand Rapids' west side more than a century ago by Polish immigrants who worked in nearby gypsum mines. Sacred Heart has been serving families ever since.

22.     Sacred Heart Academy ("Sacred Heart") remains today a parish-run Catholic school in the Diocese of Grand Rapids, Michigan. It is an apostolate (or ministry) of the parish.

23.     Sacred Heart's mission is to "restore all things in Christ."

24.     Sacred Heart's purpose is to "recover the 'Beauty ever ancient, ever new' through an integrated curricula that forms the whole person inspiring the hearts of Catholic students to know, love and serve God."

25.     Sacred Heart exists to support parents in forming their children in the Catholic faith by providing a classical Catholic education.

26.     In 2013, Sacred Heart re-founded its school to add the classical approach to the already existing Catholic education.

27.     The school is now the only classical Catholic school of its kind in the surrounding area.

28.     Sacred Heart provides a Christ-centered education based in the Word of God, which is contained in Sacred Scripture, Sacred Tradition, the Magisterium of the Catholic Church (the Church's teaching authority exercised by popes and bishops), and the Catechism of the Catholic Church.

29.     Sacred Heart Parish's pastor is the final decision-maker for the school, but he is subordinate to the Bishop of Grand Rapids, David J. Walkowiak.

30.     Sacred Heart Academy's handbook and moral expectations are derived from and rely on the Catechism of the Catholic Church. Catholic schools exist to pass on the faith and to form Christian believers. *See* Congregation for Catholic Education, *The Catholic School on the Threshold of the Third Millennium* ¶ 11 (Dec. 28, 1997).

31.     Sacred Heart's student discipline policies seek to form students in virtue and are based in the Catechism of the Catholic Church. Exhibit ("Ex.") 1, Student Handbook, at 16–20.

32.     Catholic schools must be authentic Christian communities animated by the spirit of Jesus Christ.

33.     The Catholic Church ("the Church") teaches—and Sacred Heart believes—that parents are the primary and principal educators of their children

6

and that the school exists to supplement and support parents in their educational role. Catechism of the Catholic Church ("C.C.C.") ¶ 2223.

34.    Sacred Heart and its faculty view the school as an extension of parents' homes.

35.    In line with this vision, parents are integrally involved in Sacred Heart. For example, the drama program, sports program, dances, and school lunches are organized and run by parents.

36.    Sacred Heart strives to draw its students into an authentically Catholic culture.

37.    Because Sacred Heart exists primarily to pass on the Catholic faith in the classical education tradition, it necessarily seeks to build an intentional Catholic community and culture.

38.    Sacred Heart's culture is informed by the Church's liturgical life. The school's calendar is planned around the Church's liturgical calendar and school-wide events and celebrations recognize significant Feasts and liturgical seasons throughout the year.

39.    For example, on Holy Days of Obligation, daily Mass is more solemn, sung, and often includes processions and/or Eucharistic Adoration, and the rest of the school day is marked by an intentional avoidance of servile labor, in favor of devotions, spiritual retreats, community service, pilgrimages, in class celebrations, songs, and other traditional festive practices compatible with the spirit of Sabbath rest.

40.    Sacred Heart's goal for its faculty, students, and families is eternal life in Heaven.

41.    Sacred Heart welcomes any family desiring the formation offered in its Catholic classical setting.

42.    At Sacred Heart of Jesus Parish and Sacred Heart Academy, families are striving to build an intentional Catholic community. They want the distinctly Catholic formation and culture that Sacred Heart provides children. Numerous families have purchased homes in the parish's neighborhood. Others drive their children an hour each way to and from school to provide this religious formation and education for them. And some families have moved to Michigan from other states to send their children to the school and join the community.

43.    Sacred Heart serves nearly 400 children from pre-kindergarten through the twelfth grade.

44.    Every Sacred Heart student, from second grade and up, is required to attend Mass at the beginning of each day. The lower grades, who have not yet received First Communion, attend Mass several times per week. All Sacred Heart faculty also attend daily Mass.

45.    Catholic doctrine and the Catholic faith permeate every subject at Sacred Heart.

46.    The purpose of the Sacred Heart curriculum is the pursuit of truth, and the whole curriculum is founded upon the Catholic understanding of man and woman and the purpose of each.

47.    Sacred Heart believes that in order to correctly teach truth to its students, its curriculum must necessarily be founded on a proper understanding of human anthropology.

48.    Sacred Heart's curriculum includes explicitly religious instruction. For example, younger students are taught from a religious education curriculum called the Catechism of the Good Shepherd and older students take mandatory theology courses. Older students are also offered additional elective theology courses. Sacred Heart has offered an elective course on Pope St. John Paul II's teachings called the Theology of the Body. Ex. 10, Theology of the Body.

8

49.     The Theology of the Body course explicitly lays out the Church's teaching on sexuality and marriage, but these teachings are also woven throughout the entire Sacred Heart curriculum.

50.     Sacred Heart seeks to protect its autonomy by remaining completely independent of state and federal funding. The school does this to protect its distinctly Catholic identity and intentional community.

## II.     Sacred Heart builds an intentional Catholic community around its faculty and staff.

51.     To pass on the Catholic faith to students, Sacred Heart requires all faculty and staff to support, live, and model the Catholic faith and its doctrine and morals.

52.     Following diocesan policy, Sacred Heart requires all employees to become certified catechists, *i.e.*, to be certified to teach the Catholic faith.

53.     Sacred Heart Academy believes it is the job of every employee to support, live out, model, and teach the Catholic faith and its doctrine.

54.     All Sacred Heart employees are Christians who support the Church's moral and doctrinal teachings, including its teachings on marriage and human sexuality. Every year employees sign a "memorandum of understanding" outlining their religious and moral duties and they publicly swear an "oath of fidelity" to Church teaching at a Mass. Ex. 3, Faculty Memo and Oath.

55.     Sacred Heart's staff memorandum of understanding explains that the Academy "is rooted in the reality that Truth is a person, Jesus Christ, and that complete formation of the human person necessarily requires formation of mind, body, and soul." Ex. 3, Faculty Memo and Oath, at 1.

56.     In the oath of fidelity, all employees swear to hold fast to the Catholic Church's deposit of faith in its entirety, faithfully hand it on and explain it, and avoid any teachings contrary to it. Ex. 3, Faculty Memo and Oath at 4–5.

57.     Sacred Heart requires that its employees be responsible for integrating the life of the Church and the organic unity of the Catholic faith into the curriculum presented to Sacred Heart's students. Ex. 11, Faculty Handbook.

58.     Sacred Heart requires its employees to fulfill their duties "all for the purpose of assisting in fulfilling the Academy's mission of assisting families, forming Catholics, and cultivating culture." Ex. 3, Faculty Memo and Oath, at 1.

59.     Sacred Heart maintains a standard of conduct for its employees and requires them to agree that they will support and exemplify in conduct and expression both Catholic doctrine and morality as articulated in the Catechism of the Catholic Church.

60.     Sacred Heart's standard of conduct requires that employees must be consistent, in expression and example, with the teaching and practice of the Catholic faith and shall not advocate, encourage, or counsel beliefs or practices that are inconsistent with the Catholic faith.

61.     Sacred Heart has adopted these requirements because the Catholic faith is better transmitted to and retained by young people when they are exposed to an authentic Catholic community living out Christian principles.

62.     If churches and religious organizations cannot limit their membership to those who support and believe in an organization's or community's culture and mission, it changes and undermines those institutions.

63.     Sacred Heart embraces the Catholic doctrine that all people should be treated with dignity, respect, and charity—even those who reject the Church's teachings. C.C.C. ¶ 2358. Sacred Heart therefore always strives to treat all persons, including employees, students, and families with dignity, respect, and charity.

### III.   Sacred Heart embraces the Catholic Church's teachings on marriage and human sexuality in belief and practice.

64.   The Catholic Church ("the Church") exists to make the living Christ present in the world today, and to provide onlookers with a glimpse of a society comprised of persons living as disciples of Jesus Christ.

65.   The Church understands itself as a communion of people called by God to be an assembly for religious purposes.

66.   The Church teaches that proper love of God and neighbor must be rooted in truth.

67.   Jesus Christ called on his disciples to love one another in every aspect of their lives, including human sexuality and marriage.

68.   The Church's doctrine on human sexuality and marriage are based in Sacred Scripture and Tradition and supported by natural law. The Church believes its doctrine promotes the best vision of human flourishing by encouraging responsible and selfless love and respect of others. The Church's doctrine on human sexuality and marriage facilitate love, freedom, dignity, and equality.

69.   Catholic doctrine states that "God created man in his own image . . . male and female he created them." C.C.C. ¶ 2331.

70.   Catholic doctrine states that human sexuality is a unitive and procreative gift reflecting the nature of God and that sexual acts are exclusively reserved for the loving and permanent bond of marriage, which can only exist between one man and one woman. C.C.C. ¶ 2332.

71.   Catholic doctrine also states that all sexual activity outside of marriage is gravely sinful. C.C.C. ¶¶ 2396, 2400.

72.   The Church's doctrine on human sexuality and marriage are foundational and essential to the Catholic faith. They help Catholics understand

who God is, as a Trinity of communal love, and it helps men and women understand their own identities as beloved sons and daughters of God. C.C.C. ¶ 2331.

73.     Catholic doctrine also instructs Catholics how to selflessly love their neighbors and to imitate God's radical love for us. C.C.C. ¶ 2346.

74.     The Catholic faith rejects the notion that a man or woman can "transition" to a gender inconsistent with his or her biological sex.

75.     Catholic doctrine states that "[e]veryone, man and woman, should acknowledge and accept his sexual identity" and that "[e]ach of the two sexes is an image of the power and tenderness of God, with equal dignity though in a different way." C.C.C. ¶¶ 2333, 2335.

76.     Transgender ideology (*i.e.* the idea that a person's identity can be inconsistent with his or her biological sex) undercuts Catholic doctrine on basic structures of Catholic belief. *See* Congregation for Catholic Education, *Male and Female He Created Them: Towards a Path of Dialogue on the Question of Gender Theory in Education* (2019).

77.     In response to guidelines issued by the Michigan State Board of Education, the Bishop of Grand Rapids, David J. Walkowiak, issued a statement explaining that transgender ideology is incongruent with Catholic teaching and that Catholic schools "will stand firm in our belief that all humans are created in the image and likeness of God, male and female" and that "a person's sexual identity is determined at conception." Ex. 4, Bishop Statement.

78.     Sacred Heart's teaching methods reflect Catholic doctrine that mankind is created in two distinct but complementary sexes, male and female.

79.     Sacred Heart requires all employees to embrace and follow the Church's doctrine on marriage and human sexuality.

80.     In modeling the Catholic faith, doctrine, and morals to students, Sacred Heart's faculty and staff also model authentic masculinity and femininity by

demonstrating to young boys and girls what it means to be a Catholic man or woman.

81.    Sacred Heart wrestles with the same cultural issues as other schools, public and private. However, Sacred Heart addresses all issues from a Catholic perspective, always seeking to embrace and convey the transcendentals of truth, goodness, and beauty, which reflect the infinite perfection of God. C.C.C. ¶ 41.

82.    Sacred Heart believes and embraces Catholic doctrine on marriage and human sexuality. Sacred Heart rejects ideologies that are incompatible with Catholic doctrine, like transgender ideology.

83.    Sacred Heart employs religious and lay persons as teachers and other staff members. It hires new teachers each year and advertises open employment positions on its website and on third-party sites as positions arise. Sacred Heart's employment advertisements emphasize a requirement that employees believe, support, and model the Catholic faith.

84.    Sacred Heart requires all employees to avoid all beliefs or practices inconsistent with Catholic doctrine or morals.

85.    Sacred Heart would not approve an employee's request for special treatment based in transgender ideology or other LGBTQ ideologies, such as using pronouns or bathrooms inconsistent with the employee's biological sex, because those ideologies conflict with and are incompatible with the Catholic vision of the human person and human flourishing. Doing so would be inconsistent with its mission and Catholic doctrine.

86.    Sacred Heart's job postings explain that employees are required to be practicing Catholics whose public lives are lived in conformity with the moral teachings of the Church. Ex. 5, Previous Job Postings.

87.    For example, as part of their job descriptions, teachers are expected to "integrat[e] Jesus Christ, the life of the Church and the organic unity of the

Catholic faith into the curriculum and classroom environment." Ex. 5, Previous Job Postings, at 1.

88.    Notwithstanding the Michigan Supreme Court's recent decision expanding Michigan's "sex-discrimination" laws to cover sexual orientation and gender identity, Sacred Heart plans to continue to communicate its commitment to operating consistent with Catholic beliefs to job candidates, its students, families, and the public. Ex. 7, Statement on Catholic Doctrine.

89.    Sacred Heart incorporates Catholic beliefs on human sexuality into its operation of the Academy.

90.    Sacred Heart divides its high school students into single-sex "households" or "houses" to build up community, train older students in leadership, and provide mentorship for younger students.

91.    Sacred Heart divides students by sex in houses due to its commitment to Catholic teaching on the distinctness and complementarity of each sex.

92.    Sacred Heart maintains separate restroom facilities for males and females.

93.    Sacred Heart maintains separate athletic teams for males and females.

94.    Sacred Heart organizes houses, restrooms, and sports teams by biological sex to reflect the truth that each person is made in God's image and likeness as male or female, to help the students learn their identity as beloved sons or daughters of God, and to model authentic Christian masculinity or femininity.

95.    Sacred Heart has students who struggle with gender discordance (also known as gender dysphoria).

96.    Sacred Heart works to help all students find their identity in Christ as beloved sons or daughters of God.

97.    When discussing Catholic schools and Michigan's LGBTQ student guidance, the Bishop of Grand Rapids, David J. Walkowiak, explained that "[i]n

situations where students may be questioning their identity; parents and educators will work together closely to determine the proper support necessary to meet the needs of these and all students." Ex. 4, Bishop Statement.

98.     Sacred Heart cannot embrace transgender ideology because that ideology does not reflect the truth and is inconsistent with Catholic doctrine and the Church's vision for human flourishing.

99.     Sacred Heart cannot embrace a vision of marriage and human sexuality that is inconsistent with Catholic doctrine because that undermines Sacred Heart's vision of human flourishing and harms men, women, children, and families.

100.     Sacred Heart always strives to treat students with dignity, respect, and sensitivity, especially as students grow and seek to find their identities. *See* Congregation for the Doctrine of the Faith, *Letter to the Bishops of the Catholic Church on the Pastoral Care of Homosexual Persons* (Oct. 1, 1986), https://www.vatican.va/roman_curia/congregations/cfaith/documents/rc_con_cfaith_doc_19861001_homosexual-persons_en.html.

101.     Sacred Heart encourages students to embrace their God-given biological sex because it leads to their fulfillment, helps them flourish, and helps them understand their identities as beloved sons or daughters of God.

102.     Sacred Heart does not approve or grant student requests to use a restroom, wear uniforms, or play on a sports team inconsistent with that student's biological sex. Doing so would be inconsistent with the Catholic faith and doctrine.

103.     Sacred Heart will not grant student requests that are inconsistent with its mission and Catholic doctrine. Sacred Heart will not grant requests based in transgender or other LGBTQ ideologies because those ideologies conflict with and are inconsistent with human flourishing and Catholic doctrine on the human person.

104.    Sacred Heart will not affirm a "gender identity" that is inconsistent with the person's biological sex because doing so would contradict the Catholic faith and its doctrine. It would ultimately harm Sacred Heart students and staff. It also would require lying to the person in question and others, which would be sinful. *See* C.C.C. ¶ 2485 ("By its very nature, lying is to be condemned. It is a profanation of speech, whereas the purpose of speech is to communicate known truth to others. The deliberate intention of leading a neighbor into error by saying things contrary to the truth constitutes a failure in justice and charity.").

105.    Sacred Heart will not affirm any individual's "preferred pronouns" inconsistent with biological sex because that would conflict with the Catholic faith and its doctrine, lie about the person's identity, and deter the person's authentic flourishing.

106.    Sacred Heart will not operate in a manner inconsistent with Catholic teachings in provision of educational services, in employment, or in any services offered to the public. Sacred Heart will therefore not grant or assent to requests for special treatment by students, employees, or others based on transgender or other LGBTQ ideologies.

107.    Sacred Heart would shut down its school—thereby refraining from exercising its religion by providing education—rather than operate a school inconsistent with the Church's faith and doctrine.

108.    Many families have chosen Sacred Heart and have made sacrifices to send their children to Sacred Heart precisely because of its fidelity to the Catholic faith and its doctrine.

**IV.    The Parents who choose Sacred Heart.**

    **A.    The Hatley Family**

109.    Jerry and Robin Hatley are members of the Sacred Heart community. They have nine children, including the six youngest who all currently attend Sacred Heart Academy.

110.    The Hatleys currently have children in eleventh grade, ninth grade, eighth grade, sixth grade, fourth grade, and kindergarten.

111.    The Hatleys have made significant sacrifices logistically and financially so that they can fulfill their religious obligation to teach their children in the Catholic faith.

112.    Previously, the Hatleys lived in Indianapolis, Indiana, but they felt their spiritual needs were not being met in that community.

113.    Jerry and Robin asked God to show them where they should move to better raise their children in the Catholic faith, and they discerned that God was calling them to join the Sacred Heart community.

114.    When they visited Sacred Heart, the headmaster took time off vacation to spend two hours with them showing them around campus and discussing their needs.

115.    It was very important to the Hatleys that all of their children would be able to attend the same school.

116.    Even though a grade level for one of their children was filled at Sacred Heart, the headmaster accommodated the Hatleys so that all of their children could attend Sacred Heart together.

117.    The Hatleys moved from Indianapolis to Grand Rapids specifically to form their children in the Catholic faith as members of the Sacred Heart community. There was no other reason for them to move to Grand Rapids.

118.    Both Jerry and Robin are actively involved at Sacred Heart. For example, Jerry serves on the Board of Directors of the Sacred Heart Academy Educational Foundation. And Robin serves on the Auction Committee. She also assists with school picnics, the hot lunch program, and various celebrations for Catholic feast days throughout the school year.

119.    The Hatley children have attended Sacred Heart for three years.

120.    Even though Jerry and Robin both attended public school, they have opted out of public education and chosen Catholic school so that their children can receive a rich moral and spiritual foundation as part of their academic formation.

121.    Jerry has been in the manufacturing field for 30 years and has seen firsthand the effects of children raised without a solid moral and spiritual foundation.

122.    Jerry and Robin have chosen Sacred Heart so that their children can preserve their innocence and learn what is good, true, and beautiful without any exposure to harmful ideas that contradict the truth of the Catholic faith.

123.    The Hatleys have seen spiritual fruit in their children's lives as a result of the Sacred Heart community.

124.    Their children have flourished at Sacred Heart and have been able to live their Catholic faith more freely and fully surrounded by their peers, teachers, and other families who all are striving together for holiness.

125.    The Hatleys believe Sacred Heart is the best place where they can send their children to receive a holistic moral, spiritual, and academic formation in the Catholic faith. Sacred Heart's community uniquely fills their family's spiritual needs.

**B.**     **The Boutell Family**

126.    Joe and Renee Boutell are members of the Sacred Heart community. They have five adopted children who all attend Sacred Heart Academy.

127.    They have two ninth graders, a sixth grader, a fourth grader, and a second grader.

128.    Joe is a public safety officer, and Renee stays home to care for their five children, all of whom have special needs. In January Renee will be starting a part-time position with Help Pregnancy Resource Center, which is about a mile from Sacred Heart and will allow her to still be very involved in the school.

129.    The Boutells live 40 minutes away from Sacred Heart and drive their children to and from school every day.

130.    The Boutells have bought a house about 20 minutes from Sacred Heart and are currently renovating it.

131.    When the Boutells move into their new home, Joe's commute to work will increase from 35 minutes to one hour each way.

132.    The Boutells have made significant logistical and financial sacrifices so that their children can attend Sacred Heart.

133.    Both Joe and Renee spend much time volunteering at Sacred Heart.

134.    For example, Renee volunteers on the "Liturgical Celebration Team," a team that works to integrate the life of the Church into the school by, for example, hosting special celebrations for the school in honor of Catholic feast days.

135.    And Joe is part of the Security Team for the Parish.

136.    Both Joe and Renee are also members of the New Family Team where they give tours of the school and serve as resources for new Sacred Heart families.

137.    Before the Boutell children attended Sacred Heart, they attended a non-Catholic classical school, and the Boutells were generally pleased with this school.

138.    But when Sacred Heart was re-founded as a classical *Catholic* school in 2013, Joe and Renee did not hesitate to pull their children from their prior school and enroll them at Sacred Heart.

139.    The Boutells have chosen to send their five children to Sacred Heart because of the authentic Catholic community, the genuine charity, and the formation in virtue that they experience at Sacred Heart.

140.    For the Boutell children, the rigorous academics at Sacred Heart have been challenging because of their special needs.

141.    Public schools offer more targeted learning for children with special needs, but the Boutells have opted out of public school in order to give their children an authentic Catholic education. Their youngest child does have an individualized education plan and receives special instruction one hour per week through Grand Rapids Public Schools. But the instructor comes to Sacred Heart to work with him so that he remains in the Catholic community at Sacred Heart and is not exposed to a culture that contradicts the Catholic faith in a public school.

142.    Before this school year, Joe and Renee seriously considered pulling their oldest child from Sacred Heart because of the academic challenge.

143.    But Joe and Renee ultimately decided that the truth, goodness, and beauty of the holistic Catholic education at Sacred Heart outweighed any academic challenges.

144.    Despite the academic challenges, the Boutells keep their children at Sacred Heart because of the access to the seven Sacraments, including daily Eucharist, and because everything about Sacred Heart points to and flows from the sacramental life of the Catholic Church.

145.    The unique Catholic community at Sacred Heart, formed by the priests, teachers, and families, foster a true spirit of charity that aids the Boutell children in living out and experiencing their Catholic faith.

20

146.   The Boutells value the preparation that Sacred Heart gives to children with disabilities, like the Boutell children, who may not go to college.

147.   For example, Sacred Heart helps its students to discern their vocations and to transition into those vocations after graduation.

148.   The Boutells also value the strong Catholic foundation that Sacred Heart provides for their children.

149.   The school is truly an extension of the parish, which provides essential Catholic community for their children that allows them to flourish.

150.   Joe and Renee believe that even after their children leave the school, the relationships that the Boutell children have built with priests, teachers, friends, and families at Sacred Heart will last and help them continue to live out their Catholic faith in the world.

151.   The Boutells believe that Sacred Heart is the only place where they can send their children to receive a holistic moral, spiritual, and academic formation in the Catholic faith.

### C.   The Ugolini Family

152.   Peter and Katie Ugolini are members of the Sacred Heart community. They have four children. Their oldest recently graduated from Sacred Heart, and their three youngest currently attend Sacred Heart.

153.   The Ugolinis currently have children in eleventh, ninth, and eighth grade at Sacred Heart.

154.   Peter and Katie Ugolini are both medical doctors. Peter maintains a busy practice and Katie currently serves as a biology teacher at Sacred Heart.

155.   When their oldest child was ready to attend school, Peter and Katie sent him to a public school.

156.    After one year in public school, they determined that it was not right for their family because of the lack of essential moral and spiritual formation so they decided to opt out of public education.

157.    Eventually, Katie, a trained plastic surgeon, stopped practicing medicine and homeschooled their four children.

158.    After four years of homeschooling, the Ugolinis began participating in the Classical Enrichment Curriculum program at Sacred Heart, which allows homeschooled children at the parish to take courses at Sacred Heart Academy two days per week.

159.    Through this program, their children became more involved in the Sacred Heart community.

160.    Their oldest son thrived in this community as an altar server at Mass and through sports teams, and he asked his parents if he could attend Sacred Heart full-time.

161.    Eventually, the Ugolinis enrolled all of their children at Sacred Heart full-time.

162.    The Ugolinis chose Sacred Heart because the Catholic faith is paramount and permeates every aspect of the academics, community, and culture.

163.    They value the authentic Catholic message that their children receive each day as part of the Sacred Heart community.

164.    The Ugolinis live right across the street from one of the best public high schools in the state, but each day they drive by that school to take their children to Sacred Heart 20 minutes away instead.

165.    The Ugolinis believe that in a public school, their children will not be formed in the Catholic faith because they will not hear the Gospel preached or learn by the example of teachers and peers trying to genuinely live the faith.

166.    At Sacred Heart, though, the Ugolinis have found that the teachers model the faith for their students by showing them how to be virtuous Catholic men and women striving to be more like Christ.

167.    The Ugolinis also appreciate that their children receive formation and encouragement to strive for holiness from their peers.

168.    Peter and Katie have made significant financial and logistical sacrifices so that their children can attend Sacred Heart.

169.    Peter has dedicated many hours to helping the sports programs thrive so that their children and others can participate in organized sports at Sacred Heart.

170.    Katie has given up her career as a plastic surgeon so that she can better serve her children, including by teaching biology, anatomy, and physiology at Sacred Heart.

171.    This year, two of the Ugolini children are in Katie's classes.

172.    As a science teacher at Sacred Heart, everything that Katie teaches her students aligns with the teachings of the Catholic Church.

173.    For example, she teaches her students that every person's biological sex is immutable.

174.    But the Act prohibits Katie from teaching science classes in accord with Catholic doctrine and would even require her to teach about biological sex in a way that directly contradicts the Catholic faith by, for example, using pronouns inconsistent with a student's biological sex if the student requests it.

175.    Because Katie's children take her class, the Act also prohibits Katie from teaching science classes in accord with Catholic doctrine to her own children and would even require her to teach her own children about biological sex in a way that directly contradicts the Catholic faith.

176.    The Ugolinis have also assisted with formal dances for the high school students.

177.    At these dances, the Ugolinis have seen the students put into practice what they have learned at school and at home by exercising the virtues of modesty, charity, and respect and encouraging their classmates to live virtuously.

178.    Sacred Heart is the only place where the Ugolinis can send their children to receive a holistic moral, spiritual, and academic formation in the Catholic faith.

### D.    Parent Plaintiffs' Religious Beliefs

179.    The Hatleys, Boutells, and Ugolinis are all practicing Catholics.[3] They believe all the teachings of the Catholic Church, including the Church's teaching on marriage and sexuality, and they are raising their children in the Catholic faith.

180.    The Hatleys, Boutells, and Ugolinis believe it is their religious and moral obligation to help their children know, love, and serve God in this world and be happy with Him forever in Heaven. *Baltimore Catechism,* Question 6.

181.    According to the Catechism of the Catholic Church, "[t]he fecundity of conjugal love cannot be reduced solely to the procreation of children, but must extend to their moral education and their spiritual formation. The *role of parents in education* is of such importance that it is almost impossible to provide an adequate substitute. The right and duty of parents to educate their children are primordial and inalienable." C.C.C. ¶ 2221 (internal citation omitted).

182.    The Church also teaches that "[p]arents have the first responsibility for the education of their children," *id*. ¶ 2223, and "parents have the duty of choosing schools that will best help them in their task as Christian educators," *id*. ¶ 2229.

---

[3] Where appropriate within this complaint, the Hatleys, Boutells, and Ugolinis are collectively referred to as "Parent Plaintiffs."

183.   The Hatleys, Boutells, and Ugolinis have exercised their religious right and duty to form their children in the Catholic faith by choosing to send them to Sacred Heart.

184.   Sacred Heart exists to assist parents in fulfilling their religious obligation to educate their children in the Catholic faith through academic, moral, and spiritual formation.

185.   Sacred Heart follows the Church's teaching that "[t]he Church is bound as a mother to give to these children of hers an education by which their whole life can be imbued with the spirit of Christ and at the same time do all she can to promote for all peoples the complete perfection of the human person, the good of earthly society and the building of a world that is more human." *Gravissiumum Educationis*: Declaration on Christian Education (Oct. 28, 1965).

186.   The Hatleys, Boutells, and Ugolinis believe that the Eucharist, the true Body and Blood of Christ, is the "source and summit of the Christian life." C.C.C. ¶ 1324.

187.   So it is essential to their children's spiritual well-being that their children be able to receive the Eucharist at Mass at the beginning of each school day at Sacred Heart.

188.   The Hatleys, Boutells, and Ugolinis believe that formation in the Catholic faith comes not just from formal catechesis but also from learning by the example of others authentically living the Catholic faith.

189.   So it is essential to their children's spiritual well-being that their children be surrounded by a true, good, and beautiful Catholic culture at school where students, teachers, priests, and families all strive for holiness together.

190.   At Sacred Heart, students learn the Catholic faith by observing their teachers living truly Catholic lives in faithfulness to the teachings of the Church, including those on marriage and sexuality.

191.   Students also learn the Catholic faith through having relationships with priests and consecrated religious brothers and sisters involved in Sacred Heart.

192.   Students also learn the Catholic faith from their peers. In particular, the older students at Sacred Heart often become role models of virtue for younger students.

193.   And Sacred Heart fosters a culture of accountability among the students where they encourage each other to live virtuously and grow spiritually in accordance with the teachings of the Church.

194.   Sacred Heart provides opportunities, during school, for students to live out their faith in the community by participating in corporal and spiritual works of mercy such as feeding the hungry and praying for the dead.

195.   All of this is necessary religious formation for Parent Plaintiffs' children.

196.   The Catholic Church teaches that "[p]arents have the mission of teaching their children to pray and to discover their vocation as children of God." C.C.C. ¶ 2226.

197.   The Hatleys, Boutells, and Ugolinis have chosen Sacred Heart because it helps prepare their children for their vocations.

198.   For example, students at Sacred Heart learn about the vocation of marriage through observing their teachers and staff model true, chaste courtship that results in sacramental marriage in the Catholic Church.

199.   In their own lives then, students follow this chaste courtship model in preparation for marriage rather than the mainstream dating model that encourages sexual relations outside of conjugal marriage.

200.    Students learn about the truth, goodness, and beauty of conjugal marriage from watching their teachers flourish in their own marriages and even attending their teachers' nuptial Masses.

201.    Students at Sacred Heart also learn about the vocation of priesthood and religious life by interacting with priests and consecrated religious brothers and sisters at school.

202.    The altar serving program at Sacred Heart allows male students to assist the priest during the celebration of the Mass. It is a source of pride for young men and helps them discern if they are called to the priesthood.

203.    The Hatleys, Boutells, and Ugolinis have chosen to send their children to Sacred Heart to assist them in fulfilling their religious duty to help their children get to Heaven.

204.    The Hatleys, Boutells, and Ugolinis believe the teachings of the Catholic Church that God created each person in His image either male or female and that biological sex is immutable.

205.    They also believe the teachings of the Catholic Church that marriage can only exist between one man and one woman and that any sexual acts outside of this procreative, permanent, and exclusive union are gravely sinful.

206.    The Hatleys, Boutells, and Ugolinis teach these truths to their children.

207.    The Hatleys, Boutells, and Ugolinis have sent their children to Sacred Heart because of the clear Catholic teaching, through class instruction and example, that their children receive on marriage and sexuality.

208.    Public schools teach messages, ideas, and ideologies that directly contradict the truths of the Catholic faith on marriage and sexuality. Ex. 6, Michigan Education Policy; *see also, e.g.*, *Michigan Dept. of Education LGBTQ, Gender Training Blasted by Dixon, Whitmer*, Bridge Michigan (Sept. 16, 2022),

27

https://www.bridgemi.com/talent-education/michigan-dept-education-lgbtq-gender-training-blasted-dixon-whitmer.

209. The Hatleys, Boutells, and Ugolinis have opted out of public school so that their children are not taught these harmful ideas about marriage and sexuality.

210. They believe that if a Catholic institution, like Sacred Heart, was forced to affirm positions contrary to the Church's teachings on marriage and sexuality, it would greatly confuse their impressionable children and hinder their moral and spiritual development.

211. The Hatleys, Boutells, and Ugolinis send their children to Sacred Heart so they can learn the truth, goodness, and beauty of the Church's teachings on marriage and sexuality and because they will not be exposed to anything that contradicts or confuses Catholic teaching.

212. If Sacred Heart was forced to teach, in word or example, content that violated the teachings of the Catholic Church, then the Hatleys, Boutells, and Ugolinis would remove their children from the school.

## V. Michigan's Civil Rights Act governs Sacred Heart and bans sex and religious discrimination in education, employment, and public accommodations.

213. Michigan's Elliot-Larsen Civil Rights Act ("the Act") is a broad-reaching law that prohibits discrimination on a variety of bases in education, employment, and public accommodations.

214. Among other things, the Act prohibits sex and religious discrimination in education, employment, and public accommodations.

215. The Act applies to church-run schools. *See Porth v. Roman Cath. Diocese of Kalamazoo*, 532 N.W.2d 195, 198 (1995).

216.    The Act's education, employment, and public accommodations provisions apply to Sacred Heart.

217.    Michigan's education discrimination prohibition explicitly covers private schools, including Sacred Heart Academy. M.C.L. §§ 37.2401.

218.    The Act's education provision expressly forbids sex discrimination in student admission, retention, or discipline. M.C.L. §§ 37.2402(b).

219.    The Act also prohibits discrimination based on religion, but religious schools are only exempted from the religious discrimination ban. M.C.L. §§ 37.2403. Religious schools are not exempted from the discrimination prohibition based on other classes, including sex. *Id*.

220.    The Act prohibits employment discrimination, which it defines as "fail[ing] or refus[ing] to hire or recruit, discharge, or otherwise discriminate" based on, among other things, sex. M.C.L. §§ 37.2202. The Act prohibits treating employees differently based on sex. *Id*.

221.    The Act defines an employer as any person who employs one or more individuals, which includes Sacred Heart. M.C.L. § 37.2201(a).

222.    The Act provides employers a bona fide occupational qualification ("BFOQ") exemption, which allows some employers to petition government officials for permission to discriminate on grounds relevant to the performance of a job.

223.    The Act prohibits discrimination in public accommodations, which includes educational facilities or institutions and any institution "whose goods, services, facilities, privileges, advantages, or accommodations are extended, offered, sold, or otherwise made available to the public." M.C.L. § § 37.2301. The Act's public accommodations provision includes sex, religion, and marital status as protected classes. M.C.L. § § 37.2302(a).

224.    The Act's provisions governing education, employment, and public accommodations all include "publication bans," which are provisions that prevent

covered entities from making communications contrary to the law's values. *See* M.C.L. § § 37.2402(d) (education); M.C.L. §§ 37.2206 (employment); M.C.L. §§ 37.2302(b) (public accommodations).

225.    Unlike most similar state and federal laws, Michigan's Act does not include routine religious exemptions that allow Sacred Heart to operate consistent with the Catholic faith and its doctrine.

## VI.    Michigan's Penal Code also governs Sacred Heart.

226.    Like the Act, Michigan's penal code also imposes penalties on public accommodations for religion or sex discrimination. M.C.L. § 750.146, 750.147.

227.    The penal code applies to all "places of public accommodation," but does not specifically define what public accommodations are.

228.    The penal code prohibits the refusal of accommodations and services. It also includes a publication ban restricting communications indicating a refusal of accommodations and services. M.C.L. § 750.147.

229.    The penal code's publication ban makes it illegal for public accommodations to "directly or indirectly publish, circulate, issue, display, post or mail any written or printed communications" indicating a refusal of services in violation of the code. M.C.L. § 750.147.

230.    Each violation of the penal code can potentially result in fines of $100 and/or fifteen days prison time. It also can expose public accommodations to civil liability and to treble damages for each offense. M.C.L. § 750.147.

## VII.   Michigan's legal redefinition of "sex."

231.    In May 2018, the Commission reinterpreted the Act's prohibition on discrimination "because of sex" to include sexual orientation and gender identity in Michigan Civil Rights Commission, Interpretative Statement 2018–1 (2018), https://bit.ly/3yGdHdM.

232.    The Commission investigated two businesses for alleged discrimination based on sexual orientation and gender identity in 2019. *See* Complaint, *Rouch World, LLC v. Mich. Dep't of C.R.*, No. 20–000145–MZ (Mich. Ct. Cl. July 28, 2020).

233.    The businesses under investigation challenged the Interpretive Statement's conclusion that "sex" includes sexual orientation or gender identity by filing a complaint for declaratory judgment and injunctive relief in August 2020. *Id.*

234.    In December 2020, a Michigan Court of Claims held that "sex" includes gender identity, but not sexual orientation. The court invalidated the Interpretative Statement's conclusion that sex includes sexual orientation. *See Rouch World, LLC v. Mich. Dep't of C.R.*, No. 20–000145–MZ (Mich. Ct. Cl. Dec. 7, 2020).

235.    The Department appealed the Michigan Court of Claims' decision on sexual orientation discrimination directly to the Michigan Supreme Court, which decided *Rouch World, LLC v. Department of Civil Rights* on July 28, 2022. *See* No. 162482, 2022 WL 3007805.

236.    The Michigan Supreme Court held that "discrimination on the basis of sexual orientation necessarily involves discrimination because of sex in violation of [Michigan civil rights law]." *Id.* at *11.

237.    A dissenting justice in *Rouch World* specifically noted that Michigan's civil-rights law does not contain any exemptions for religious organizations. *Id.* at *43 (Viviano, J., dissenting). The dissenting justice criticized the majority for its lack of "any concern for whether that interpretation violates constitutional protections of religious liberty." *Id.*

238.    After the Court of Claims' and Michigan Supreme Court's decisions, "sex discrimination" in Michigan law now includes sexual orientation and gender identity.

## VIII.  Sacred Heart cannot legally operate according to its religious beliefs under Michigan's re-understood Act and penal code.

239.   Michigan's Act and penal code impose significant burdens on Sacred Heart and pressure it to change how it operates its school, how it manages employment decisions, and how it communicates its Catholic faith.

240.   Michigan's laws do not contain an exemption for religious entities like Sacred Heart with respect to the prohibitions on discrimination based on sex, sexual orientation, gender identity, or marital status.

241.   Sacred Heart would have to abandon its commitment to the Catholic Church's faith and doctrine in order to operate the school consistent with the Act and penal code.

242.   If Sacred Heart must choose between operating consistent with Catholic teaching and closing the school, Sacred Heart will close the school.

243.   Sacred Heart's policies and practices violate Defendants' recent interpretation of the Act and penal code.

244.   Sacred Heart has had students who experienced gender discordance or same-sex attraction and currently has at least one student who experiences gender discordance. Sacred Heart always ministers to all students with sensitivity, compassion, and charity. Due to its commitment to student flourishing, personal fulfillment, and spiritual growth, Sacred Heart will not adopt policies, permit behavior, or communicate messages that are inconsistent with the Catholic faith and its doctrine.

245.   In employment, education, or in any services provided to the public, Sacred Heart will not affirm gender identities, use pronouns, or allow any person to use restrooms or participate in sex-specific activities inconsistent with his or her biological sex. These practices are incompatible with living according to the Catholic faith and its doctrine.

246.    The Act's specific education, employment, and public accommodations provisions make it illegal for Sacred Heart to operate its school consistent with the Catholic faith and its doctrine.

## IX.   The Act's education provisions threaten Sacred Heart's religious exercise.

247.    Sacred Heart Academy is an apostolate of Sacred Heart of Jesus Parish, and it fulfills the parish's evangelical mission to foster and transmit the Catholic faith and its doctrine and to cultivate Catholic culture.

248.    Sacred Heart understands itself as an extension of its families' homes, and therefore it is necessary that the school community reflect the Catholic values that families desire to live out.

249.    In order to form an intentional Catholic community, Sacred Heart only admits students from practicing Catholic families or those from families who, though not Catholic, desire Sacred Heart's classical Catholic formation for their children.

250.    To maintain an intentional Catholic community, all families interview with Sacred Heart's headmaster before their students are admitted. Sacred Heart Academy generally admits students from practicing Catholic families after receiving a reference from the family's Catholic parish. For families who are not practicing Catholics, Sacred Heart admits students only after an interview with Sacred Heart's pastor, who confirms the family's desire for a Catholic education and formation for their child.

251.    Each year, parents and students are required to sign an agreement indicating that they will follow Sacred Heart's policies that require students to live virtuously according to Catholic doctrine. Ex. 2, Student Agreement.

252.    Under the re-understood Act's education provisions, schools cannot discriminate in student admission, retention, or discipline on the basis of sex, sexual orientation, or gender identity. M.C.L. §§ 37.2402(b).

253.    The re-understood Act makes it illegal for Sacred Heart to limit enrollment to build an intentional Catholic community.

254.    Sacred Heart's student admissions, retention, and discipline policies and practices violate the re-understood Act.

255.    Sacred Heart does not admit or retain students who do not want to live in an intentional Catholic Christian community or those who will not cooperate with Sacred Heart's Catholic formation program.

256.    Sacred Heart admits and retains students who experience same sex attraction, gender confusion, or gender dysphoria, provided those students and their families sincerely desire a Catholic formation and education. Sacred Heart helps all students to find their identities as beloved sons and daughters of God.

257.    However, Sacred Heart cannot admit or retain students who adopt sexual identities that conflict with the Catholic faith and its doctrine.

258.    Sacred Heart's student discipline policies are rooted in the Catechism of the Catholic Church, which teaches the Church's faith and doctrine. Sacred Heart does not allow behavior inconsistent with the Catholic faith and its doctrine. Sacred Heart seeks to correct student misbehavior to bring students fully back into its Christian community, and its policies cultivate students' virtue.

259.    Sacred Heart does not allow students who willfully refuse to conform their behavior to or who persistently reject the Catholic faith and its doctrine to continue at the school.

260.    Sacred Heart would not allow students whose behavior obstinately and publicly rejects the Catholic faith and its doctrine to remain in the school because it would undermine Sacred Heart's intentional Catholic community and mission and

harm the other students' formation. This includes students who reject the Catholic faith and its doctrine and adopt sexual identities inconsistent with Catholic teaching.

261. Because the legal interpretation of the Act's prohibition on sex discrimination has been judicially changed to include sexual orientation and gender identity, Sacred Heart wants to communicate its commitment to operating consistent with the Catholic faith and its doctrine, including on marriage and human sexuality, to its families and the public, but the publication ban makes it illegal for Sacred Heart to do so. A copy of Sacred Heart's desired communication is attached as Ex. 7, Statement on Catholic Doctrine.

262. The Act's education provisions make it impossible for Sacred Heart to use its admissions, retention, and student discipline policies to form an intentional Catholic community among its student population.

## X. The Act's employment provisions threaten Sacred Heart's religious exercise.

263. As an apostolate of the parish, Sacred Heart Academy exists to help parents form their children in the Catholic faith. It is therefore essential that all people who work at Sacred Heart Academy support, live, and model the Catholic faith to the school's students and to each other.

264. Students are more likely to grow in the faith and retain it if they have been formed in a community where members support, live, and model the Church's faith and doctrine.

265. Sacred Heart only recruits, hires, and retains employees who will be invaluable members and leaders of its intentional Christian community and who support, live, and model the Catholic faith and its doctrine.

266.   But the Act's employment provisions make it illegal for Sacred Heart to build an intentional Catholic community by ensuring that its employees support, live out, and model the faith.

267.   The Act prohibits Sacred Heart from limiting, segregating, or classifying employees or applicants in a way that adversely affects their employment or application status "because of" religion, sex, sexual orientation, marital status, or gender identity. M.C.L. § 37.2202(1)(b).

268.   Sacred Heart cannot, therefore, ensure that prospective employees support, model, and can effectively communicate the Church's faith and doctrine. Nor can it exclusively recruit and hire candidates who commit to Catholic faith and doctrine or decline to recruit and hire prospective employees who are unable or refuse to do so.

269.   The Act's employment provisions also prohibit Sacred Heart from maintaining policies or practices of only recruiting and hiring candidates who support, live, and model Church teaching and declining to hire those who cannot or will not.

270.   The Act's employment provisions make it illegal for Sacred Heart to impose employment-related qualifications and responsibilities on any position and to treat candidates who do not support the Catholic faith and its doctrine differently from those who do—for example, by screening applications on that basis.

271.   The Act also prevents Sacred Heart from ensuring its current employees live consistently with the Church's faith and doctrine and asking them to recommit each year to living the Catholic faith.

272.   The Act prohibits Sacred Heart from taking adverse employment actions against any employee who violates the employment memorandum of understanding.

36

273.   The Act's publication bans prohibit employers from posting or publishing a statement related to employment "which indicates a preference, limitation, specification, or discrimination, based on religion," "sex," "marital status," sexual orientation, or gender identity. M.C.L. § 37.2206(1).

274.   The publication ban prohibits employers from making or using a written or oral inquiry or application "that elicits or attempts to elicit information" concerning a prospective employee's religion or that "expresses a preference, limitation, specification, or discrimination based on religion," "sex," "marital status," sexual orientation," or gender identity, or that keeps records of that information. M.C.L. § 37.2206(2).

275.   The publication ban makes it illegal for Sacred Heart to ask candidates about their commitment to supporting, living, modeling, and sharing the Catholic faith and its doctrine. It means that Sacred Heart cannot ask prospective employees whether they identify as a Catholic, the name of their Catholic parish, or their frequency of Mass attendance.

276.   The publication ban prohibits Sacred Heart from posting employment opportunities on its website or other job-hunting sites which indicate a desire to recruit and hire employees who share Sacred Heart's Catholic faith.

277.   Sacred Heart is currently hiring employees and will hire more employees in the spring. Sacred Heart wants to communicate to applicants its commitment to Catholic faith, doctrine, and morals, including on marriage and human sexuality, but the Act prohibits Sacred Heart from publishing its statement. Ex. 7, Statement on Catholic Doctrine.

278.   For example, Sacred Heart is now in the process of hiring an art teacher. Advertising the position and its requisite Catholic values violates the Act, as re-interpreted. Sacred Heart has therefore refrained from posting the position and its Catholic beliefs.

279. Sacred Heart will also be hiring an athletic coach for the spring and advertising the position and its requisite Catholic values violates the Act, as re-interpreted. Sacred Heart has therefore refrained from posting the position and its Catholic beliefs.

280. Sacred Heart's description for the positions they wish to advertise but legally cannot is attached as Ex. 9, Current Job Postings.

281. Sacred Heart will also hire new teachers for the next school year this spring and wants to communicate its commitment to the Catholic faith and its doctrine, including on marriage and human sexuality, to applicants. Ex. 7, Statement on Catholic Doctrine. Sacred Heart cannot both do that and comply with the Act and penal code.

282. Sacred Heart annually requires all employees to sign a memorandum of understanding that explains the Church's doctrine on, among other things, marriage and human sexuality. The memorandum of understanding explains that all sexual activity outside of a marriage between one man and one woman and transgender identification are contrary to the Catholic faith and its doctrine. Ex. 3, Faculty Memo and Oath, at 2.

283. Sacred Heart also annually requires all employees to publicly swear an oath of fidelity to Catholic doctrine, including on marriage and sexuality. Ex. 3, Faculty Memo and Oath, at 4–5.

284. The publication ban makes it illegal for Sacred Heart to require employees to sign its memorandum of understanding and to swear the oath of fidelity which ensures that employees support, live, and model the Catholic faith and its doctrine.

285. By restricting Sacred Heart's ability to manage its employment relationships according to the Catholic faith and its doctrine as described above, the Act's employment provisions and accompanying publication ban interfere with the

school's ability to promote and model the faith to students, families, and the community.

286.   The Act and penal code also undermine Sacred Heart's religious purpose because they interfere with the school's ability to form and maintain an intentional Catholic community of persons who seek to bring the living Christ into the world by supporting and loving each other consistent with the Church's faith and doctrine.

287.   The Act's employment provisions restrict Sacred Heart's ability to operate consistent with Church doctrine, but they make several exemptions from their provisions for other employers. For example, they contain exemptions related to employees or prospective employees with disabilities, certain instances in which age discrimination is permitted, and complete exemptions when the employer and employee are family. *See, e.g.*, M.C.L. §§ 37.1202, 37.1206, 37.2202(2)–(3), 37.2211.

288.   Instead of allowing the Sacred Heart to hire ministers and coreligionists to run its religious school, the Act forces Sacred Heart to seek permission from government officials to operate consistent with the Catholic faith and its doctrine through the BFOQ process for every single employee. *See* Ex. 8, BFOQ Form.

289.   Government officials who do not share or are hostile to the Catholic faith and its doctrine are unlikely to grant Sacred Heart a BFOQ exemption for every position in its school.

290.   Regardless, the BFOQ process violates Plaintiffs' rights and harms them because:

a.   participating in it would validate the incorrect idea that churches must seek government approval to hire employees consistent with their faith and doctrine;

b.      participating in the BFOQ process invades Sacred Heart's autonomy and conflicts with the First Amendment's ministerial and co-religionist exceptions;

c.      seeking a BFOQ exception would alert hostile state officials to the fact that Sacred Heart's operations conflict with Michigan's re-understood laws;

d.      if Sacred Heart applied for exceptions for each of its employees, the Commission may direct the Department to investigate any matter relevant to the application, including by demanding that Sacred Heart produce records, documents, data, or other information, MDCR Rule 37.25(2); and

e.      applying for exceptions for every Sacred Heart employee would substantially burden Sacred Heart because it would have to hire legal counsel to seek an exception every time it has an open position (which is frequently).

291.    The Act also allows the Department to make individualized exemptions, which in the context of Sacred Heart and other religious schools would result in government officials becoming entangled with religious institutions' hiring practices. M.C.L. § 37.2208; *see also Fulton v. City of Philadelphia*, 141 S. Ct. 1868, 1879 (2021).

292.    Teachers who are not Catholic and/or who do not wish to embrace the Catholic faith and its doctrine may teach in any number of public or secular private schools that reflect those teachers' values.

293.    The BFOQ process also puts Sacred Heart at a competitive disadvantage. The Grand Rapids area has a number of employment alternatives for teachers and other staff to work in the educational industry. *See* https://grps.tedk12.com/hire/index.aspx#aJobListings.

40

**XI.    The Act's and penal code's public accommodations provisions threaten Sacred Heart's ability to operate according to its religious beliefs.**

294.    The Act broadly defines public accommodations as an "educational. . . facility[] or any institution of any kind, whether licensed or not, whose goods, services, facilities, privileges, or accommodations are extended, offered, sold, or otherwise made available to the public." M.C.L. § 37.2301(a).

295.    The Act also defines public service to include "a tax exempt private agency established to provide service to the public." M.C.L. § 37.2301(b).

296.    According to Michigan, Sacred Heart fits within the Act's definition of a place of public accommodation and a public-service provider.[4]

297.    The Act's public accommodations provisions prohibit discrimination in places of public accommodation and, like the employment provisions, they include a publication ban.

298.    The public accommodations provisions prohibit entities from denying an individual "the full and equal enjoyment of the goods, services, facilities, privileges, advantages, or accommodations . . . because of religion," "sex," "marital status," sexual orientation, or gender identity. M.C.L. § 37.2302(a).

299.    The provisions prohibit "outright denial of access to" a public accommodation's goods, premises, or facilities as well as denial of "*equal* enjoyment of th[ose] goods, services, [or] facilities." *Clarke v. K Mart Corp.*, 495 N.W.2d 820, 822 (Mich. App. 1992).

---

[4] Sacred Heart welcomes any student whose family desires that their child receive a Catholic education provided in an authentic Christian environment that strives to operate consistent with the Catholic Church's faith and doctrine. Sacred Heart believes that, although it invites all persons to participate in the Christian life of its school, it is not a public accommodation because of its selective enrollment policies, which ensure commitment to the Church's teachings and religious beliefs. *See Varlesi v. Wayne State Univ.*, 909 F. Supp. 2d 827, 847 (E.D. Mich. 2012)

300.    Public accommodations are also prohibited from maintaining policies that make distinctions because of a protected characteristic. *Whitman v. Mercy-Mem'l Hosp.*, 339 N.W.2d 730, 732 (Mich. App. 1983).

301.    The public accommodations provisions force Sacred Heart to violate Catholic doctrine on the human person and human sexuality. Sacred Heart refers to students and staff by their pronouns when they are consistent with biology. But the public accommodations provisions require Sacred Heart use preferred pronouns for those who identify as a gender inconsistent with their biological sex.

302.    The public accommodations provision also forces Sacred Heart to provide educational services to gender-confused children in a manner that violates the Catholic faith and its doctrine.

303.    For example, Sacred Heart makes distinctions based on students' biological sex and accordingly provides them separate access to sports teams, restroom facilities, and even student "households" or "houses."

304.    The Act's public accommodations provisions require Sacred Heart to allow student access to these facilities and activities based on the student's perceived gender identity, even if that differs from the student's biological sex. But Sacred Heart cannot allow such access without violating the Catholic faith and its doctrine on human sexuality.

305.    Sacred Heart makes sex-based distinctions due to the Catholic Church's doctrine on the complementarity of the sexes, authentic Christian masculinity and femininity, and each person's identity in Christ as a beloved son or daughter of God. However, under the Act's public accommodations provisions, Sacred Heart violates the law by not facilitating student or parent requests that children be treated inconsistent with their biological sex.

306.    The public accommodations provisions also apply to Sacred Heart's employment decisions. *See Haynes v. Neshewat*, 729 N.W.2d 488, 490 (Mich. 2007)

(once an entity is a public accommodation, it "prohibits unlawful discrimination against any individual, not just members of the public").

307.   The public accommodations provisions therefore require Sacred Heart to approve employee requests for special treatment that is inconsistent with the Catholic faith and its doctrine, like use of preferred pronouns, restroom facilities, and other issues.

308.   Likewise, the publication bans prohibit Sacred Heart from explaining the Catholic doctrine and its policies on religion and on human sexuality. That's because the Act and the penal code prohibit publishing or printing messages that indicate that its services might be denied to individuals due to protected status, *see* M.C.L. § 37.2302(b), or that individuals may not be welcome to the public accommodations' services due to protected status, *see* M.C.L. § 750.147.

309.   Practically, the publication bans prohibit Sacred Heart from sharing Church doctrine in its school handbooks, on its website, in its memorandum of understanding, or elsewhere. *See* Exs. 1, Student Handbook, 3, Faculty Memo and Oath, 7, Statement on Catholic Doctrine, 9, Current Job Postings, 11 Faculty Handbook. It prohibits Sacred Heart from teaching Catholic beliefs directly to current or prospective students or to members of the public.

310.   Sacred Heart wants to communicate its commitment to operating consistent with Church teaching in all areas, including human sexuality and marriage, but it cannot do so without violating the Act and penal code and their publication bans.

311.   Sacred Heart's Pastor wishes to issue a statement on the Church's doctrine on marriage and human sexuality and how it relates to sexual orientation and gender identity issues and Michigan law.

312.   Sacred Heart wishes to publish this statement but cannot do so under the Act and the penal code.

313. A copy of the pastor's statement is attached as Ex. 7, Statement on Catholic Doctrine.

314. The Act and penal code's publication bans are vague, overbroad, and discretionary. The publication bans leave Sacred Heart guessing on what speech is permissible or illicit under the act, make more speech illicit than necessary to achieve Michigan's anti-discrimination goals, and provide Defendants too much discretion in determining which speech they will deem illicit.

315. Those seeking educational choices that provide alternative viewpoints on marriage and human sexuality have many options.

316. Grand Rapids, Michigan, has a large number of schools (from pre-kindergarten to twelfth grade) in the area, including over 40 public schools. *See About Us*, Grand Rapids Public Schools, https://grps.org/our-district/about-us/ (last visited Dec. 16, 2022).

## XII. Defendants aggressively enforce the Act and penal code against alleged discrimination.

317. The Commission and the Department investigate, enforce, and prosecute alleged violations of the Act.

318. The Department receives complaints alleging violations of the Act from "[a]ny person claiming to be aggrieved by unlawful discrimination." MDCR Rule 37.4(1).

319. "Person" includes individuals, associations, advocacy organizations, legal or commercial entities, and Michigan, its subdivisions, and its agencies. MDCR Rule 37.2(m).

320. The Department may initiate complaints on its own authority. M.C.L. § 37.2602(c).

321. The Commission, the Director, or any of their agents may initiate and file a complaint with the Department on their own authority. MDCR Rule 37.4(2).

322.   The Department and the Commission also have the authority to use "testers" to investigate suspected violations of Michigan's civil-rights law and have in fact used testing evidence to bring enforcement action under some provisions of Michigan's civil-rights law.[5]

323.   Even where a particular complainant lacks a basis for challenging, the Department and Commission may pursue cases alleging discrimination based on a policy or a "pattern or practice of discrimination." M.C.L. § 37.2605(1).

324.   After the Department receives a complaint against an entity that allegedly discriminated, the Department investigates the complaint. M.C.L. § 37.2602(c).

325.   This investigatory process imposes significant burdens on those accused of discrimination and it occurs in an adversarial process where the Department prosecutes the charge. MDCR Rule 37.12(6).

326.   If the Commission finds that unlawful discrimination occurred, it can award significant remedies including damages for mental distress, humiliation, embarrassment, outrage, disappointment, and other forms of mental anguish that result from discrimination based on the complaint's testimony alone.

327.   The Commission has significant discretion in awarding non-economic damages and has awarded significant non-economic damages in the past.

328.   The Commission has significant discretion in awarding attorney fees and costs and does award significant attorney fees and costs.

329.   The Department and the Commission actively receive and prosecute complaints and charges for alleged violations of the Act.

---

[5] Mich. C.R. Comm'n, 2020 2021 Biannual Report, https://bit.ly/3tkuWiw.

330.    According to the Department's most recent legislative report, in Fiscal Year 2021, the Department received 1,033 complaints of discrimination in employment, public accommodations, and education.[6]

331.    Between fiscal years 2011 and 2021, the Department and the Commission received, investigated, and processed more than 7,000 complaints against employers and more than 2,000 complaints against public accommodations.

332.    Between fiscal years 2011 and 2021, the Department and the Commission also received, investigated, and processed more than 5,000 complaints alleging sex discrimination and more than 700 complaints alleging religious discrimination.

333.    Between May 2018 and December 2019, the Department and the Commission received, investigated, and processed 73 complaints alleging sexual orientation and gender-identity discrimination.

334.    The Department and the Commission did so even though a binding court opinion held that Michigan's civil-rights law did not prohibit sexual orientation discrimination.

335.    For the fiscal year ending in 2023, the Department and the Commission have a $7 million budget to investigate and prosecute complaints. Executive Budget Bill FY 2023–2024 at 36 (2022), https://bit.ly/3AVzJMe.

336.    The Act also permits any person alleging a violation of the law to file a civil action for injunctive relief, damages, and attorney fees and costs in an appropriate circuit court. M.C.L. § 37.2801(1)–(2).

## XIII.  Defendants' hostile actions further demonstrate a likelihood of enforcement

337.    Michigan's Attorney General, Defendant Nessel, has taken the position that laws that prohibit discrimination "because of sex" likewise prohibit

---

[6] The report is available at https://bit.ly/3FZHtj3.

discrimination based on sexual orientation and gender identity. *See* Br. for Ill. et al. as Amici Curiae in Support of Employees 3–4, *Bostock v. Clayton County*, 2019 WL 2915040 (Nos. 17-1618, 17-1623, 18-107) (July 3, 2019).

338. Defendant Nessel believes that failing to use preferred pronouns is an act of gender-identity discrimination, as the policy for her office requires employees to use preferred pronouns and contains no religious accommodations or exceptions.[7]

339. Sacred Heart also fears aggressive government enforcement because Defendant Nessel has made public comments hostile to the Catholic faith and because the school's faith-based approach to education makes it a target for those who disagree with its religious worldview.

340. Defendant Nessel has already been faulted by this Court for acting without neutrality toward religious actors in another case. *See Buck v. Gordon*, 429 F.Supp. 3d 447, 462–63 (W.D. Mich 2019).

341. Defendant Nessel campaigned on the principle that the Catholic Church's beliefs and practices about marriage constitute "hate," and that a Michigan law protecting the religious liberty rights of adoption and foster agencies is "discriminatory animus." *Id*. at 462.

342. After taking office, Defendant Nessel settled a case for the purpose of nullifying that duly enacted law while supporting termination of Catholic adoption and foster agencies in a manner that the district court found to be a "pretext for religious targeting." *Id*. at 463.

343. Defendant Nessel has referred to Catholic adoption agencies as "hate mongers," smeared Catholics with a snide remark about "their rosary," and maligned a respected former Michigan Court of Appeals Judge simply because he is

---

[7] Mich. Dep't of Att'y Gen., Transgender Policy (June 8, 2021), http://bit.ly/3Q7SWiT.

Catholic. Ingrid Jacques, *Nessel Wages Crusade Against Catholics*, The Detroit News (April 15, 2019), https://perma.cc/U6QF-CPBJ.

344. Defendants Nessel and the Department "filed a bypass application in the Michigan Supreme Court, seeking a prompt review of [*Rouch World*]." Press Release, AG Nessel, *Department of Civ. Rights File to Protect Citizens from Sexual Orientation Discrimination Before Michigan Supreme Court* (Oct. 25, 2021).

345. After the *Rouch World* decision, Nessel stated that "[n]ow is the time . . . to ensure no person in this state ever experiences barriers to employment, housing, education, or public accommodations and services because of who they are or whom they love." Press Release, *AG Nessel Prevails in ELCRA Case* (July 28, 2022).

346. Because of Defendants' history of public hostility to the Catholic faith, its beliefs about marriage and human sexuality, and toward Catholic institutions, Plaintiffs face enforcement of the Act and penal code.

347. Another Christian entity recently filed suit against Defendants, alleging that the re-understood Act and penal code violate its First and Fourteenth Amendment rights. Defendants did not deny that the Act and penal code apply to religious institutions and did not disclaim enforcing the Act and penal code against religious institutions going forward.

348. Some recent polling suggests that nearly 40% of children in "gen Z" (i.e. the generation of students at Sacred Heart) and 30% of Christian students now identify as LGBTQ. *See* Paul Bond, *Nearly 40 Percent of U.S. Gen Zs, 30 Percent of Young Christians Identify as LGBTQ, Poll Shows*, Newsweek (October 20, 2021) https://www.newsweek.com/nearly-40-percent-us-gen-zs-30-percent-christians-identify-lgbtq-poll-shows-1641085.

349. Sacred Heart has had and does have students who experience same sex attraction, gender discordance, or gender dysphoria. Sacred Heart has always

treated these students in accordance with its Catholic beliefs and has declined to affirm any identity inconsistent with Catholic doctrine. With nearly 400 students and dozens of staff members, Sacred Heart, like all schools, faces the likelihood of receiving a student or staff member's request for special treatment that violates the Catholic faith and its doctrine. To operate consistent with its faith and doctrine, Sacred Heart would have to refuse such a request and risk complaints and a subsequent investigation by Defendants. For example, a student experiencing gender discordance recently left Sacred Heart because that student no longer wished to abide by the school's Catholic requirements and formation.

350.    Defendants' broad prosecutorial authority means Sacred Heart faces a credible threat and substantial risk of investigation and enforcement if it applies for BFOQ exemptions for every one of its employees.

351.    Sacred Heart requires every single employee to sign the memorandum of understanding and swear the oath of fidelity, which require every employee to live out the Catholic faith in every aspect of life. So that means Sacred Heart would have to apply for a BFOQ exemption for every current employee and every single time it wanted to hire any employee.

352.    Sacred Heart has refrained from going through the BFOQ exception process due to fear of Defendants' prosecution, because the process is burdensome on Sacred Heart and an invasion of its autonomy, because the requirement to apply for government permission to hire ministers and coreligionists violates Sacred Heart's rights, and because the creation of a formal mechanism for granting exceptions renders this policy and process not generally applicable.

353.    The Act's BFOQ process does not provide Sacred Heart with sufficient protection against allegations of employment discrimination because (a) any complaint of a violation of the Act by an employee or applicant would terminate any request that Sacred Heart made for a BFOQ exemption. MDCR Rule 37.25(2); (b)

the commission may revoke any BFOQ exemption. MDCR Rule 37.25(3); (c) BFOQ exemptions are interpreted narrowly; and (d) going through the BFOQ process exposes Sacred Heart to liability because Michigan can initiate complaints against BFOQ applicants. MCL § 37.2602(c); MDCR Rule 37.4.

354.    Plaintiffs are not aware of any jurisdiction granting a BFOQ exception based on religious beliefs about sexual orientation, marital status, or gender identity. And Michigan has no record of any BFOQ applications or granted exemptions. *See* Ex. 12, BFOQ FOIA.

355.    The very fact that Title VII contains a specific co-religionist exception in addition to the BFOQ exception indicates that the BFOQ exception is not sufficient to allow Sacred Heart to hire people who share its faith.

356.    Sacred Heart's operations violate the Act and penal code in Michigan's view. Based on the investigative and prosecutorial authority granted to Defendants along with their prior actions, Sacred Heart faces imminent investigation, enforcement, and punishment by Defendants.

## Legal Allegations

357.    Sacred Heart is subject to and must comply with Act and the penal code.

358.    The Act's education, employment, and public accommodations provisions and its publication bans violate Plaintiffs' constitutional rights, and chill and deter Sacred Heart from exercising its constitutional rights.

359.    The penal code's employment and public accommodations provisions and its publication ban violate Plaintiffs' constitutional rights, and chill and deter Sacred Heart from exercising its constitutional rights.

360.    As a direct and proximate result of Defendants' violations of Plaintiffs' constitutional rights, Plaintiffs have suffered and will suffer ongoing irreparable harm, entitling them to declaratory and injunctive relief.

361.    Plaintiffs do not have an adequate monetary or legal remedy for the loss of its constitutional rights.

362.    Unless Defendants are enjoined, Plaintiffs will continue to suffer irreparable harm.

**First Cause of Action**
**Violation of the First Amendment's Free Exercise and Establishment Clauses: Religious Autonomy, Ministerial Exception, Co-Religionists, and Compelled Participation**

363.    Sacred Heart repeats and realleges all preceding allegations.

364.    Sacred Heart exercises its religion by living as an intentional Christian community where each employee is an authority figure responsible for modeling and teaching the Catholic faith and its doctrine to students and each other. Every Sacred Heart employee is responsible for modeling the Catholic faith to students and they serve as "catechists," *i.e.* ministers certified to teach the Catholic faith and its doctrine to Sacred Heart's students.

365.    The First Amendment's Free Exercise and Establishment Clauses protect Sacred Heart's right to 1) form an intentional Catholic community, 2) select its leaders and ministers, 3) decide for itself matters of faith and doctrine, 4) manage its internal affairs related to employment and the services it provides, 5) to decide how to effectively communicate its religious beliefs, 6) operate itself as a Catholic apostolate, 7) associate with and employ employees and staff in accordance with Catholic teaching, and 8) be free from participating in activities and procedures that violate its religious beliefs.

366.    The First Amendment's religion clauses protect churches' autonomy by restricting the state's power to regulate matters of faith, doctrine, and church government; this is known as the "Church Autonomy Doctrine."

367.    The application of the challenged Act and penal code provisions burden Sacred Heart's religious exercise and violate Sacred Heart's religious autonomy rights by forcing it to govern its school in manner inconsistent with the Catholic faith and its doctrine.

368.    Application of the Act violates Sacred Heart's Free Exercise rights specifically by:

a.    Prohibiting Sacred Heart from or penalizing it for favoring Catholic job and student applicants over those who do not share or support the community's faith.

b.    Forcing Sacred Heart to employ those who do not or cannot support, model, and communicate the Catholic faith and its doctrine, including in key leadership positions.

c.    Forcing Sacred Heart to abandon or penalizing it for maintaining employee conduct requirements consistent with the Catholic faith and its doctrine.

d.    Preventing Sacred Heart from only hiring or admitting co-religionists.

e.    Forcing Sacred Heart to admit and retain students who do not support or desire to be formed according to its Catholic faith and doctrine.

f.    Forcing Sacred Heart to admit and retain students whose conduct is inconsistent with the Catholic faith and its doctrine.

g.    Forcing Sacred Heart to abandon student conduct standards based on Catholic doctrine on the nature of the human person, human sexuality, and marriage.

h.      Forcing Sacred Heart to honor student or staff requests for special treatment based on transgender or other sexual ideologies that are inconsistent with the Catholic faith and its doctrine.

i.      Forcing Sacred Heart to refrain from teaching Catholic doctrine on the nature of the human person, human sexuality, and marriage.

j.      Prohibiting Sacred Heart from making sex-based distinctions in its operations based on Catholic doctrine on the nature of the human person, human sexuality, and marriage.

k.      Prohibiting Sacred Heart from or penalizing it for communicating Catholic doctrine on the nature of the human person, human sexuality, and marriage in the classroom, or to employees, applicants, families, and the public.

l.      Prohibiting Sacred Heart from or penalizing it for requiring all employees to sign a "memorandum of understanding" where they affirm their commitment to live and model—and their responsibility to teach—the Catholic faith and its doctrine, including on marriage and human sexuality.

m.      Prohibiting Sacred Heart from or penalizing it for requiring all employees to swear an "oath of fidelity" to the Catholic Church, its teachings and doctrine.

n.      Requiring Sacred Heart to ask state officials for "bona fide occupational qualification" exemptions for all current employees and when hiring employees in the future, when the state has no authority to regulate its hiring, discipline, and retention of ministers and co-religionists.

369.    Sacred Heart is a Catholic Christian school that exists to bring the living Christ into the world through intentional community, to model the Catholic life, and to support parents in the religious formation and education of their children.

370.   The First Amendment's religion clauses protect churches' autonomy by allowing them sole authority to choose individuals who play important ministerial roles. This is known as the "Ministerial Exception," and it limits the state's regulatory power.

371.   As applied to Sacred Heart, the Act's employment and public accommodations provisions violate the Ministerial Exception because they prohibit Sacred Heart from employing or retaining only those individuals who support, model, and can communicate the Catholic faith and its doctrine to students.

372.   The Act violates the First Amendment by requiring Sacred Heart to ask state officials for "bona fide occupational qualification" exemptions for all current employees and when hiring future employees, when the state has no authority to regulate Sacred Heart's hiring, discipline, and retention of ministers and co-religionists.

373.   Indeed, Sacred Heart has a constitutional right to employ only coreligionists—individuals who all share the same understanding of and commitment to the Catholic faith.

374.   Defendants have no compelling interest in enforcing the challenged Act and penal code provisions against Sacred Heart and its intentionally Catholic Christian community.

375.   Defendants are not pursuing any legitimate government interests in the means least restrictive to Sacred Heart's religious exercise.

376.   As applied to Sacred Heart, the challenged Act and penal code provisions violate the Free Exercise Clause because they put Sacred Heart to a choice between operating its school consistent with the Catholic faith and its doctrine or closing its school to comply with the law.

377.   Without relief from the Act and penal code's enforcement, Sacred Heart will have to cease providing education services as an exercise of its faith.

378.   Defendants do not serve any compelling or even valid interest in a narrowly tailored way by infringing Plaintiffs' rights to freely exercise Plaintiff's religion.

379.   Accordingly, as applied to Sacred Heart, the challenged Act and penal code provisions violates the First Amendment's protections to freely exercise religion.

### Second Cause of Action
### Violation of the First Amendment's Free Exercise Clause: Lack of General Applicability, Individualized Exemptions, Hostility, and Compelled Participation

380.   Plaintiffs repeat and reallege all preceding allegations up to and including Paragraph 362.

381.   The First Amendment's Free Exercise Clause protects Plaintiffs' rights to be free from having special disabilities imposed on the basis of stating disfavored religious views, being subject to individualized assessments, being subject to laws that lack neutrality and general application, being targeted for their religious beliefs, and being punished for exercising their religious beliefs.

382.   Sacred Heart exercises its religion by forming students as Catholics and by cultivating Catholic culture to serve as a witness of and to make present the living Christ to the Grand Rapids community.

383.   Sacred Heart exercises its religion by operating its school and adopting policies consistent with the Catholic faith and its doctrine in all aspects.

384.   Sacred Heart exercises its religion by making sex-based distinctions between male and female students that reflect and model Catholic doctrine on human sexuality. These distinctions include, among other things, separating students by sex for community and fellowship purposes, separating males and females in competitive athletics to teach students virtues and authentic femininity and masculinity, by having distinct uniforms and restroom facilities for males and

females, and by providing instruction to students on human sexuality, including the distinctness of the sexes and its theological implications.

385.    Sacred Heart exercises its religion by recruiting, hiring, and retaining employees who follow Catholic doctrine in all aspects of their life and by requiring its employees to sign a memorandum of understanding and swear an oath of fidelity each year agreeing to abide by Church doctrine.

386.    Sacred Heart exercises its religion by honestly communicating Catholic doctrine to employees, students, families, and the public.

387.    Without injunctive relief against Defendants, Sacred Heart is refraining from and will have to refrain from engaging in certain religious exercise because of the challenged Act and penal code provisions.

388.    For example, simply maintaining a policy of only hiring employees who believe and model the Catholic faith, and of requiring employees to affirm the memorandum of understanding and swear an oath of fidelity to Catholic doctrine every year, constitutes—in Michigan's view—a pattern or practice of discrimination in violation of the Act.

389.    Likewise, simply making sex-based distinctions, in policy and practice, between male and female students, in line with Catholic doctrine, and only referring to students by sex-based pronouns, constitutes—in Michigan's view—a pattern or practice of discrimination in violation of the Act.

390.    As applied to Sacred Heart, the Act's and penal code's employment, education, and public accommodations provisions, and publication bans substantially burden Sacred Heart's sincerely held religious beliefs by requiring it either to refrain from adopting and maintaining policies and practices consistent with its Catholic beliefs, ignore those beliefs, or close its school.

391.   And Sacred Heart is currently refraining from communicating the Catholic faith and its doctrine because doing so would violate the Act and penal code as they are now understood.

392.   As applied to Sacred Heart, the Act's and penal code's employment, education, and public accommodations provisions, and publication bans substantially burden Sacred Heart's sincerely held religious beliefs by a) stopping it from honestly communicating the Catholic faith and its conduct expectations with prospective employees, families, students, and the public; b) barring it from inquiring or informing prospective employees, students, and families about its religious beliefs, and c) by preventing its religiously motivated speech in teaching the Catholic faith to its students.

393.   The Act's and penal code's employment, education, and public accommodations provisions are not neutral or generally applicable because they contain a system of exceptions, including individualized exemptions that authorize Michigan to make individualized assessments of employment positions and exempt some positions for BFOQs based on Defendants' sole discretion.

394.   The Act gives Defendants discretion to grant exemptions from its requirements and categorically exempts some organizations and individuals from the Act's requirements for secular but not religious reasons.

395.   The Act's and penal code's employment, education, and public accommodations provisions and publication bans do not force nonreligious persons and schools, or persons and schools with favored religious views, to choose between violating their convictions and operating their organizations.

396.   And Defendants have already targeted other Catholic institutions for exercising their religion.

397.   The Act and penal code are not facially or operationally neutral or generally applicable, are hostile towards religion, target and show favoritism

towards certain religious beliefs, and impose special disabilities on Sacred Heart due to its religious beliefs.

398.    The Act, penal code, and Defendants' overt hostility toward the Catholic faith impose severe coercive pressure on Sacred Heart to change or violate its religious beliefs, stop communicating its beliefs, and to stop operating according to the Catholic faith.

399.    Without relief from the Act and penal code's enforcement, Sacred Heart will have to cease providing education services as an exercise of its faith.

400.    As applied to Sacred Heart, the challenged Act and penal code provisions violate the First and Fourteenth Amendments to the United States Constitution by conditioning the privileges or immunities of citizenship on Sacred Heart's abandoning its commitment to Catholic doctrine and religious exercise.

401.    Sacred Heart's right to operate its religious school consistent with the Catholic faith and its doctrine is deeply rooted in this Nation's history and tradition and is implicit in the concept of ordered liberty.

402.    As applied to Sacred Heart, the Act and penal code and their publication bans violate Sacred Heart's hybrid Free Exercise and Free Speech rights by outlawing its religious speech about Catholic doctrine on marriage and human sexuality.

403.    Defendants do not serve any compelling or even valid interest in a narrowly tailored way by infringing the rights to freely exercise Plaintiff's religion.

404.    Accordingly, as applied to Sacred Heart, the Act and penal code violate the First Amendment's protections to freely exercise religion.

**Third Cause of Action**
**Violation of the First Amendment's Free Speech and Assembly Clauses:**
**Freedom of Speech, Expressive Association, and Assembly**

405.    Plaintiffs repeat and reallege all preceding allegations up to and including Paragraph 362.

406.    The First Amendment's Free Speech, and Assembly Clauses protect Sacred Heart's ability to speak; to create, publish, and distribute speech; to associate with others for expressive purposes; to only associate with Sacred Heart's desired messages; and to peaceably assemble to engage in otherwise lawful religious worship, exercise, and speech activities with persons of its choosing.

407.    The First Amendment also protects Plaintiffs' ability not to speak; to exercise control over their speech; to decline to associate with others for expressive purposes; and to decline to assemble with others.

408.    The First Amendment further protects Plaintiffs' right to be free from content, viewpoint, and speaker-based discrimination, overbroad restrictions on speech, and vague laws allowing unbridled discretion by enforcement officials.

409.    The Catholic Church is a community of persons called by God into assembly to make the living Christ present in the world today, and to provide onlookers with a glimpse of a society comprised of persons living as disciples of Jesus Christ. Sacred Heart is a local intentional Catholic community responding to God's call to assemble. Sacred Heart exists to communicate the Gospel message of Christ to its community and does so through its expression and expressive assembly.

410.    Sacred Heart engages in expression, expressive activities, and protected assembly as an organization when its employees and students gather together and pursue the Church's mission through the school's activities, including by expressing and modeling the Catholic faith and its doctrine.

411.    Sacred Heart also engages in expression, expressive activities, and protected assembly as an organization when its employees gather together, provide Catholic education to students, and communicate with the public because Sacred

Heart believes that these activities and this organization are a witness of the Catholic faith and an expression of its cultivation of Catholic culture.

412.   Sacred Heart engages in expression, expressive activities, and protected assembly by gathering to transmit the Catholic faith to students, their families, and the community.

413.   Sacred Heart's classroom instruction, website, handbooks, employment memorandum of understanding, curricula, and other documents communicate with its students, employees, families, and the public about the Catholic faith and its doctrine. These are forms of protected speech and expression.

414.   The Act's publication ban prohibits any public accommodation or public service from publishing a "statement, advertisement, notice, or sign" to the effect that" a person's "patronage of or presence at" the public accommodation or public service is "objectionable, unwelcome, unacceptable, or undesirable" because of the person's religion, sex, marital status, sexual orientation, or gender identity. M.C.L. § 37.2302(b). The penal code similarly prohibits publishing any statement indicating that someone is "not welcome, objectionable, or not acceptable, not desired or solicited" because of religion. M.C.L. § 750.147.

415.   Sacred Heart cannot legally communicate its commitment to the Catholic faith and its doctrine on marriage and human sexuality because that doctrine is incompatible with transgender ideology and other LGBTQ ideologies.

416.   The Act and penal code and their publication bans violate Sacred Heart's free speech rights by making it illegal for Sacred Heart to communicate its Catholic faith and doctrine. Sacred Heart's protected free speech activities currently violate the Act and penal code and their publication bans.

417.   The Catholic faith and its doctrine on marriage and human sexuality is incompatible with same-sex marriage and gender identities differing from biological sex. Therefore, Sacred Heart cannot communicate the Catholic faith or its doctrine

on these subjects without violating the challenged provisions of the Act and penal code, including their publication bans. That includes classroom instruction, statements to its community and the public, and in internal and external documents. *See* Exs. 1, Student Handbook, 3, Faculty Memo and Oath, 7, Statement on Catholic Doctrine, 9, Current Job Postings, 10 Theology of the Body.

418.   Simply maintaining a written policy of only hiring employees who support, follow, and model the Catholic faith and its doctrine and requiring employees to affirm the memorandum of understanding and swear an oath of fidelity each year, constitutes—in Michigan's view—a pattern or practice of discrimination in violation of the Act and penal code.

419.   Simply maintaining a written policy of not granting student or employee requests based on transgender or other sexual ideologies inconsistent with Catholic teaching constitutes—in Michigan's view—a pattern or practice of discrimination in violation of the Act and penal code.

420.   As applied to Sacred Heart, the challenged Act and penal code provisions violate Sacred Heart's Free Speech, assembly, and expressive association rights because they:

a.   prohibit Sacred Heart from engaging in its desired expressive association and assembly;

b.   compel Sacred Heart to engage in expressive associations and assembly it finds objectionable;

c.   compel Sacred Heart to speak messages that violate its Catholic faith by using pronouns that are inconsistent with a person's biological sex;

d.   inhibit Sacred Heart from forming expressive associations and assemblies it desires to form and from avoiding expressive associations and assemblies it wants to avoid;

e.      prohibit Sacred Heart from adopting and maintaining its desired employment policies;

f.      prohibit Sacred Heart from advertising and posting its employment opportunities;

g.      prohibit Sacred Heart from publishing statements on Catholic doctrine on marriage and sexuality (*see* Ex. 7, Statement on Catholic Doctrine);

h.      prohibit Sacred Heart from adopting and maintaining its desired student admission, retention, and discipline policies; and

i.      regulate expression, association, and assembly based on content, viewpoint, and speaker identity.

421.    As applied to Sacred Heart, the public accommodations provision compels speech about marriage and human sexuality that Sacred Heart objects to, forbids it from forming an intentional Catholic community, and prohibits it from adopting policies consistent with the Catholic faith and its doctrine.

422.    The challenged provisions of the Act and penal code regulate speech based on content, viewpoint, and speaker identity by making it illicit to communicate the Catholic faith and its doctrine on marriage and human sexuality but allowing speech on other topics or even opposite viewpoints on marriage and sexuality.

423.    As applied to Sacred Heart, the Act and penal code's publication bans force it to refrain from communicating its continued commitment to operate consistent with the Catholic faith and its doctrine despite Michigan's change in law.

424.    As applied to Sacred Heart, the Act conditions its ability to provide educational services on the requirement that Sacred Heart abandon its religious beliefs when it provides educational services and as it makes employment decisions.

425.    As applied to Sacred Heart, the Act contains content, viewpoint, and speaker-based regulations that ban, chill, and burden Sacred Heart's desired speech

(and publication of that speech) on its website, in its internal and external documents, and directly to prospective and existing employees, students, families, and the public.

426.   As applied to Sacred Heart, the Act and penal code's publication bans are vague, overbroad, and allow Defendants unbridled discretion to evaluate speech and then discriminate based on content and viewpoint in determining whether to apply the Act and penal code.

427.   The Act and penal code's publication bans are also facially unconstitutional because they are vague, overbroad, allow unbridled discretion, and are a content-based and viewpoint-based regulation that bans, chills, and burdens speech and publication of speech.

428.   Sacred Heart cannot not engage in certain protected speech, expressive association, and assembly without violating the Act and penal code.

429.   Sacred Heart is self-chilling its desired speech on Church doctrine about marriage and human sexuality because of the Act and the penal code and their publication bans. *See* Ex. 7, Statement on Catholic Doctrine.

430.   Defendants have no valid interest in silencing Sacred Heart's religious speech about the Catholic faith and its doctrine on marriage and human sexuality.

431.   Defendants do not pursue a valid interest in a narrowly tailored way by infringing on Sacred Heart's free-speech, free-association, and free-assembly rights.

432.   Accordingly, as applied to Sacred Heart, the Act and penal code violate the First Amendment's protections for free speech, free association, and free assembly.

433.   Accordingly, Michigan's publication bans facially violate the First Amendment's protections for free speech.

**Fourth Cause of Action**
**Violation of Parents' Fourteenth Amendment fundamental right to direct their children's education.**

434.   Plaintiffs repeat and reallege all preceding allegations up to an including Paragraph 362.

435.   The Fourteenth Amendment provides that no State shall "deprive any person of life, liberty, or property, without due process of law." U.S. Const. amend. XIV.

436.   The Supreme Court has recognized that the Fourteenth Amendment protects parents' fundamental interest in the "care, custody, and control of their children." *Troxel v. Granville*, 530 U.S. 57, 65 (2000) (plurality op.).

437.   Indeed, this right is "perhaps the oldest of the fundamental liberty interests recognized by [the United States Supreme] Court." *Id*.

438.   In fact, "The history and culture of Western civilization reflect a strong tradition of parental concern for the nurture and upbringing of their children. This primary role of the parents in the upbringing of their children is now established beyond debate as an enduring American tradition." *Wisconsin v. Yoder*, 406 U.S. 205, 232 (1972).

439.   This fundamental right "without doubt" includes parents' right to "establish a home and bring up children" and "to control the education of their own." *Meyer v. Nebraska*, 262 U.S. 390, 399, 401 (1923); *accord Pierce v. Soc'y of Sisters of Holy Names of Jesus & Mary*, 268 U.S. 510, 534–35 (1925).

440.   "And, when the interests of parenthood are combined with a free exercise claim . . . more than merely a reasonable relation to some purpose within the competency of the State is required to sustain the validity of the State's requirement under the First Amendment." *Yoder*, 406 U.S. at 233 (internal quotations and citation omitted).

441.   Parent Plaintiffs have exercised their fundamental right parental rights to direct their children's education by choosing to send their children to Sacred Heart.

442.   Parent Plaintiffs chose to send their children to Sacred Heart so that their children will be educated in the Catholic faith.

443.   Parent Plaintiffs exercised their religious beliefs to raise their children in the faith by sending their children to Sacred Heart.

444.   The Act forbids Sacred Heart from operating in accordance with its Catholic beliefs.

445.   The Act directly and substantially interferes and threatens to interfere with Parent Plaintiffs' fundamental rights.

446.   First, it directly and substantially interferes with Parent Plaintiffs' fundamental parental right and responsibility to control the education of their children.

447.   Parent Plaintiffs specifically opted out of the public school system and have chosen to send their children to a Catholic school that will allow their children to grow academically and spiritually in the Catholic faith. *See* C.C.C. ¶ 2229 ("As those first responsible for the education of their children, parents have the right to *choose a school* for them which corresponds to their own convictions. This right is fundamental.").

448.   Because Michigan's law forbids Sacred Heart from operating consistent with its Catholic beliefs, Parent Plaintiffs have been deprived of their fundamental right to send their children to a Catholic school. *See Pierce*, 268 U.S. at 534–35 (recognizing the right of parents to send their children to Catholic school rather than public school).

449.   Second, the Act directly and substantially interferes with Parent Plaintiffs' fundamental parental right and responsibility to raise their children in their religious faith.

450.   By sending their children to Sacred Heart, Parent Plaintiffs exercised their religious beliefs and religious obligation to raise their children in the Catholic faith. *See* C.C.C. ¶ 2225 ("Through the grace of the sacrament of marriage, parents receive the responsibility and privilege of *evangelizing their children*.").

451.   But because Sacred Heart cannot operate its school in accordance with its Catholic beliefs, Parent Plaintiffs are deprived of their right to raise children in the Catholic faith. *See Yoder*, 406 U.S. at 233 (recognizing the right of parents to raise their children in the faith by controlling their education).

452.   Defendants do not serve any compelling or even valid interest in a narrowly tailored way by infringing on Parent Plaintiffs' fundamental parental rights.

453.   Accordingly, the Act violates Parent Plaintiffs' fundamental parental rights under the Fourteenth Amendment as applied.

454.   The Act has caused, is continuing to cause, and will likely cause irreparable injury to Parent Plaintiffs by depriving them of their fundamental right to direct their children's upbringing and education.

### Fifth Cause of Action
### Violation of Parents' First Amendment right to free exercise of religion.

455.   Plaintiffs repeat and reallege all preceding allegations up to and including Paragraph 362.

456.   The First Amendment's Free Exercise Clause protects Parent Plaintiffs' rights to exercise their Catholic faith.

457.   It also protects Parent Plaintiffs' rights to raise their children in accordance with their Catholic faith. *See, e.g.*, *Espinoza v. Mont. Dep't of Revenue*,

140 S. Ct. 2246, 2261 (2020); *Empl. Div., Dept. of Human Res. of Or. v. Smith*, 494 U.S. 872, 881–82 (1990); *Yoder*, 406 U.S. at 213–14; *Pierce*, 268 U.S. at 534–35.

458.   As explained above, Parent Plaintiffs are practicing Catholics who believe all of the teachings of the Catholic Church and are raising their children in the Catholic faith.

459.   They have exercised their religious faith by opting out of public school and sending their children to Sacred Heart so that their children will receive academic, moral, and spiritual formation in the Catholic faith.

460.   The Act violates Parent Plaintiffs' free exercise rights by depriving their children of an authentic Catholic education at Sacred Heart when it prevents Sacred Heart from operating according to its Catholic beliefs.

461.   The Act also violates Parent Plaintiffs' free exercise rights under the hybrid rights doctrine, because it implicates their free exercise rights in conjunction with their fundamental right to direct the upbringing, education, and care of their children, as alleged in the Fifth Cause of Action. *See Smith*, 494 U.S. at 881–82; *Yoder*, 406 U.S. at 233.

462.   Michigan has no legitimate—much less compelling—governmental interest in usurping Parent Plaintiffs' rights to exercise their Catholic faith by raising their children in the faith.

463.   Nor are Michigan's actions narrowly tailored to serve any compelling governmental interest.

464.   Application of the Act violates Parent Plaintiffs' right to the free exercise of religion. *See* U.S. Const. amend. I.

465.   Application of the Act has caused, is continuing to cause, and will likely cause irreparable injury to Parent Plaintiffs by depriving them of their constitutional right to the free exercise of religion.

**Prayer for Relief**

Plaintiffs respectfully ask this Court to enter judgment against Defendants and provide the following relief:

1.      A preliminary and permanent injunction to stop Defendants and any person acting in concert with them from:

a.      enforcing the Act's and penal code's employment, education, and public accommodations provisions and the publication bans as applied to Sacred Heart's constitutionally protected, religious exercise, religious autonomy, establishment clause, speech, association, and assembly rights; and

b.      enforcing the Act's publication bans facially;

c.      enforcing the Act's and penal code's employment, education, and public accommodations provisions and the publication bans as applied to Parent Plaintiffs' constitutionally protected religious exercise and fundamental parental rights;

2.      A declaration that the Act's and penal code's employment, education, and public accommodations provisions, and the publication bans have violated and continue to violate Sacred Heart's First Amendment rights under the United States Constitution to exercise religion, religious autonomy, be free from the establishment of religion, engage in speech, association, and assembly as applied to Plaintiff's constitutionally protected activities;

3.      A declaration that the Act's and penal code's publication bans facially violates the United States Constitution's First Amendment protections for speech and press and the Fourteenth Amendment protections for due process;

4.      A declaration that the Act's and penal code's employment, education, and public accommodations provisions and publication bans have violated and continue to violate Parent Plaintiffs' First Amendment rights as applied under the United States Constitution to exercise their religion;

5.      A declaration that the Act's and penal code's employment, education, and public accommodations provisions and publication bans have violated and continue to violate Parent Plaintiffs' Fourteenth Amendment rights as applied under the United States Constitution to direct the upbringing and education of their children;

6.      That this Court adjudge, decree, and declare the rights and other legal relations of the parties to the subject matter here in controversy so that these declarations shall have the force and effect of a final judgment;

7.      Nominal damages for the violation of Plaintiffs' constitutional rights;

8.      That this Court retain jurisdiction of this matter for the purpose of enforcing its orders;

9.      That this Court award Plaintiffs' costs and expenses in this action, including reasonable attorneys' fees, in accordance with 42 U.S.C. § 1988;

10.     That this Court issue the requested injunctive relief without a condition of bond or other security required of Plaintiffs; and

11.     That this Court grant any other relief that it deems equitable and just in the circumstances.

Respectfully submitted this 22nd day of December, 2022.


David A. Cortman
Arizona Bar No. 029490
Ryan J. Tucker
Arizona Bar No. 034382
Katherine L. Anderson
Arizona Bar No. 033104
**Alliance Defending Freedom**
15100 N. 90th Street
Scottsdale, AZ 85260
(480) 444-0020
(480) 444-0028 (facsimile)
rtucker@ADFlegal.org
kanderson@ADFlegal.org

By: s/ John J. Bursch
  John J. Bursch
  Michigan Bar No. P57679
  Hailey M. Vrdolyak
  Illinois Bar No. 6333515
  **Alliance Defending Freedom**
  440 First Street NW, Suite 600
  Washington, DC 20001
  (202) 393-8690
  (202) 347-3622 (facsimile)
  jbursch@ADFlegal.org
  hvrdolyak@ADFlegal.org

  *Attorneys for Plaintiffs*

### DECLARATION UNDER PENALTY OF PERJURY

I, <u>Rev. Ronnie P. Floyd, STL</u>, a citizen of the United States and a resident of the State of Michigan, hereby declare under penalty of perjury pursuant to 28 U.S.C. § 1746 that Paragraphs 5–6, 10, 21–108, and 213–356 are true and correct to the best of my knowledge.

Executed this ___18___ day of December, 2022, at _Grand Rapids_, Michigan.

Rev. Ronnie P. Floyd, STL

## DECLARATION UNDER PENALTY OF PERJURY

I, Robin Hatley, a citizen of the United States and a resident of the State of Michigan, hereby declare under penalty of perjury pursuant to 28 U.S.C. § 1746 that Paragraphs 7–10, 109–125, and 179–356 are true and correct to the best of my knowledge.

Executed this _20_ day of December, 2022, at Byron Center Michigan.

Robin Hatley

## DECLARATION UNDER PENALTY OF PERJURY

I, <u>Renee Boutell</u>, a citizen of the United States and a resident of the State of Michigan, hereby declare under penalty of perjury pursuant to 28 U.S.C. § 1746 that Paragraphs 8, 10, 126–151, and 179–356 are true and correct to the best of my knowledge.

Executed this <u>20</u> day of December, 2022, at <u>Belmont</u>, Michigan.

Renee Boutell

**DECLARATION UNDER PENALTY OF PERJURY**

I, Katie Ugolini, a citizen of the United States and a resident of the State of Michigan, hereby declare under penalty of perjury pursuant to 28 U.S.C. § 1746 that the foregoing is true and correct to the best of my knowledge.

Executed this _18_ day of December, 2022, at _Grand Rapids_, Michigan.

<u>KATIE UGOLINI</u>