# UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF MICHIGAN
### SOUTHERN DIVISION

| | |
|---|---|
| **Sacred Heart of Jesus Parish**; **Jerry** and **Robin Hatley**; **Joseph** and **Renee Boutell**; **Peter** and **Katie Ugolini**, <br><br> Plaintiffs, <br><br> v. <br><br> **Dana Nessel**, in her official capacity as Attorney General of Michigan; **John E. Johnson, Jr.**, in his official capacity as Executive Director of the Michigan Department of Civil Rights; **Portia L. Roberson**, **Zenna Faraj Elhason**, **Gloria E. Lara**, **Regina Gasco-Bentley**, **Anupama Kosaraju**, **Richard Corriveau**, **David Worthams**, and **Luke R. Londo**, in their official capacities as members of the Michigan Civil Rights Commission, <br><br> Defendants. | Case No. 1:22-cv-01214 <br><br> **Plaintiffs' Brief in Support of Their Preliminary Injunction Motion** <br><br> *Oral Argument Requested* |

# Table of Contents

Table of Authorities ....................................................................................iii

Introduction ............................................................................................... 1

Summary of Facts ...................................................................................... 2

Argument ................................................................................................... 9

    I.     The Free Exercise Clause protects Sacred Heart's right to operate its school according to the Catholic faith. ........................................... 9

        A.     The employment provision violates Sacred Heart's religious autonomy. ................................................................................... 11

        B.     The education provision compels Sacred Heart to teach students in contradiction to the Catholic faith. ......................................... 13

        C.     The Act and penal code's public accommodation provisions require Sacred Heart to violate its Catholic faith. .............................. 15

        D.     The Act and penal code provisions are also not neutral and generally applicable. ..................................................................... 16

    II.    The Act violates Sacred Heart's First Amendment free speech and association rights. ................................................................... 17

        A.     The public accommodations provision compels Sacred Heart's speech. .................................................................................... 18

        B.     The publication bans restrict Sacred Heart's religious speech based on content and viewpoint. ................................................... 22

        C.     The employment and education provisions violate Sacred Heart's free association rights. .......................................................... 24

    III.    Michigan's law violates the rights of Sacred Heart parents. .................... 26

        A.     Michigan's law violates Parent Plaintiffs' fundamental parental rights. ..................................................................................... 27

        B.     Michigan's law violates Parent Plaintiffs' free exercise rights. .......... 29

    IV.    The Act fails strict scrutiny ........................................................ 31

i

A.    Michigan has no compelling interest in violating the constitutional rights of Sacred Heart and its parents. .................................. 31

B.    The Act is not narrowly tailored. ............................................. 33

V.    Plaintiffs satisfy the remaining preliminary injunction factors. ............... 35

Conclusion ................................................................................................ 35

Certificate of Compliance ....................................................................... 36

Certificate of Service ............................................................................... 37

## Table of Authorities

**Cases**

*Ashcroft v. ACLU,*
    542 U.S. 656 (2004) ................................................................... 33

*Bays v. City of Fairborn,*
    668 F.3d 814 (6th Cir. 2012) ............................................... 9, 35

*Boy Scouts of America v. Dale,*
    530 U.S. 640 (2000) ..................................................... 25, 26, 33

*Brown v. Entertainment Merchants Association,*
    564 U.S. 786 (2011) ................................................................... 31

*Buck v. Gordon,*
    429 F. Supp. 3d 447 (W.D. Mich. 2019) ................................... 8

*Christian Legal Society v. Walker,*
    453 F.3d 853 (7th Cir. 2006) ................................................... 26

*Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah,*
    508 U.S. 520 (1993) ................................................................... 31

*City of Boerne v. Flores,*
    521 U.S. 507 (1997) ................................................................... 31

*Clarke v. K Mart Corp.,*
    495 N.W.2d 820 (Mich. Ct. App. 1992) ................................. 20

*Elrod v. Burns,*
    427 U.S. 347 (1976) ................................................................... 35

*Employment Division, Department of Human Resources of Oregon v. Smith,*
    494 U.S. 872 (1990) ............................................................ 16, 17

*Fulton v. City of Philadelphia,*
    141 S. Ct. 1868 (2020) ................................................ 16, 17, 31, 32

*G&V Lounge, Inc. v. Michigan Liquor Control Commission,*
    23 F.3d 1071 (6th Cir. 1994) ................................................... 35

*Gonzales v. O Centro Espírita Beneficente União do Vegetal,*
    546 U.S. 418 (2006) ................................................................... 32

iii

*Gonzalez v. Roman Catholic Archbishop of Manila,*
  280 U.S. 1 (1929) ................................................................... 11

*Hall v. Baptist Memorial Health Care Corp.,*
  215 F.3d 618 (6th Cir. 2000) ............................................... 12

*Hankins v. The New York Annual Conference of United Methodist Church,*
  516 F. Supp. 2d 225 (E.D.N.Y. 2007)................................... 33

*Holt v. Hobbs,*
  574 U.S. 352 (2015) ............................................................. 33

*Hosanna-Tabor Evangelical Lutheran Church and School v. EEOC,*
  565 U.S. 171 (2012) ............................................................. 11

*Hutchinson v. Thomas,*
  789 F.2d 392 (6th Cir. 1986) ............................................... 25

*Janus v. American Federation of State, County & Municipal Employees, Council 31,*
  138 S. Ct. 2448 (2018) ................................................... 19, 21

*Kedroff v. Saint Nicholas Cathedral of Russian Orthodox Church in North America,*
  344 U.S. 94 (1952) ............................................................... 11

*Meriwether v. Hartop,*
  992 F.3d 492 (6th Cir. 2021) ........................................ passim

*Meyer v. Nebraska,*
  262 U.S. 390 (1923) ............................................................. 27

*Our Lady of Guadalupe School v. Morrissey-Berru,*
  140 S. Ct. 2049 (2020) .................................... 10, 11, 12, 13

*Pacific Gas & Electric Co. v. Public Utilities Commission of California,*
  475 U.S. 1 (1986) ........................................................... 18, 31

*Pierce v. Society of Sisters of Holy Names of Jesus & Mary,*
  268 U.S. 510 (1925) ....................................................... 27, 28

*Planet Aid v. City of St. Johns,*
  782 F.3d 318 (6th Cir. 2015) ............................................... 21

*Presbyterian Church in United States v. Mary Elizabeth Blue Hull Memorial Presbyterian Church,*
  393 U.S. 440 (1969) ............................................................. 11

iv

*Prescott v. Rady Children's Hospital-San Diego,*
  265 F. Supp. 3d 1090 (S.D. Cal. 2017)......................................................... 20

*Ramirez v. Collier,*
  142 S. Ct. 1264 (2022) ............................................................................. 34

*Reed v. Town of Gilbert,*
  576 U.S. 155 (2015) ............................................................ 18, 22, 23, 31

*Roberts v. Jaycees,*
  468 U.S. 609 (1984) ................................................................................ 25

*Seattle's Union Gospel Mission v. Woods,*
  142 S. Ct. 1094 (2022) ............................................................................. 12

*Serbian Eastern Orthodox Diocese for United States of America & Canada v.
  Milivojevich,*
  426 U.S. 696 (1976) ................................................................................ 11

*Sherbert v. Verner,*
  374 U.S. 398 (1963) ................................................................................ 17

*Telescope Media Group v. Lucero,*
  936 F.3d 740 (8th Cir. 2019) .............................................................. 20, 34

*Troxel v. Granville,*
  530 U.S. 57 (2000) .................................................................................. 27

*United Food & Commercial Workers Union, Local 1099 v. Southwest Ohio
  Regional Transit Authority,*
  163 F.3d 341 (6th Cir. 1998) .................................................................... 35

*United States v. Playboy Entertainment Group, Inc.,*
  529 U.S. 803 (2000) ................................................................................ 31

*Watson v. Jones,*
  80 U.S. 679 (1871) ............................................................................. 11, 12

*Whitman v. Mercy-Memorial Hospital,*
  339 N.W.2d 730 (Mich. Ct. App. 1983) .................................................... 20

*Wisconsin v. Yoder,*
  406 U.S. 205 (1972) .......................................................................... passim

*Wooley v. Maynard,*
  430 U.S. 705 (1977) ................................................................................ 18

## Statutes

20 U.S.C. § 1681 .................................................................................................. 34

42 U.S.C. § 2000e-1 ..................................................................................... 12, 34

Grand Rapids Code § 9.957 ............................................................................... 34

Ind. Code Ann. § 22-9-1-3 ................................................................................ 34

M.C.L. § 37.2102 ......................................................................................... 19, 31

M.C.L. § 37.2202 ..................................................................................... 6, 12, 17

M.C.L. § 37.2206 ............................................................................. 6, 13, 23, 24

M.C.L. § 37.2301 ................................................................................................ 15

M.C.L. § 37.2302 ......................................................................................... passim

M.C.L. § 37.2302a ............................................................................................. 32

M.C.L. § 37.2402 ......................................................................................... passim

M.C.L. § 37.2403 ................................................................................................ 34

M.C.L. § 37.2503 ................................................................................................ 32

M.C.L. § 37.2602 ................................................................................................ 13

M.C.L. § 37.2605 ..................................................................................... 16, 19, 25

M.C.L. § 750.146 .......................................................................................... 12, 15

M.C.L. § 750.147 ......................................................................................... passim

Ohio Rev. Code Ann. § 4112.02 ....................................................................... 34

## Regulations

34 C.F.R. § 106.12  34

## Other Authorities

Catechism of the Catholic Church .............................................................. passim

Congregation for Catholic Education, Male and Female He Created Them:
    Towards a Path of Dialogue on the Question of Gender Theory in Education
    (2019) ............................................................................................................ 19

Michigan Department of Civil Rights Rule 37.4 ......................................................... 13

Pope John Paul II, *Gratissimam Sane*, Letter to Families (1994) ............................ 28

Press Release, AG Nessel, Department of Civil Rights File to Protect Citizens
    from Sexual Orientation Discrimination Before Michigan Supreme Court
    (Oct. 25, 2021), https://perma.cc/FE8Y-DVTV ......................................................... 8

## Introduction

Plaintiff Sacred Heart of Jesus Parish operates a classical Catholic school in the heart of Grand Rapids, Sacred Heart Academy ("Sacred Heart"), which assists parents in fulfilling their religious duty to raise their children in the Catholic faith. Sacred Heart and its families form an intentional Catholic community of Christians striving together for holiness. To foster this environment and guide its students in virtue, Sacred Heart abides by Catholic doctrine in all areas, including marriage and sexuality, and implements policies and practices accordingly.

But Michigan's laws imperil Sacred Heart's ability to operate its school consistent with its Catholic beliefs. Michigan courts reinterpreted the prohibition on sex discrimination in Michigan's Civil Rights Act and penal code to include sexual orientation and gender identity without providing an exemption for religious institutions. Now, the State has put Sacred Heart to a test: Either cease teaching and practicing the Catholic faith and jeopardize the spiritual well-being of its community or close its doors forever.

Michigan's reinterpreted laws force Sacred Heart to hire and retain employees who lead lives in direct opposition to the Catholic faith, speak messages that violate Church doctrine, and refrain from articulating Catholic beliefs in teaching its students and when advertising the school to prospective students or job applicants. All of this violates Sacred Heart's free speech and free exercise rights. Rather than defy Catholic doctrine in these ways, Sacred Heart would shut down.

The laws also violate the parental and free exercise rights of Sacred Heart families. Parent Plaintiffs have explicitly opted out of public schools to send their children to Sacred Heart for an authentic Catholic education where their children would not be exposed to harmful ideas that contradict the Catholic faith. When Michigan coerces Sacred Heart to operate inconsistent with its Catholic beliefs, Michigan violates Parent Plaintiffs' fundamental parental and free exercise rights.

It is beyond peradventure that Michigan's Attorney General and Civil Rights Commission will claim that Sacred Heart violates Michigan's judicially reinterpreted laws. Accordingly, Sacred Heart and its families ask this Court for injunctive relief and to declare their constitutional rights.

## Summary of Facts

Sacred Heart Academy, an apostolate of Sacred Heart of Jesus Parish in Grand Rapids, is a classical Catholic pre-kindergarten through twelfth grade school that exists to support parents in forming their children in the Catholic faith. V. Compl. ("VC") ¶¶ 21–26, PageID.5-6. Sacred Heart, the only school of its kind in the region, strives to "recover the 'Beauty ever ancient, ever new' through an integrated curricula that forms the whole person inspiring the hearts of Catholic students to know, love and serve God." VC ¶ 24, PageID.6. Sacred Heart's Christ-centered curriculum is based in Sacred Scripture, Sacred Tradition, the Magisterium of the Catholic Church (the teaching authority of the Church), and the Catechism of the Catholic Church. VC ¶ 28, PageID.6.

Sacred Heart fosters an authentic Catholic culture, and Sacred Heart's families have built an intentional Catholic community around the parish and school. VC ¶ 42, PageID.8. Numerous families have purchased property in the parish neighborhood and others drive their children an hour each way for the school's distinctly Catholic moral and spiritual formation. *Id.*, PageID.8. Some families even moved to Grand Rapids from other states to join this intentional Catholic community. *Id.*, PageID.8.

The Sacred Heart curriculum is founded on the Catholic understanding of human anthropology and guides students in the pursuit of truth. VC ¶¶ 46–47, PageID.8. Students attend Mass at the beginning of each school day, and Sacred Heart faculty attend Mass with them. VC ¶ 44, PageID.8. And each student receives

2

explicit and mandatory religious instruction. VC ¶¶ 48–49, PageID.8-9. For older students, this includes required theology classes as well as electives, such as Theology of the Body. *Id.*, PageID.8-9.

The Catholic formation at Sacred Heart is not limited to formal catechesis. The school fosters an environment where every aspect of the curriculum and student life is oriented toward and flows from the truth, goodness, and beauty of Catholic doctrine. In line with diocesan policy, Sacred Heart requires *all* employees to become certified catechists—that is, certified to teach the Catholic faith to students. VC ¶ 52, PageID.9. And each year, every employee is required to sign a "memorandum of understanding" detailing their religious and moral duties and to swear an "oath of fidelity" to Church doctrine at a public Mass. VC ¶¶ 54–61, PageID.9-10. Faculty and staff assist in students' moral and spiritual formation by never teaching or speaking anything that violates Catholic doctrine and by living out the Catholic faith in their daily lives. *Id.*, PageID.9-10.

Sacred Heart accepts all students desiring a classical Catholic education, regardless of religious background. But Sacred Heart requires all students to live in accordance with the Catholic faith, as detailed in the student handbook. VC ¶¶ 31, 251, 258, PageID.6, 33-34; VC Exs. 1, 2, PageID.76-110, 111-112. All of Sacred Heart's student discipline policies exist to form students in virtue and are based in the Catechism of the Catholic Church. *Id.*, PageID.6, 33-34. Sacred Heart will not promote or condone student conduct that contradicts Church doctrine. VC ¶¶ 259–60, PageID.34.

Sacred Heart fully embraces Catholic doctrine on marriage and human sexuality and implements this doctrine in the school. VC ¶¶ 68–75, 78–82, 89–96, PageID.11-14. The Catholic Church teaches, and Sacred Heart believes, that each person is created in the image and likeness of God as either male or female. C.C.C. ¶ 2331. Catholic doctrine clearly states that human sexuality is a unitive and

procreative gift, and that all sexual acts are reserved for the permanent and exclusive bond of conjugal marriage. C.C.C. ¶ 2332. Any sexual acts outside of marriage are gravely sinful and endanger the souls of the participants. C.C.C. ¶¶ 2396, 2400. Sacred Heart rejects, and requires its employees to avoid, any ideas or ideologies that are inconsistent with Catholic doctrine on marriage and sexuality. VC ¶¶ 82, 84, PageID.13. So Sacred Heart will never affirm, speak, or teach that two members of the same sex can enter a marital union together, or that a person's identity can be inconsistent with his biological sex. VC ¶¶ 98–99, PageID.15.

As part of advancing Church doctrine on marriage and sexuality, Sacred Heart divides students into single-sex "households" to foster community, train older students in leadership, provide mentorship for younger students, and assist students in flourishing as authentic men and women created in God's image. VC ¶¶ 90–91, PageID.14. And Sacred Heart divides restrooms, locker rooms, and sports teams by biological sex to reflect the truth that each student is created male or female in God's image, and that identity cannot be altered. VC ¶¶ 92–94, PageID.14.

Sacred Heart, previously and currently, has students who experience same-sex attraction and gender discordance (or gender dysphoria). VC ¶ 95, PageID.14. Sacred Heart will never lie to these students about their God-given identity and biological sex. VC ¶¶ 104–05, PageID.16. Instead, Sacred Heart enables these students to flourish by helping them align their feelings with their biological sex and understanding their true identity as a beloved son or daughter of God. VC ¶¶ 96–97, PageID.14; Declaration of Fr. Ronnie P. Floyd ("Floyd Decl.") ¶¶ 36–37.

Many families, including the Hatleys, Boutells, and Ugolinis (collectively "Parent Plaintiffs"), have chosen to send their children to Sacred Heart because of the holistic moral and spiritual formation that Sacred Heart provides and its fidelity to Catholic doctrine in all areas. VC ¶¶ 120, 122, 125, 139, 151, 162–63, 178,

PageID.18-24. Parent Plaintiffs have all opted out of public school and made significant sacrifices so that their children can receive authentic Catholic formation at Sacred Heart. VC ¶¶ 207-09, PageID.27-28; Declaration of Robin Hatley ("Hatley Decl.") ¶¶ 19–23, 56; Declaration of Renee Boutell ("Boutell Decl.") ¶¶ 15–20, 50; Declaration of Katie Ugolini ("Ugolini Decl.") ¶¶ 19–22, 56. They are all practicing Catholics and believe all the teachings of the Catholic Church. VC ¶ 179, PageID.24. They believe it is their religious and moral obligation to form their children in the Catholic faith so that their children can attain eternal life with God in Heaven. VC ¶¶ 180–82, PageID.24; *See* C.C.C. ¶ 2221 ("[t]he fecundity of conjugal love cannot be reduced solely to the procreation of children, but must extend to their moral education and their spiritual formation. The role of parents in education is of such importance that it is almost impossible to provide an adequate substitute. The right and duty of parents to educate their children are primordial and inalienable." (cleaned up)). Parent Plaintiffs have exercised their religious right and duty to educate their children in the faith by choosing to send them to Sacred Heart. VC ¶ 183, PageID.25.

Parent Plaintiffs have chosen Sacred Heart because they know the school will teach, in word or deed, consistent with Catholic doctrine and will foster a virtuous community among faculty, staff, and students. VC ¶¶ 188–93, 207, 211, PageID.25-28; Hatley Decl. ¶¶ 54–55; Boutell Decl. ¶¶ 48–49; Ugolini Decl. ¶¶ 54–55. At Sacred Heart, unlike at public schools, Parent Plaintiffs do not have to worry that a non-Catholic curriculum will expose their children to harmful ideas or ideologies that contradict the Catholic faith. VC ¶¶ 208, 210, PageID.27-28. For example, Parent Plaintiffs chose Sacred Heart because all faculty and staff are excellent role models of faith for their children, especially on issues of marriage and human sexuality—they do not live contrary to Catholic doctrine on these or other issues. VC ¶¶ 190, 198–200, PageID.25-27. If Sacred Heart were forced to violate Catholic

doctrine, the Hatleys, Boutells, and Ugolinis would remove their children from the school. VC ¶¶ 211–12, PageID.28; Hatley Decl. ¶¶ 57, 59; Boutell Decl. ¶¶ 62–63; Ugolini Decl. ¶¶ 57, 64.

But Michigan's recent reinterpretation of the Elliot-Larsen Civil Rights Act ("the Act") to include "sexual orientation" and "gender identity" in prohibited sex discrimination changes all that. The Act's broad education, employment, and public accommodations provisions apply to Sacred Heart and, because there is no religious exemption, prevent Sacred Heart from operating according to its Catholic beliefs. The Act forbids sex discrimination in student admission, retention, or discipline, M.C.L. § 37.2402(b); in recruiting, hiring, retaining, and discharging employees, M.C.L. § 37.2202; and in public accommodations, M.C.L. § 37.2302. The Act also includes "publication bans," which prevent covered entities from communicating any message contrary to the Act's values. *See* M.C.L. § 37.2402(d) (education); M.C.L. § 37.2206 (employment); M.C.L. § 37.2302(b) (public accommodations).

These reinterpreted requirements conflict directly with how Sacred Heart operates. For example, instead of lovingly assisting students who experience gender discordance to align with their God-given sex, Sacred Heart must now lie to them, and other students, by using pronouns inconsistent with biological sex. And Sacred Heart can no longer use single-sex "households," sports teams, and facilities to encourage students to grow in genuine Christian femininity and masculinity. Floyd Decl. ¶ 60. Instead, Sacred Heart must allow students to participate in these programs and use facilities based on subjectively pronounced gender identity, communicating a false message about human sexuality. *Id*.

The Act also prevents Sacred Heart from maintaining a student handbook explaining Catholic doctrine and requiring students to live out this doctrine. *Id*. Sacred Heart can no longer explain its Catholic beliefs to prospective families and students in any published statements, and Sacred Heart cannot recruit, admit, and

retain only students who agree to follow its policies based on Catholic doctrine. *Id.*
The Act also bans Sacred Heart from disciplining students in accord with its policies
or even requiring students to align with their biological sex in activities. *Id.* In sum,
the Act forbids Sacred Heart from fostering a school culture consistent with its
Catholic beliefs.

In the employment context, the Act prohibits Sacred Heart from creating an
intentional Catholic community by ensuring its employees live and model the
Catholic faith, in all aspects, for its students. *Id.* The Act forbids Sacred Heart from
exclusively recruiting and hiring candidates who adhere to Catholic doctrine on
marriage and sexuality in their lives, from declining to recruit and hire candidates
who oppose Catholic doctrine on these issues, and from maintaining any policy to
that effect. *Id.* When advertising open positions, Sacred Heart is banned from
publishing any statement explaining its religious beliefs on marriage and sexuality
and requiring prospective employees to also accept and live out those beliefs. *Id.*
And when considering applicants, Sacred Heart cannot make any written or oral
inquiry about the applicants' religious beliefs and commitment to Catholic doctrine
or express any preference for Catholics living in accordance with Catholic doctrine.
*Id.*

The Act also prohibits Sacred Heart from ensuring its employees live in
accordance with Church doctrine and from having them recommit to Church
doctrine yearly by signing the memorandum of understanding and swearing the
oath of fidelity. *Id.* And Sacred Heart cannot discipline or discharge any employee if
he or she fails to live out Catholic doctrine on marriage and sexuality. *Id.* In other
words, the Act prevents Sacred Heart from operating consistent with Catholic
doctrine by severely interfering with its employment relationships, preventing
Sacred Heart from building an intentional Catholic community, and prohibiting
teaching Catholic beliefs on marriage and sexuality to its students in classes like

Theology of the Body. So Sacred Heart faces an imminent threat of enforcement of the Act against it.

Given Attorney General Nessel's blatant anti-Catholic hostility and the Department's zeal in advocating for the Michigan Supreme Court to redefine "sex" discrimination, this threat is quite real. Press Release, *AG Nessel, Department of Civil Rights File to Protect Citizens from Sexual Orientation Discrimination Before Michigan Supreme Court* (Oct. 25, 2021), https://perma.cc/FE8Y-DVTV. General Nessel is charged with enforcing the Act. VC ¶¶ 12–13, PageID.4. And she has previously campaigned on the principle that Catholic doctrine on marriage constitutes "hate," and that a Michigan law protecting religious liberty rights of adoption and foster agencies is "discriminatory animus." VC ¶ 339, PageID.47; *see Buck v. Gordon*, 429 F. Supp. 3d 447, 462–63 (W.D. Mich. 2019). At least one Michigan court has found her actions in this context to be a "pretext for religious targeting." *Id.* at 463.

Beyond that, General Nessel has referred to Catholic adoption agencies as "hate mongers," smeared Catholics with a snide remark about "their rosary," and maligned a respected former Michigan Court of Appeals Judge simply because he is Catholic. VC ¶ 343, Page ID.47. Sacred Heart has every reason to fear enforcement.

What's more, the Act is already preventing Sacred Heart from exercising its free exercise and free speech rights. For example, Sacred Heart's pastor wants to post a statement on the website reaffirming the school's commitment to Catholic doctrine on marriage and sexuality in light of the Act's judicial reinterpretation. VC Ex. 7, PageID.135-137. Sacred Heart also is hiring an art teacher for next school year and will likely hire other employees, including a coach, in the next few months. VC ¶ 278–79, PageID.37-38. Sacred Heart wants to advertise these positions on its own website and third-party sites and explain the employment requirement that prospective employees must live out Catholic doctrine in their own lives. VC ¶¶

8

276–81, Page ID.37-38; VC Ex. 9, Page ID.143-149. But the Act's publication bans prevent Sacred Heart from doing any of this, chilling its speech and interfering with its religious exercise.

Rather than comply with a law that forces Sacred Heart to operate its school inconsistent with the Catholic faith, Sacred Heart would shut down. VC ¶ 107, Page ID.16; Floyd Decl. ¶ 61. This deprives Parent Plaintiffs of an authentic Catholic education for their children, violating their free exercise and parental rights. And it also violates Sacred Heart's free exercise and free speech rights because it interferes with Sacred Heart's religious autonomy and forces it to communicate messages that violate Catholic doctrine while also preventing Sacred Heart from speaking its Catholic beliefs. Injunctive relief is the only way to stop these harms.

**Argument**

For preliminary injunction requests, courts typically consider likelihood of success on the merits, irreparable harm to plaintiffs absent an injunction, whether an injunction will cause substantial third-party harm, and whether an injunction will serve the public interest. *Bays v. City of Fairborn*, 668 F.3d 814, 818–19, 825 (6th Cir. 2012). But likelihood of success is the "crucial inquiry" here because First Amendment violations satisfy the other factors. *Id.* at 819, 825. Sacred Heart requires an injunction because Michigan's law violates Sacred Heart's constitutional rights in several ways.

## I.   The Free Exercise Clause protects Sacred Heart's right to operate its school according to the Catholic faith.

The First Amendment's religion clauses protect the rights of believers to form intentional communities and to govern those communities according to their religious beliefs. In *Wisconsin v. Yoder*, the Supreme Court considered Wisconsin's compulsory education law, which required that all children attend school until they reached age sixteen. 406 U.S. 205, 207 (1972). Wisconsin's law conflicted with the

9

religious exercise of the Amish, who removed their children from school at age twelve, opting instead to bring them up in apprenticeship and train them in skills for life within their religious community. *Id.* at 210–12. In weighing Wisconsin's interest in an educated populace against the Amish's religious exercise, the Court held that the State's interest had to yield. *Id.* at 235. The Court noted that the Amish's religious exercise of forming young people through apprenticeship also achieved the state's asserted interests and explained that in some ways the Amish even did a better job achieving those interests. *Id.*

The same conflict exists in Michigan now. For the Sacred Heart community, operating the Academy is a religious exercise. As the Supreme Court recognizes, "[i]n the Catholic tradition, religious education is 'intimately bound up with the whole of the Church's life.'" *Our Lady of Guadalupe Sch. v. Morrissey-Berru*, 140 S. Ct. 2049, 2065 (2020) (quoting *Catechism of the Catholic Church* ("C.C.C.") ¶ 8). Sacred Heart's intentional Catholic community educates its children in an environment where the Catholic faith and its doctrine are taught, lived, and modeled for students. VC ¶¶ 36–37, 44–49, PageID.7-9. Everything done at Sacred Heart Academy is toward this end.

But Michigan's Elliott-Larsen Civil Rights Act and portions of the penal code prohibit Sacred Heart from operating according to the Catholic faith and its doctrine. The Act's education, employment, and public accommodations provisions— which now cover sexual orientation and gender identity—all apply to Sacred Heart. VC ¶ 216–29, 238, PageID.29-31. Those provisions prohibit Sacred Heart from recruiting, hiring, and retaining employees who support, model, and teach the Catholic faith and its doctrine. They prevent Sacred Heart from conducting student admissions and discipline consistent with Church teaching. And, coupled with the publications bans, they even prevent Sacred Heart from teaching and publishing the Church's doctrines on the human person, human sexuality, and marriage. As

explained below, the challenged portions of the Act, penal code, and their publications bans put Sacred Heart to an unconstitutional choice: either operate the school in violation of its religious beliefs or close its doors.

### A. The employment provision violates Sacred Heart's religious autonomy.

The First Amendment's religion clauses protect religious institutions' autonomy and their right "'to decide for themselves, free from state interference, matters of church government as well as those of faith and doctrine.'" *Our Lady of Guadalupe Sch.*, 140 S. Ct. at 2055 (quoting *Kedroff v. Saint Nicholas Cathedral of Russian Orthodox Church in N. Am.*, 344 U.S. 94, 116 (1952)). The First Amendment restrains Michigan from intruding into the sphere of church government by placing churches' employment, personnel, and internal governance decisions beyond the State's control. *Id.* at 2060.

It's not just that the State must make exceptions for religious institutions. The Supreme Court has explained that "there are areas of conduct protected by the Free Exercise Clause of the First Amendment and thus beyond the power of the State to control, even under regulations of general applicability." *Yoder*, 406 U.S. at 220. That's why the Supreme Court has deferred to church authority in legal disputes involving real property, *Watson v. Jones*, 80 U.S. 679 (1871), *Presbyterian Church in U.S. v. Mary Elizabeth Blue Hull Mem'l Presbyterian Church*, 393 U.S. 440, 449–50 (1969); bequests in wills, *Gonzalez v. Roman Catholic Archbishop of Manila*, 280 U.S. 1, 16 (1929); internal procedures, *Serbian Eastern Orthodox Diocese for U.S.A. & Canada v. Milivojevich*, 426 U.S. 696, 721 (1976); employment decisions involving ministers, *Hosanna-Tabor Evangelical Lutheran Church and Sch. v. EEOC*, 565 U.S. 171, 188–89 (2012); and, importantly, the religious education and formation of children. *Yoder*, 406 U.S. at 233–34.

As a part of their autonomy, churches and religious institutions have a right to choose their "ministers"—those individuals who play a key role in the institution's mission. *Our Lady of Guadalupe Sch.*, 140 S. Ct. at 2060. This "ministerial exception" keeps churches' employment decisions beyond state regulation and discrimination claims out of courts. *Id*. Without the "authority to select, supervise, and if necessary, remove a minister without interference by the secular authorities . . . a wayward minister's preaching, teaching, and counseling could contradict the church's tenets and lead the congregation away from the faith." *Id.*

Churches and religious institutions also have the right to limit their hiring to co-religionists, which further ensures and protects the institution's religious character and integrity. *See Hall v. Baptist Mem. Health Care Corp.*, 215 F.3d 618, 627 (6th Cir. 2000). Courts have always recognized that religious organizations have autonomy to "entertain" their religious beliefs, "practice [their] religious principle[s]," and "teach [their] religious doctrine." *Watson*, 80 U.S. at 33. That's why "the courts of appeals have generally protected the autonomy of religious organization to hire personnel who share their beliefs." *Seattle's Union Gospel Mission v. Woods*, 142 S. Ct. 1094, 1094 (2022) (Alito, J., respecting the denial of certiorari) (collecting cases).

But the Act's employment provisions make it illegal for Sacred Heart to hire only staff who support, live, and model the Catholic faith and its doctrine. *See* VC Exs. 3, 5, 9, PageID.114-118, 121-126, 143-149. The reinterpreted Act now bans discrimination based on sexual orientation and gender identity. M.C.L. § 37.2202. Michigan's penal code, which also punishes employment discrimination in public accommodations, also applies to Sacred Heart's employment actions. M.C.L. §§ 750.146, 750.147. Unlike similar civil rights laws, like Title VII, the Act and the penal code do not include religious exemptions. *See, e.g.*, 42 U.S.C. § 2000e-1(a).

And it's not enough that Michigan *may* grant exceptions for bona fide occupational qualifications ("BFOQ"). First, if Sacred Heart even applies for a BFOQ exemption, it exposes itself to liability because Michigan can initiate complaints against BFOQ applicants. M.C.L. § 37.2602(c); MDCR Rule 37.4. Second, Michigan has no record of any applications or granted exemptions, showing the whole process is hidden and likely futile for Sacred Heart. VC Ex. 12, PageID.225-227. Finally, the highly-intrusive BFOQ process itself violates Sacred Heart's religious autonomy. *See* VC Ex. 8, PageID.138-142. Sacred Heart does not have to hire an attorney to fill out paperwork and ask the State's permission every time it wishes to hire any employee and for each one of its 48 current employees. This would place a huge, unconstitutional burden on Sacred Heart.

Michigan's employment provisions mean that Sacred Heart must hire those who reject Catholic doctrine regarding marriage and sexuality, who live publicly opposed to the Catholic faith, who are in relationships that directly contradict the Catholic faith and its doctrine, and who therefore cannot model or teach the Catholic faith to Sacred Heart students. Those provisions also mean that Sacred Heart cannot part ways with staff whose conduct contradicts the Catholic faith.

The Act and penal code also include publication bans, which, as explained below, prohibit Sacred Heart from publishing its doctrinal and moral requirements, its faculty conduct expectations, and its teaching about marriage and human sexuality. M.C.L. § 37.2402(d) (education); M.C.L. § 37.2206 (employment); M.C.L. § 37.2302(b) (public accommodations); M.C.L. § 750.147 (penal code).

## B. The education provision compels Sacred Heart to teach students in contradiction to the Catholic faith.

The transmission of the faith is the very reason for the existence of most religious schools. *Our Lady of Guadalupe Sch.*, 140 S. Ct. at 2055. That is certainly the case for Sacred Heart, which would shut down instead of compromising the

Catholic faith or operating inconsistent with its doctrine. VC ¶ 107, PageID.16.
Sacred Heart conducts all its operations according to the Catholic faith and its
doctrine and exercises its religion by operating its school. VC ¶ 5, 107, PageID.3, 16.

But the reinterpreted Act bans sexual orientation and gender identity
discrimination in student admission, retention, and discipline. M.C.L. § 37.2402(b).
As a result, Sacred Heart cannot legally screen applicants or their families to make
sure that they are a good fit for its intentional Catholic community. It also means
that Sacred Heart cannot adopt student discipline measures based on the
Catechism of the Catholic Church or consistent with the Church's doctrines on
marriage and human sexuality. Sacred Heart does these things because they are
essential to protecting Sacred Heart's Catholic community. VC ¶¶ 30–31, 258–60,
PageID.6, 34. The law's requirements burden Sacred Heart's religious exercise.

For example, Sacred Heart would have to allow students to wear uniforms,
use restrooms, and play on sports teams inconsistent with their biological sex. VC
¶ 102–03, PageID.15. Sacred Heart would have to lie to students about their
identities and use pronouns and affirm gender identities inconsistent with a
student's biological sex, which is inconsistent with Catholic understanding of the
human person. VC ¶ 104, PageID.16. If Sacred Heart complied with Michigan's Act,
it would self-sabotage its Catholic mission and identity. Operating the parish school
in a manner inconsistent with the Catholic faith and its doctrine would
communicate to students that Sacred Heart is not really committed to the things it
believes and teaches. VC ¶¶ 102–07, 210, PageID.15-16, 28. This would confuse the
students Sacred Heart is working to form in the Catholic faith. And it would cause
many Catholic parents, including the plaintiff families, to pull their students from
Sacred Heart. VC ¶¶ 108, 212, PageID.16, 28.

**C.      The Act and penal code's public accommodation provisions require Sacred Heart to violate its Catholic faith.**

The Act also now prohibits sexual orientation and gender identity discrimination in public accommodations, which it defines broadly as "any institution of any kind," specifically including educational facilities. M.C.L. §§ 37.2301(a), 37.2302(a). Michigan's interpretation of the Act's public accommodations provisions also covers Sacred Heart's employees. *See Haynes v. Neshewat*, 729 N.W.2d 488, 490 (Mich. 2007) (once an entity is a public accommodation, the statute "prohibits unlawful discrimination against any individual, not just members of the public"). Additionally, the penal code imposes penalties on Sacred Heart if it makes distinctions based on sexual orientation or gender identity. M.C.L. §§ 750.146, 750.147.

Sacred Heart is not just teaching young men and women academic subjects like a public school would. *See V*C Ex. 11, PageID.180-224. Sacred Heart Academy exists to form students *as* Catholic men and women, to help them understand their identity as beloved sons and daughters of God. VC ¶¶ 72, 94, 96, 305, PageID.11, 14, 42. For this reason, it's necessary that Sacred Heart employ faculty and staff who can model authentic Christian masculinity and femininity. VC ¶¶ 79–80, PageID.12. It is also necessary that Sacred Heart be able to limit membership in its community to those who are committed to living the Catholic faith or who wish to have their children raised in a Catholic environment. VC ¶¶ 51–62, 247–51, PageID.9-10, 33. This is part of the parish's evangelical mission. VC ¶ 37, 247, PageID.7, 33.

But like the education and employment provisions of the Act, the public accommodations provisions in the Act and penal code prevent Sacred Heart from operating according to the Catholic faith and its doctrine. They prevent Sacred Heart from admitting and retaining only students and families who are committed to being a part of its intentional Catholic community. They also prevent Sacred

15

Heart from conducting its affairs, including in employment and student discipline, in line with Catholic faith and doctrine. And as explained below, they prevent Sacred Heart from sharing Catholic teaching on human sexuality or from expressing its intent to operate consistent with the Church's faith and doctrine. M.C.L. § 37.2302(b). These provisions would require Sacred Heart to affirm sexual identities inconsistent with an individual's biological sex based on transgender ideology. VC ¶¶ 301–05, PageID.42. They would require Sacred Heart to furnish access to private spaces, sports teams, and uniforms inconsistent with students' biological sex. VC ¶¶ 102–05, PageID.15-16. And these provisions would require Sacred Heart to hire and retain staff whose lives are publicly in opposition to the Catholic faith and its doctrine. VC ¶¶ 265–72, PageID.35-36.

For violating the public accommodations provisions of the Act, Sacred Heart faces investigation and enforcement by the Department and the Commission, which can punish Sacred Heart in numerous ways, including with five-figure fines and mandatory injunctive relief. M.C.L. § 37.2605. And each violation of the penal code can potentially result in fines of $100 and/or fifteen days prison time. M.C.L. § 750.147. It also can expose Sacred Heart to civil liability and to treble damages for each offense. *Id.* These restrictions severely burden Sacred Heart's religious exercise, and the Act and penal code unconstitutionally put Sacred Heart to a choice between operating according to its Catholic faith and its doctrine or closing.

### D.   The Act and penal code provisions are also not neutral and generally applicable.

Laws that burden religious exercise violate the U.S. Constitution's First Amendment if they are not neutral and generally applicable. *See Fulton v. City of Phila.* 141 S. Ct. 1868, 1881 (2020).[1] In *Fulton*, Philadelphia rescinded Catholic

---

[1] *Employment Division, Department of Human Resources of Oregon v. Smith*, 494 U.S. 872, 879–81 (1990), does not apply in this case because the Act and Penal code

Charities' license to provide foster care services after Catholic Charities announced that it could not place children in family situations inconsistent with the Catholic faith. *Id.* at 1875–76. Catholic Charities sued, alleging the City's actions violated its Free Exercise rights. *Id.* The Supreme Court ruled for Catholic charities, explaining that the City Ordinance at issue was not generally appliable because it provided a mechanism of individualized assessments that allowed for local officials to make exceptions. *Id.* at 1882. It did not matter that the City had never provided such an exception; the mere power to make exceptions meant that the ordinance was not generally applicable, and thus faced strict scrutiny. *Id.* at 1879, 1882 ("The creation of a system of exceptions under the contract undermines the City's contention that its non-discrimination policies can brook no departures.").

The same is true of the Act. In the employment context, the Act allows Defendants to provide Bona Fide Occupational Qualification ("BFOQ") exemptions. M.C.L. § 37.2202(2). These exemptions allow Defendants, in their sole discretion, to determine which employers have "good enough" reasons to violate the Act and which ones do not, or which positions are religious enough to qualify. Such a capacity for individualized assessments is the hallmark of a law that is not generally applicable. *Smith*, 494 U.S. at 884. The Act's ban on employment discrimination therefore faces the "strictest scrutiny." *Fulton*, 141 S. Ct. at 1881.

## II.   The Act violates Sacred Heart's First Amendment free speech and association rights.

The First Amendment protects Sacred Heart's right to speak its Catholic beliefs as well as its right to decline to speak messages that contradict those beliefs. But Michigan's laws unconstitutionally both compel and restrict Sacred Heart's

---

are not neutral to religion or generally applicable. But *Smith* was wrongly decided and should be reversed. Laws that burden religious exercise should face strict scrutiny regardless of whether they are neutral and generally application. *See Sherbert v. Verner*, 374 U.S. 398, 403–04 (1963).

religiously motivated speech by (1) forcing it to speak a message on gender identity, through pronouns, that contradicts Catholic doctrine; (2) prohibiting it from speaking its Catholic beliefs in classroom instruction or in communications to prospective families, students, employees, or the public; (3) forbidding it from maintaining written policies requiring current employees and students to live by Catholic doctrine on marriage and sexuality; and (4) requiring it to associate with messages that violate Catholic doctrine.

### A.   The public accommodations provision compels Sacred Heart's speech.

The public accommodations provision requires Sacred Heart to violate its Catholic beliefs about the immutability of sex by referring to students with pronouns that reflect a self-asserted, malleable identity rather than an inherent one based on their creation as sons and daughters of God. *See* C.C.C. ¶ 2331. That compels speech based on content and viewpoint and triggers strict scrutiny. *See Reed v. Town of Gilbert*, 576 U.S. 155, 164–65 (2015) (applying strict scrutiny to content and viewpoint-based law); *Pac. Gas & Elec. Co. v. Pub. Utils. Comm'n of Cal.*, 475 U.S. 1, 19 (1986) (plurality) (same to law compelling speech).

The First Amendment prevents governments from forcing anyone "to be an instrument for fostering public adherence to an ideological point of view he finds unacceptable." *Wooley v. Maynard*, 430 U.S. 705, 715 (1977). So speakers may choose to speak—or stay silent—on any topic. *Id.* at 714. Sacred Heart, guided by Catholic doctrine, has made such a choice on pronouns.

Masculine and feminine pronouns "convey a powerful message implicating a sensitive topic of public concern"—gender identity. *Meriwether v. Hartop*, 992 F.3d 492, 508 (6th Cir. 2021). For Sacred Heart, pronouns speak a message to students about their intrinsic identity as either male or female. Sacred Heart believes, in accord with Catholic doctrine, that "[e]veryone, man and woman, should acknow-

ledge and accept his sexual identity" and that "[e]ach of the two sexes is an image of the power and tenderness of God, with equal dignity though in a different way." C.C.C. ¶¶ 2333, 2335; VC ¶ 75, PageID.12. Sacred Heart, in line with Bishop Walkowiak's statement, intentionally affirms this doctrine by, among other things, referring to its students using sex-based pronouns. *See* VC Ex. 4, PageID.119-120 (Catholic schools "will stand firm in our belief that all humans are created in the image and likeness of God, male and female" and that "a person's sexual identity is determined at conception"); VC ¶ 105, PageID.16. And Sacred Heart will not espouse a view that contradicts Catholic doctrine on sexual identity by referring to students or staff by pronouns inconsistent with their sex. *See* Congregation for Catholic Education, *Male and Female He Created Them: Towards a Path of Dialogue on the Question of Gender Theory in Education* (2019); VC ¶ 105, PageID.16.

Others use preferred pronouns to communicate that a person's sex is rooted in their self-professed gender-identity. *See* VC Ex. 6, PageID.127-134. In this debate, Sacred Heart's sex-based pronoun decision "concerns a struggle over the social control of language" and reflects its "conviction that one's sex cannot be changed." *Meriwether*, 992 F.3d at 508. Ultimately, through its pronoun policy and practice, the school stakes its claim on the "sensitive political topic[]" of "gender identity." *Janus v. Am. Fed'n of State, Cnty. & Mun. Emps., Council 31*, 138 S. Ct. 2448, 2476 (2018).

But Michigan's law makes this stance illegal. The public accommodations provision requires Sacred Heart to provide "equal enjoyment" and "equal utilization" of their goods, services, and privileges. M.C.L. §§ 37.2302(a), 37.2102(1). The law bans Sacred Heart from even having a policy or practice that makes gender-identity distinctions even if the policy never leads to an actual denial. M.C.L. § 37.2605; *Whitman v. Mercy-Memorial Hospital*, 339 N.W.2d 730, 732

19

(Mich. Ct. App. 1983) (policy violated law without denial of service). And the law requires public accommodations and services to provide the *exact* same services to all regardless of gender identity. *See Clarke v. K Mart Corp.*, 495 N.W.2d 820, 822 (Mich. Ct. App. 1992) (law bans denial of "'full and *equal* enjoyment'"); *cf. Telescope Media Grp. v. Lucero*, 936 F.3d 740, 748–49, 750 n.2 (8th Cir. 2019) (adopting same interpretation of public-accommodations law).

This law threatens Sacred Heart's pronoun policy and practice. In its policy, Sacred Heart requires all students to follow the teachings of the Church, including those on marriage and sexuality. VC ¶¶ 251, 255–60, PageID.33-35; Floyd Decl. ¶ 28, 31–32. And it requires all employees to live out the faith and not to speak any message that contradicts Catholic doctrine, including using pronouns inconsistent with a student's sex. VC ¶¶ 58–60, 79, 282, PageID.10, 12, 38; Floyd Decl. ¶¶ 44, 46–47. That means, in practice, Sacred Heart will only speak messages that affirm a students' God-given identity as male or female by using only sex-based pronouns. VC ¶¶ 101, 104–05, 245, PageID.15-16, 32; Floyd Decl. ¶¶ 35–37. So Sacred Heart uses a student's preferred pronouns when these align with his or her sex but not pronouns based on the student's subjective gender identity when that differs from sex. VC ¶ 301, PageID.42.

According to Michigan, Sacred Heart's policy unlawfully makes distinctions, and its practice denies equal treatment (pronoun usage) based on gender identity. Michigan's interpretation tracks how other jurisdictions have interpreted laws like Michigan's, requiring public accommodations to use gender-identity-based pronouns. *See, e.g.*, *Prescott v. Rady Children's Hosp.-San Diego*, 265 F. Supp. 3d 1090, 1099–1100 (S.D. Cal. 2017) (hospital patient stated a sex discrimination claim by alleging staff referred to "transgender boy" patient with feminine pronouns).

In turn, Michigan compels speech by forcing Sacred Heart to refer to biological males who identify as female with feminine pronouns and vice versa to

avoid penalty. Sacred Heart objects to this compelled speech because it violates Catholic doctrine and undermines its entire purpose as a Catholic institution. VC ¶¶ 101–05, PageID.15-16. Forcing Sacred Heart to use gender-identity-based pronouns burdens Sacred Heart's ability to speak and teach the Catholic faith to its students because it confuses and alters the content of its desired message. VC ¶¶ 101–05, 210, PageID.15-16, 28. This "violates" a "cardinal constitutional command" by forcing Sacred Heart "to mouth support for views [it] finds objectionable." *Janus*, 138 S. Ct. at 2463.

The Sixth Circuit has already held that Michigan cannot impose this kind of burden on Sacred Heart. In *Meriwether*, a university required professors to address students using their gender-identity-based pronouns. 992 F.3d at 498. One professor objected because of his religious "conviction that one's sex cannot be changed." *Id.* at 508. The university punished him. *Id.* at 502. The court held that the university violated the First Amendment because the punishment compelled him to express a view about gender identity that he opposed through pronoun usage. *Id.* at 506–07. So too here.

*Meriwether* also shows that Michigan's law compels speech based on content and viewpoint. Michigan's law is content-based because it applies to the substance of Sacred Heart's speech: pronouns. The law doesn't apply to all, or even most, forms of speech (food, gardening, etc.). *See Planet Aid v. City of St. Johns*, 782 F.3d 318, 327 (6th Cir. 2015) (law is content-based when it is "not applicable to all speech irrespective of content" (cleaned up)). And the law is viewpoint-based because it disfavors Sacred Heart's sex-based-pronouns and favors gender-identity-based pronouns. *Meriwether*, 992 F.3d at 506 (school policy viewpoint based when it forbade professor's "views on gender identity" that sex was unchangeable).

Michigan's law compels this speech even though Sacred Heart happily enrolls students struggling with gender discordance and accompanies them to find their

inherent dignity in their identity in Christ. VC ¶¶ 95–96, 244, 256, 347, PageID.14, 32, 34, 48; Floyd Decl. ¶¶ 34–37. Sacred Heart assists these students while using pronouns that reflect this identity based in biological sex. *Id.* But the public accommodations provision prohibits this underlying policy and practice. So Sacred Heart now risks prosecution each time it interacts with any student experiencing gender discordance.

### B. The publication bans restrict Sacred Heart's religious speech based on content and viewpoint.

The publication bans relating to public accommodations, educational institutions, and employment are all content- and viewpoint-based as applied, *see Reed*, 576 U.S. at 164–65, and they cannot satisfy strict scrutiny. These provisions restrict Sacred Heart's right to communicate its Catholic message on marriage and sexuality to prospective students, families, employees, and the public.

A law is content-based when it "draws distinctions based on the message a speaker conveys." *Id.* at 163. A law is content- or viewpoint-based as applied if it "cannot be justified without reference to the content of the regulated speech," or if the government adopted the law because it disagrees with the speaker's message. *Id.* at 164 (cleaned up). The publication bans fail these standards.

The public accommodations publication bans prohibit statements that "indicate[] that the full and equal enjoyment" of public accommodations will be denied or that anyone is "unwelcome" based on their gender identity or sexual orientation. M.C.L. § 37.2302(b); M.C.L. § 750.147. Similarly, the corresponding ban for educational institutions forbids statements that "indicate[] a preference, limitation, specification, or discrimination" based on the sexual orientation, gender identity, or religion of any student applicant. M.C.L. § 37.2402(d). And the employment ban prohibits statements that "indicate[] a preference" or "express[] a preference" based on sexual orientation or gender identity or "elicit[] or attempt[] to

22

elicit information concerning" those characteristics. M.C.L. § 37.2206(1)-(2). Thus, each clause is content based because its restrictions "depend entirely on the communicative content of the" speech. *Reed*, 576 U.S. at 164. The law restricts some speech that touches on sexual orientation, gender identity, or other protected classes, but not all such speech and not speech on other topics. That triggers strict scrutiny as applied to Sacred Heart. *Id*. at 164–65.

For Sacred Heart, these bans mean that it cannot express its Catholic beliefs. For example, Sacred Heart desires to publish a statement explaining its continuing commitment to Catholic doctrine on marriage and sexuality to families, employees, and the public. VC Ex. 7, PageID.135-137; Floyd Decl. ¶¶ 55–56. But under the Act, such a statement would be impermissibly discriminatory because, in Michigan's view, it communicates that anyone experiencing same-sex attraction or gender discordance is "unwelcome." M.C.L. § 37.2302(b). The Act's broad language even forbids Sacred Heart from teaching its students Catholic doctrine that marriage is a permanent, exclusive, and procreative union between one man and one woman, or that God created each person in His image either male or female and this identity cannot be altered. *See* C.C.C. §§ 2331–33, 2357, 2360, 2363; VC ¶¶ 48–49, 89, PageID.8-9, 14. This type of catechesis is now banned as discriminatory. M.C.L. § 37.2302(b).

Likewise, Sacred Heart wants to continue advertising its Catholic beliefs on marriage and sexuality to prospective job applicants, asking applicants about their commitment to Church doctrine on these issues, and maintaining a written policy requiring all employees to abide by Catholic teaching in all areas of their lives. VC Ex. 3, 5, 7, 9, 11, PageID.114-118, 121-126, 135-137, 143-149, 180-224. But, again, the Act forbids Sacred Heart from speaking that message in job postings, interviews with applicants, or employment policies because it indicates a "preference, limitation, specification, or discrimination" based on sexual orientation or gender

23

identity and "attempts to elicit information" about a prospective employee's commitment to living out Catholic teaching on human sexuality. M.C.L. § 37.2206(1), (2)(a), (2)(c).

Finally, Sacred Heart wishes to advertise its Catholic beliefs to student applicants and maintain its written student code of conduct that requires students to live virtuously in accordance with Catholic doctrine, including on marriage and sexuality. VC Ex. 1, 2, 7, PageID.76-110, 111-112, 135-137. Yet, the Act prohibits these statements because, in Michigan's opinion, they indicate a "preference, limitation, specification, or discrimination" based on sexual orientation or gender identity of the student and "discriminate" against students who live out gender identities inconsistent with Church teaching. M.C.L. § 37.2402(b), (d).

All of this turns solely on the content and viewpoint of Sacred Heart's speech. Under the Act, Sacred Heart would be free to communicate its religious beliefs if Catholic doctrine stated that marriage between two people of the same sex is permitted or that a person's gender identity can differ from his biological sex. But because Catholic doctrine explicitly and emphatically proclaims the opposite view, the Act silences Sacred Heart on these topics. So the Act is both content and viewpoint-based. But laws cannot ban speech about and constitutionally-protected activities. See *Meriwether*, 992 F.3d at 506–07 (school policy could not ban constitutional views in syllabus). As explained, Sacred Heart has a constitutional right to operate its school in accordance with its Catholic beliefs. *Supra* § I. So it also has the right to profess those beliefs to students, families, employees, and the public.

## C.   The employment and education provisions violate Sacred Heart's free association rights.

The employment and education provisions force Sacred Heart to associate in ways that undermine its religious messages. Implicit in Sacred Heart's religious

liberty is "a corresponding right to associate with others in pursuit of . . . religious . . . ends." *Roberts v. Jaycees*, 468 U.S. 609, 622 (1984). The Supreme Court uses a three-part test to evaluate this expressive association right. *Boy Scouts of Am. v. Dale*, 530 U.S. 640, 648, 653, 656 (2000). Sacred Heart passes this test.

First, Sacred Heart "engage[s] in some form of expression." *Id.* at 648; *see also id.* at 653 (courts defer to "an association's assertions regarding the nature of its expression"). Sacred Heart instructs its students in Catholic doctrine through formal and informal catechesis, preaches the Catholic faith in its entire curriculum, prays with all students and employees at daily Mass and in each class period throughout the day, passes the faith to students through the example of employees and other students, and forms an intentional Catholic community of members striving for holiness together through its parish and school. VC ¶¶ 37, 44–45, 48–49, 194, 249–50, PageID.7-8, 26, 33. Sacred Heart also expresses some of its religious views on its website. VC ¶ 413, PageID.60. It "is unquestioned" that Sacred Heart has the right to organize as a "religious association[] to assist in the expression and dissemination of any religious doctrine." *Hutchinson v. Thomas*, 789 F.2d 392, 394 (6th Cir. 1986) (citation omitted).

Second, Michigan's law "affects in a significant way" Sacred Heart's "ability to advocate public or private viewpoints," *Dale*, 530 U.S. at 648, and interferes with its right to "not . . . associate." *Jaycees*, 468 U.S. at 622–23. Here too, the school easily passes. *Dale*, 530 U.S. at 653 (courts defer "to an association's view of what would impair its expression").

Michigan's law deprives Sacred Heart of that freedom. The law forbids Sacred Heart from keeping its faith-based employment and student admission and discipline policies. *See* M.C.L. §§ 37.2402, 37.2605 (banning "a pattern or practice of discrimination"). And the law forces Sacred Heart to hire and retain employees who disagree with and do not follow its Catholic beliefs on marriage and sexuality.

*Supra* § I.A. It also requires Sacred Heart to admit students who will not follow Catholic doctrine on marriage and sexuality and forbids Sacred Heart from disciplining those students. *Supra* § I.B. That in turn forces Sacred Heart to associate with those who communicate messages contrary to the school's messages promoted through its curriculum, community, policies, and its very existence as an arm of the Catholic Church. What's more, the law requires Sacred Heart to insert such employees into leadership positions within the school, which is part of the Catholic parish. *Supra* § I.A. There is "no clearer example of an intrusion" into a religious organization's associational protections than forcing it to accept insiders who do not share its faith, since that "would cause the group as it currently identifies to cease to exist." *Christian Legal Soc'y v. Walker*, 453 F.3d 853, 861, 863 (7th Cir. 2006). In these ways, the law forces Sacred Heart "to propound a point of view contrary to its beliefs" by associating with others who reject the organization's religious beliefs. *Dale*, 530 U.S. at 654.

Finally, forcing Sacred Heart to associate fails strict scrutiny. *Id.* at 656–57; *See infra* § IV. So Michigan cannot alter Sacred Heart's desired expression by forcing it to associate with persons who don't share its religious views or banning it from following such a policy.

## III.  Michigan's law violates the rights of Sacred Heart parents.

When Sacred Heart is forbidden from operating according to its Catholic beliefs, its parents are also harmed. The law violates Parent Plaintiffs' rights by 1) preventing them from providing their children with an authentic Catholic education at Sacred Heart, and 2) prohibiting them from exercising their religion by raising their children in the Catholic faith at Sacred Heart.

A.    **Michigan's law violates Parent Plaintiffs' fundamental parental rights.**

The Fourteenth Amendment protects parents' fundamental interest in the "care, custody, and control of their children." *Troxel v. Granville*, 530 U.S. 57, 65 (2000) (plurality op.). This fundamental interest is "perhaps the oldest of the fundamental liberty interests recognized by [the United States Supreme] Court." *Id*.

That means "without doubt" that parents have the fundamental right to "establish a home and bring up children" and "to control the education of their own." *Meyer v. Nebraska*, 262 U.S. 390, 399, 401 (1923); *accord Pierce v. Soc'y of Sisters of Holy Names of Jesus & Mary*, 268 U.S. 510, 534–35 (1925).

These rights are strengthened all the more when combined with religious free-exercise rights. *See Yoder*, 406 U.S. at 233 (explaining heightened scrutiny applies when law violates parental and free exercise rights). For example, the Supreme Court has been clear that parents have the right to educate their children in the faith by sending them to Catholic schools rather than public schools. *See Pierce*, 268 U.S. at 534–35 (law requiring public school attendance "unreasonably interferes with the liberty of parents and guardians to direct the upbringing and education of children under their control"). And states cannot interfere with a parent's right to educate his child in his faith, even if his faith compels him to remove his child from formal education altogether. *See Yoder*, 406 U.S. at 218 ("The impact of the compulsory-attendance law on respondents' practice of the Amish religion is not only severe, but inescapable, for the Wisconsin law affirmatively compels them, under threat of criminal sanction, to perform acts undeniably at odds with fundamental tenets of their religious beliefs.").

The Parent Plaintiff have a religious obligation to educate their children in the Catholic faith because "[f]atherhood and motherhood represent *a responsibility which is not simply physical but spiritual in nature*." Pope John Paul II,

27

*Gratissimam Sane*, Letter to Families 10 (1994). Catholic doctrine states that "[p]arents have the first responsibility for the education of their children," C.C.C. ¶ 2223, and "parents have the duty of choosing schools that will best help them in their task as Christian educators," *id.* ¶ 2229; VC ¶¶ 179–83, PageID.24-25.

The Supreme Court agrees. *See Yoder*, 406 U.S. at 232 ("This primary role of the parents in the upbringing of their children is now established beyond debate as an enduring American tradition."); *Pierce*, 268 U.S. at 534–35 ("The child is not the mere creature of the State; those who nurture him and direct his destiny have the right, coupled with the high duty, to recognize and prepare him for additional obligations."). In fact, the Court recognized that "the values of parental direction of the religious upbringing and education of their children in their early and formative years have a high place in our society." *Yoder*, 406 U.S. at 213–14.

But Michigan disagrees. Its law violates Parent Plaintiffs' fundamental parental rights because it prevents them from providing their children with an authentic Catholic education at Sacred Heart by making that education illegal.

For example, as noted above, the Act compels Sacred Heart to hire teachers and other staff who are not living out Church doctrine on marriage and sexuality. *Supra* § I.A. When Sacred Heart is forced to hire employees whose lives contradict the truth of Catholic teaching, it undermines the moral and spiritual formation of the students and leads to confusion. Hatley Decl. ¶ 57; Boutell Decl. ¶ 62; Ugolini Decl. ¶ 57.

The Act also compels Sacred Heart to violate Church doctrine for students and staff experiencing gender discordance or dysphoria. *Supra* § I.C. In other words, Sacred Heart must lie to the struggling student or employee by communicating a false message of identity, in violation of its Catholic beliefs. And in speaking these messages contrary to Church doctrine, Sacred Heart is also forced to incorrectly teach its students about identity. These requirements teach students that identity

28

is not rooted in the ontological reality that every person is created male or female as a beloved child of God. Instead, it teaches students that, contrary to Church teaching, identity is self-defined and dependent not on innate and immutable truths but on malleable feelings.

The Act also prevents Sacred Heart from teaching Catholic doctrine on marriage and sexuality at all. Sacred Heart has previously offered an elective Theology of the Body course that explicitly lays out and teaches Church doctrine on marriage and sexuality, and these teachings are woven into the entire curriculum. VC  ¶¶ 48–49, PageID.8-9; VC Ex. 10, PageID.150-179. But under the Act, that constitutes discrimination and is prohibited.

By all of this interference, Michigan "will in large measure influence, if not determine, the religious future of the child." *Yoder*, 406 U.S. at 232. That unconstitutionally prevents Parent Plaintiffs from exercising their fundamental right to direct the upbringing and education of their children and form them in the Catholic faith. The Hatleys, Boutells, and Ugolinis have exercised their protected right to control their children's education by sending them to Sacred Heart. When Michigan forces Sacred Heart to abandon its Catholic beliefs and teach falsehoods, it negates Parent Plaintiffs' choice to educate their children in the Catholic faith and violates their rights to "guide the religious future and education of their children." *Id.* at 232.

**B.     Michigan's law violates Parent Plaintiffs' free exercise rights.**

In trampling on Parent Plaintiffs' fundamental parental rights, Michigan also violates their free exercise rights. For "when the interests of parenthood are combined with a free exercise claim," then "more than merely a 'reasonable relation to some purpose within the competency of the State' is required to sustain the validity of the State's requirement under the First Amendment." *Id.* at 233.

Parent Plaintiffs exercised their religion by sending their children to Sacred Heart for an authentic Catholic education. They chose Sacred Heart to fulfill their religious duty to form their children intellectually, morally, and spiritually in the Catholic faith. VC ¶¶ 122, 139, 162–63, 183, PageID.18, 20, 22, 25; Hatley Decl. ¶ 14–16; Boutell Decl. ¶¶ 11–12; Ugolini Decl. ¶¶ 14–15.

But the Act prevents Parent Plaintiffs from raising their children in the Catholic faith. *Supra* § III.A. First, it forbids Sacred Heart from teaching its students, formally and informally, Catholic beliefs on marriage and sexuality. Sacred Heart can no longer teach, in formal catechesis or otherwise, that marriage is a permanent, exclusive, and procreative union between one man and one woman. It also cannot teach that each person is created male or female in the image and likeness of God and that this identity is immutable. The Act prevents Sacred Heart from, among other things, posting these teachings on its website, requiring employees to live by them, and explicitly instructing students on these teachings.

And second, the Act affirmatively requires Sacred Heart to convey a message contrary to Catholic teaching on marriage and sexuality. Michigan compels Sacred Heart to hire and retain employees who live in opposition to Catholic doctrine. The example of these employees conveys a false message to Sacred Heart students about the truth, goodness, and beauty of Catholic doctrine on marriage and sexuality. The same goes for the Act's required treatment for students experiencing same-sex attraction or gender discordance. Sacred Heart is prevented from responding charitably in accordance with its Catholic beliefs and is instead compelled to lie to these students. This too conveys a false message to the entire student body about Catholic doctrine.

By preventing Sacred Heart from teaching Catholic doctrine on marriage and sexuality and actually requiring Sacred Heart to teach the opposite, Michigan undermines the Catholic intellectual, moral, and spiritual formation of Sacred

Heart students. Thus, the Act violates Parent Plaintiffs' right to raise their children in the Catholic faith.

## IV.    The Act fails strict scrutiny

The employment provision is per se unconstitutional because they invade Sacred Heart's religious autonomy. *See supra* § I.A. And, as applied to Sacred Heart, the public accommodations, employment, and education provisions, along with their publication bans, are at least subject to strict scrutiny—"the most demanding test known to constitutional law," *City of Boerne v. Flores*, 521 U.S. 507, 534 (1997)—because they violate Sacred Heart's free-speech and free-exercise rights and Parent Plaintiffs' free-exercise and parental rights. *Pac. Gas*, 475 U.S. at 19 (plurality op.) (speech); *Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 546 (1993) (religion); *Yoder*, 406 U.S. at 233 (religion and parental rights). Strict scrutiny requires Michigan to prove that its law serves a compelling interest in the most narrowly tailored way. *See, e.g.*, *Fulton*, 141 S. Ct. at 1881; *Reed*, 576 U.S. at 171. Michigan's law cannot pass that test.

### A.    Michigan has no compelling interest in violating the constitutional rights of Sacred Heart and its parents.

A compelling interest must be "of the highest order." *Fulton*, 141 S. Ct. at 1881. Michigan must justify that interest by producing evidence of "an actual problem" in need of solving. *United States v. Playboy Ent. Grp., Inc.*, 529 U.S. 803, 822–24 (2000).

Michigan may claim an interest in ending discrimination. *See* M.C.L. § 37.2102. But the law is underinclusive as to that interest. *Brown v. Entm't Merchs. Ass'n*, 564 U.S. 786, 802 (2011) (noting underinclusivity undermines government's asserted interest). For example, Michigan's law regulates real estate. M.C.L. § 37.2102(1). But the law authorizes blatant discrimination in that context. Some sports leagues can discriminate based on sex, sexual orientation, and gender

31

identity. M.C.L. § 37.2302a(4). And some landlords can discriminate for any reason. M.C.L. § 37.2503. If Michigan can allow these exceptions, it cannot defend coercing Sacred Heart to operate its school inconsistent with its religious mission.

Michigan's general antidiscrimination interest is also insufficient because strict scrutiny requires "precise analysis" beyond "broadly formulated interests" like eradicating discrimination. *Fulton*, 141 S. Ct. at 1881 (cleaned up); *see also Gonzales v. O Centro Espírita Beneficente União do Vegetal*, 546 U.S. 418, 431 (2006) (compelling interest must be justified as to the "particular . . . claimant"). Michigan must prove it has a compelling interest in applying its law to *Sacred Heart*. With that focus, Michigan's interest in applying the employment, education, and public accommodations provisions and their publication bans here falls flat.

First, compelling Sacred Heart to use pronouns for students and employees inconsistent with their biological sex and restricting Sacred Heart from explaining Catholic doctrine in its policies does not stop discrimination by public accommodations, services, or educational institutions. Sacred Heart welcomes all students, including those experiencing same-sex attraction and gender confusion. VC ¶¶ 95–96, 244, 256, 349, PageID.14, 32, 34,48-49. Sacred Heart has previously enrolled and currently enrolls such students. *Id.*, PageID.14, 32, 34,48-49. And Sacred Heart has refrained from violating Catholic doctrine on marriage and sexuality by using incorrect pronouns or allowing student use of and participation in sex-segregated spaces and activities while also accompanying these students toward their flourishing. VC ¶¶ 244, 349, PageID.32, 48. *See Meriwether*, 992 F.3d at 510 (no interest in compelling pronoun usage). Forcing Sacred Heart to allow student use of and participation in sex-segregated facilities and activities, like sports teams and households, does nothing to ensure educational access when other entities will readily provide these. In fact, Michigan public schools readily ensure this type of access and participation. VC ¶ 315–16, PageID.44; *See* VC Ex. 6,

PageID.127-134. Sacred Heart simply exercises its Catholic faith by offering parents and students an alternative to public schools. What's more, barring Sacred Heart from explaining Catholic doctrine to prospective students, job applicants, and the public *harms* them—without that explanation, they lack relevant information about the school and its curriculum so they are unable to make informed educational and employment decisions.

Second, Michigan also lacks a compelling interest in forcing Sacred Heart to abandon its education and employment policies and recruit, hire, admit, and retain students and employees who live in opposition to Catholic doctrine and morals. Michigan's general interest "do not justify such a severe intrusion" on Sacred Heart's ability to express its religious views. *Dale*, 530 U.S. at 659 (no compelling interest when law imposed "severe intrusion" on expression). Likewise, Michigan's interests do not overcome Sacred Heart's free-exercise rights. *Hankins v. The New York Ann. Conf. of United Methodist Church*, 516 F. Supp. 2d 225, 237 (E.D.N.Y. 2007) (age discrimination law had no compelling interest applied to religious denomination). In any event, there's no actual education or employment problems here either because many other education and employment opportunities exist in Michigan's educational system. VC ¶ 316, PageID.44. Finally, because Sacred Heart's education and employment policies are constitutionally protected, Michigan has no interest in banning its speech on those topics.

**B.    The Act is not narrowly tailored.**

Michigan's law also fails the "exceptionally demanding" narrow-tailoring prong. *Holt v. Hobbs*, 574 U.S. 352, 364 (2015). Michigan must prove that regulating Sacred Heart is "the least restrictive means among available, effective alternatives." *Ashcroft v. ACLU*, 542 U.S. 656, 666 (2004). But many more tailored options exist.

First, Michigan could limit its law to stop actual status discrimination. For example, Michigan could exempt First Amendment activity from its law, as at least one Michigan city has done. *See* Grand Rapids Code § 9.957 ("This Chapter shall be construed and applied in a manner consistent with the First . . . Amendment[]."). This would allow Sacred Heart to develop reasonable pronoun policies while still serving everyone, employ faculty and staff who agree with its beliefs, admit and discipline students in accord with Catholic doctrine, teach the Catholic faith to its students, and publish constitutionally permissible notices about its school and employment. Likewise, Michigan could interpret its law to allow expression of religious beliefs. Other jurisdictions do this without an increase in discrimination. *See, e.g.*, *Telescope Media*, 936 F.3d at 752.

Second, Michigan could exempt religious organizations when the Act's requirements conflict with religious beliefs. Michigan already exempts religious schools from religious discrimination under the education provision, just not "sex" discrimination. *See* M.C.L. § 37.2403. Michigan could easily exempt religious organizations from the Act, just as the federal government offers exemptions from sex discrimination for religious schools when it violates their religious beliefs. *See* 20 U.S.C. § 1681(a)(3); 34 C.F.R. § 106.12.

Third, Michigan could exempt religious organizations from its employment law. Again, the federal government already does this. 42 U.S.C. § 2000e-1(a). So do most states. *See, e.g.*, Ind. Code Ann. § 22-9-1-3; Ohio Rev. Code Ann. § 4112.02.

These exemptions—already in place elsewhere—prove Michigan's law is not narrowly tailored. *Ramirez v. Collier*, 142 S. Ct. 1264, 1279 (2022) (other states' practices showed Texas' "ban on audible prayer" not narrowly tailored). This proves the law cannot pass strict scrutiny.

## V.    Plaintiffs satisfy the remaining preliminary injunction factors.

Because Plaintiffs have shown likely success on the merits, they satisfy the other factors for a preliminary injunction. *See Bays*, 668 F.3d at 819 (6th Cir. 2012) (noting that likely success on the merits is determinative in First Amendment cases).

That's because "[t]he loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury," *Elrod v. Burns*, 427 U.S. 347, 373 (1976), and that harm is always "sufficient to justify injunctive relief," *United Food & Com. Workers Union, Local 1099 v. Sw. Ohio Reg'l Transit Auth.*, 163 F.3d 341, 363 (6th Cir. 1998). And it's "always in the public interest to prevent violation of a party's constitutional rights." *G&V Lounge, Inc. v. Mich. Liquor Control Comm'n*, 23 F.3d 1071, 1079 (6th Cir. 1994).

This case is no exception. Michigan has violated Plaintiffs' First Amendment rights, and Plaintiffs are entitled to injunctive relief.

## Conclusion

Sacred Heart and its families ask this Court to grant its preliminary injunction motion.

Respectfully submitted this 22nd day of December, 2022.

By: s/ John J. Bursch

|  |  |
|---|---|
| David A. Cortman | John J. Bursch |
| Arizona Bar No. 029490 | Michigan Bar No. P57679 |
| Ryan J. Tucker | Hailey M. Vrdolyak |
| Arizona Bar No. 034382 | Illinois Bar No. 6333515 |
| Katherine L. Anderson | **Alliance Defending Freedom** |
| Arizona Bar No. 033104 | 440 First Street NW, Suite 600 |
| **Alliance Defending Freedom** | Washington, DC 20001 |
| 15100 N. 90th Street | (202) 393-8690 |
| Scottsdale, AZ 85260 | (202) 347-3622 Fax |
| (480) 444-0020 | jbursch@ADFlegal.org |
| (480) 444-0028 (facsimile) | Hvrdolyak@ADFlegal.org |
| rtucker@ADFlegal.org | |
| kanderson@ADFlegal.org | *Attorneys for Plaintiff* |

**Certificate of Compliance**

I hereby certify that this brief contains 10,794 in compliance with W.D. Mich. LCivR 7.2(b), and that this brief was prepared using Microsoft® Word for Microsoft 365 MSO (Version 2202 Build 16.0.14931.20806).

s/ John J. Bursch
John J. Bursch

*Attorney for Plaintiffs*

**Certificate of Service**

I hereby certify that on the 22nd day of December, 2022, I electronically filed the foregoing document with the Clerk of Court using the ECF system which will send notification of such filing to all counsel of record who are registered users of the ECF system. The foregoing document will be served via private process server with the Summons and Complaint to all defendants.

s/ John J. Bursch
John J. Bursch

*Attorney for Plaintiffs*