UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

SACRED HEART OF JESUS PARISH,
GRAND RAPIDS, et al.,

      Plaintiffs,

v.

DANA NESSEL, et al.,

      Defendants.

_____/

Case No. 1:22-cv-1214

HON. JANE M. BECKERING

## **OPINION AND ORDER**

Pursuant to 42 U.S.C. § 1983, Plaintiffs Sacred Heart of Jesus Parish, Grand Rapids (Sacred Heart) and six parents of Sacred Heart students ("Parent Plaintiffs") (collectively, "Plaintiffs") filed this pre-enforcement civil rights action for declaratory and injunctive relief against Defendants Dana Nessel, Michigan's Attorney General; John E. Johnson, Jr., the Executive Director of Michigan's Department of Civil Rights ("the Department" or MDCR); and eight individual members of Michigan's Civil Rights Commission ("the Commission" or MCRC) (collectively, "Defendants").[1]  Sacred Heart alleges that the enforcement of certain provisions in Michigan's civil rights and public-accommodations laws will infringe on its religious mission and thereby violate its rights and, in a derivative way, Parent Plaintiffs' rights under the First and Fourteenth Amendments to the United States Constitution.  Pending before the Court are Plaintiffs'

---

[1] In August 2022, Plaintiffs' counsel filed similar claims in *Christian Healthcare Centers, Inc. v. Nessel, et al.,* 1:22-cv-787, which this Court dismissed in March 2023.  The case at bar is also related to another pre-enforcement civil rights lawsuit brought in December 2022 on behalf of St. Joseph Parish against these same Defendants, *St. Joseph Parish St. Johns v. Nessel, et al.*, 1:22-cv-1154, again alleging similar claims.  *See* Administrative Order 23-CA-008 (ECF No. 9).

Motion for a Preliminary Injunction (ECF No. 4) and Defendants' Motion to Dismiss (ECF No. 22), as well as certain supplemental filings.  Defendants move to dismiss this case under Federal Rule of Civil Procedure 12(b)(1) and defend against the requested preliminary injunction for largely the same reasons, arguing, in pertinent part, that no case or controversy exists for federal jurisdiction.  For the following reasons, the Court agrees and grants the motion to dismiss and closes this case.

## I.  BACKGROUND

### A.  Statutory Framework

Plaintiffs' pre-enforcement challenge concerns Michigan's Elliott-Larsen Civil Rights Act (ELCRA), MICH. COMP. LAWS § 37.2101 *et seq.*, and Michigan's Equal Accommodations Act (EAA), MICH. COMP. LAWS § 750.146.  A brief description of both laws will help to place this case (and this Court's decision) in context.

### 1.    Michigan's ELCRA

The ELCRA generally prohibits discrimination by an "educational institution" because of "religion, race, color, national origin, or sex."  MICH. COMP. LAWS § 37.2402.  The Act defines "educational institution" to mean a "public or private institution," MICH. COMP. LAWS § 37.2401, although the prohibitions related to religious discrimination expressly do not apply to "religious educational institutions," MICH. COMP. LAWS § 37.2403.

In the employment context, the ELCRA defines "employer" as "a person who has 1 or more employees."  MICH. COMP. LAWS § 37.2201(a).  Under the ELCRA, employers may not "[f]ail or refuse to hire or recruit, discharge, or otherwise discriminate against an individual … because of … sex[.]"  MICH. COMP. LAWS § 37.2202(1)(a).  And employers cannot "print, circulate, post, mail, or otherwise cause to be published a statement, advertisement, notice, or sign relating

to employment by the employer … that indicates a preference, limitation, specification, or discrimination, based on … sex[.]"  MICH. COMP. LAWS § 37.2206(1).  As Plaintiffs acknowledge (Verified Compl. [ECF No. 1] ¶ 222), the ELCRA provides exemptions for certain types of discrimination, including "sex," where there is a "bona fide occupational qualification reasonably necessary to the normal operation of the business[.]"  MICH. COMP. LAWS § 37.2208.

The public accommodations section of the ELCRA defines a "place of public accommodation" to include an "institution of any kind … whose goods, services, facilities, privileges, advantages, or accommodations are extended, offered, sold, or otherwise made available to the public."  MICH. COMP. LAWS § 37.2301(a).  The ELCRA provides, in pertinent part, that "*[e]xcept where permitted by law*, a person shall not [d]eny an individual the full and equal enjoyment of the goods, services, facilities, privileges, advantages, or accommodations of a place of public accommodation or public service because of … sex …."  MICH. COMP. LAWS § 37.2302(a) (emphasis added).

Michigan's Department of Civil Rights is charged with receiving, initiating, investigating, conciliating, adjusting, disposing of, issuing charges, and holding hearings on complaints alleging a violation of the ELCRA.  MICH. COMP. LAWS § 37.2602(c).  The Commission was established by the Michigan Constitution of 1963 to carry out the guarantees against discrimination articulated in Article 1, § 2.  *See* MICH. CONST. 1963, Art. 1, § 2, Art. 5, § 29.  Any person claiming to be aggrieved by unlawful discrimination may file a complaint with the Department to be heard before the Commission, MICH. COMP. LAWS § 37.1605, or the aggrieved individual may bring a civil action in state circuit court, MICH. COMP. LAWS § 37.1606.  *See also* MDCR Rule 37.2(m) (broadly defining "person" to include not only individuals but also corporations, associations, or "any other legal or commercial entity").  Importantly, the construction provision of the ELCRA, which

3

applies to employment, public accommodations, and educational institutions, expressly provides that the Act "shall not be construed as preventing the commission from securing civil rights guaranteed by law other than the civil rights set forth in this act." MICH. COMP. LAWS § 37.2705(1).

The ELCRA also provides the Department with authority to make individualized exemptions for employers who make a "sufficient showing" that religion is a bona fide occupational qualification (BFOQ) "reasonably necessary to the normal operation of the business." MICH. COMP. LAWS § 37.2208.  Alternatively, as noted above, "[a]n employer may have a bona fide occupational qualification on the basis of religion … *without obtaining prior exemption from the commission*, provided that an employer who does not obtain an exemption shall have the burden of establishing that the qualification is reasonably necessary to the normal operation of the business."  *Id.* (emphasis added).  According to the Department's Director of Enforcement, the BFOQ application is based on position, not necessarily specific individuals, so duplicative requests with every hire are not required (Trevino Decl. [ECF No. 32-2] ¶ 6).  Additionally, the BFOQ application allows for submission of a request covering multiple positions (*id.*).  Last, BFOQ exemptions are valid for five years and may be extended (*id.* ¶ 7).  The Department has considered and granted BFOQs since 1976, albeit infrequently (*id.* ¶¶ 5, 8).  Sacred Heart concedes that it has not sought a BFOQ exemption (Verified Compl. ¶ 352).

In May 2018, the Commission adopted Interpretive Statement 2018-1, in which it concluded that "sexual orientation" and "gender identity" fall within the meaning of "sex" as used in the ELCRA (Verified Compl. ¶ 231).  The Commission explained in its statement that

> the U.S. 6th Circuit Court of Appeals . . . ruled in the case of *EEOC v R.G. & G.R. Harris Funeral Homes, Inc.* that the same language "discrimination because of . . . sex" when used in federal civil rights law protected a transgender Michigan woman who was gender stereotyped and discriminated against for not behaving like a male[.]

4

(ECF No. 23 at PageID.376, quoting Interpretative Statement 2018-1).   Accordingly, the Commission found that "continuing to interpret the protections afforded by the phrase 'discrimination because of . . . sex' more restrictively by continuing to exclude individuals for reasons of their gender identity or sexual orientation would itself be discriminatory" (*id.*).   *See generally* MICH. COMP. LAWS § 24.207(h) ("[A]n interpretive statement … in itself does not have the force and effect of law but is merely explanatory.").

Subsequently, three private individuals filed complaints with the Department based on Interpretive Statement 2018-1.  First, Natalie Johnson and Megan Oswalt filed a complaint alleging that Rouch World, LLC, an event center operator, discriminated against them "on the basis of sex" in violation of the ELCRA by denying their April 2019 request to host their same-sex wedding at its facility.  The owners of Rouch World asserted that hosting the ceremony would violate their religious beliefs.  Second, Marissa Wolfe, a transgender woman, filed a complaint with the Department, alleging that Uprooted Electrolysis, LLC, a hair removal business, had discriminated against her "on the basis of sex" in violation of the ELCRA in denying her services.  The owner of Uprooted Electrolysis perceived the requested services to be centrally connected to Wolfe's transgender identity and asserted that providing the services would violate her religious beliefs. The MDCR investigations were stayed when Rouch World and Uprooted Electrolysis jointly sued the MDCR and its then director in the Michigan Court of Claims, seeking (1) a declaratory judgment that sexual orientation and gender identity were not encompassed by the ELCRA's prohibition of sex discrimination in places of public accommodation and (2) an injunction prohibiting the continued investigation of the complaints filed against plaintiffs and the MDCR's adherence to Interpretive Statement 2018-1.  *See generally Rouch World, LLC v. Dep't of C.R.*, 987 N.W.2d 501, 505–06 (Mich. 2022) (setting forth factual background).

The Michigan Court of Claims held that discrimination "because of sex" under the ELCRA includes discrimination because of an individual's "gender identity," and granted relief in favor of the Department with regard to Uprooted Electrolysis' claim. *Id.* at 506.  However, on the basis of stare decisis, the court denied summary disposition as to the sexual orientation claim. *Id.* Regarding Rouch World's and Uprooted Electrolysis' First Amendment free exercise of religion claim, the Court of Claims concluded that the issue "had not been sufficiently briefed to resolve at this juncture." *See Rouch World, LLC v. Dep't of Civ. Rights*, Case No. 20-000145-MZ, unpublished order of the Court of Claims, entered 12/7/2020, at p. 7 (Defs. Ex. A, ECF No. 23-1 at PageID.422).  The plaintiffs did not seek to appeal the gender-identity ruling.

The Department appealed the decision directly to the Michigan Supreme Court.  In July 2022, the Michigan Supreme Court held that "the denial of 'the full and equal enjoyment of the goods, services, facilities, privileges, advantages, or accommodations of a place of public accommodation or public service' on the basis of sexual orientation constitutes discrimination 'because of ... sex' and, therefore, constitutes a violation of the ELCRA under MICH. COMP. LAWS § 37.2302(a)." *Rouch World*, 987 N.W.2d at 519.  The Michigan Supreme Court did not decide whether gender identity was encompassed by the ELCRA—the basis of the complaint against Uprooted Electrolysis—because the issue was not appealed. *Id.* at 506.  Additionally, the Michigan Supreme Court expressly noted that "[w]hether enforcement under the ELCRA for sexual-orientation and gender-identity discrimination would violate [the] plaintiffs' federal and state constitutional religious liberty protections has not yet been adjudicated below and, accordingly, is also not currently before this Court." *Id.* at 506 n.5.

On March 16, 2023, after the case at bar was filed, Michigan's Legislature amended the ELCRA to add "sexual orientation" and "gender identity or expression" as classes protected from

discrimination.  *See* 2023 Mich. Legis. Serv. P.A. 6 (S.B. 4).  The amendment takes effect on the 91st day after final adjournment of the 2023 regular session of the Michigan Legislature, i.e., presumably at some time in March 2024.

**2.      Michigan's Equal Accommodations Act**

The EAA, which is part of Michigan's Penal Code, provides that "[a]ll persons within the jurisdiction of this state shall be entitled to full and equal accommodations, advantages, facilities and privileges of inns, hotels, motels, government housing, restaurants, eating houses, barber shops, billiard parlors, stores, public conveyances on land and water, theatres, motion picture houses, public educational institutions, in elevators, on escalators, in all methods of air transportation and all other places of public accommodation, amusement, and recreation, subject only to the conditions and limitations established by law and applicable alike to all citizens and to all citizens alike, with uniform prices."  MICH. COMP. LAWS § 750.146.

The Attorney General is authorized to criminally prosecute public accommodations violations.  MICH. COMP. LAWS § 750.147.  However, Defendants represent that neither Attorney General Nessel nor her predecessors have filed an action to criminally enforce the Act (ECF No. 26 at PageID.453).  Sacred Heart, a private educational institution with selective enrollment policies, indicates its own belief that it is not a place of "public accommodation" that would even fall within the purview of the EAA (Verified Compl. ¶ 296 n.4).

**B.      Factual Background**

Sacred Heart is a parish-run Catholic school in the Diocese of Grand Rapids, Michigan (Verified Compl. ¶ 22).  Sacred Heart provides a classical Catholic education for nearly 400 children from pre-kindergarten through the twelfth grade (*id.* ¶¶ 25, 43).  The purpose of the Sacred Heart curriculum is the pursuit of "truth," including the "the Catholic understanding of man and

woman and the purpose of each" and "a proper understanding of human anthropology" (*id.* ¶¶ 46–47). Specifically, according to Plaintiffs, the Catholic faith espouses the belief that "a person's sexual identity is determined at conception" and rejects the "notion that a man or woman can 'transition' to a gender inconsistent with his or her biological sex" (*id.* ¶¶ 74 & 77). Plaintiffs allege that Sacred Heart "will not affirm a 'gender identity' that is inconsistent with the person's biological sex because doing so would contradict the Catholic faith and its doctrine" (*id.* ¶ 104).

All Sacred Heart employees must support the Catholic Church's moral and doctrinal teachings, including its teachings on marriage and human sexuality, and are required to annually sign a "memorandum of understanding" outlining their religious and moral duties and publicly swear an "oath of fidelity" to Church teaching at a Mass (*id.* ¶ 54). Similarly, parents and students are required to annually sign an agreement indicating that they will "follow Sacred Heart's policies that require students to live virtuously according to Catholic doctrine" (*id.* ¶ 251). In employment, education, or in any services provided to the public, Sacred Heart will not "affirm gender identities, use pronouns, or allow any person to use restrooms or participate in sex-specific activities inconsistent with his or her biological sex" (*id.* ¶ 245). Sacred Heart alleges that it will not grant or assent to any requests for "special treatment by students, employees, or others based on transgender or other LGBTQ ideologies" (*id.* ¶ 106). Indeed, Plaintiffs allege that Sacred Heart would "shut down its school—thereby refraining from exercising its religion by providing education—rather than operate a school inconsistent with the Church's faith and doctrine" (*id.* ¶ 107).

Plaintiffs do not identify any pending complaint, investigation, or prosecution against them; rather, Plaintiffs allege that "because of Defendants' history of public hostility to the

Catholic faith, its beliefs about marriage and human sexuality, and toward Catholic institutions, Plaintiffs face enforcement of the Act and penal code" (*id.* ¶ 346).

### C.  Procedural Posture

On December 22, 2022, Plaintiffs initiated this action with the filing of a Verified Complaint, alleging the following five claims:

I.    Violation of the First Amendment's Free Exercise and Establishment Clauses: Religious Autonomy, Ministerial Exception, Co-Religionists, and Compelled Participation

II.    Violation of the First Amendment's Free Exercise Clause: Lack of General Applicability, Individualized Exemptions, Hostility, and Compelled Participation

III.    Violation of the First Amendment's Free Speech and Assembly Clauses: Freedom of Speech, Expressive Association, and Assembly

IV.    Violation of Parents' Fourteenth Amendment's fundamental right to direct their children's education

V.    Violation of Parents' First Amendment right to free exercise of religion

(ECF No. 1).  Plaintiffs seek injunctive and declaratory relief, nominal damages for the violation of their constitutional rights, and costs and attorney fees (*id.* at PageID.68–69).

Plaintiffs accompanied their Verified Complaint with a Motion for a Preliminary Injunction (ECF No. 4), seeking to enjoin Defendants from enforcing the ELCRA, MICH. COMP. LAWS §§ 37.2202(1), 37.2302(a), 37.2402(a)–(c), "as interpreted by the Michigan Supreme Court to encompass sexual orientation and gender identity"; the Penal Code, MICH. COMP. LAWS § 750.147; and publication bans, MICH. COMP. LAWS §§ 37.2302(b); 37.2206(1), (2)(a),(c); 37.2402(d); 750.147, to (1) "prevent Sacred Heart from operating and adopting policies consistent with Catholic doctrine and teachings regarding marriage and human sexuality"; (2) "prevent Plaintiff parents from providing their children with an authentic Catholic education at Sacred Heart and raising their children in the Catholic faith"; (3) "prevent Sacred Heart from adopting or following a policy, pattern, or practice of recruiting, offering positions for, hiring, and retaining only

employees who adhere to and agree to abide by all tenets of the Catholic faith"; and (4) "prevent Sacred Heart Academy from communicating its Catholic beliefs regarding marriage and human sexuality to employees, prospective employees, families, students, and the public" (*id.* at PageID.240–244).  Defendants filed a response in opposition to the motion for a preliminary injunction (ECF No. 26).

Defendants also filed a Motion to Dismiss (ECF No. 22).  Plaintiffs filed a combined brief, responding in opposition to the motion to dismiss and replying in further support of their preliminary injunction motion (ECF No. 29), a brief that they also seek to supplement (ECF No. 34).  Defendants oppose the motion to supplement (ECF No. 36) and filed a reply in further support of their motion to dismiss (ECF No. 32).  Plaintiffs have also since filed Notices of three supplemental authorities (ECF Nos. 38, 40, & 42), to which Defendants filed responses (ECF Nos. 39, 41, & 43).  Having considered the parties' submissions, the Court concludes that oral argument is not necessary to resolve the issues presented.  *See* W.D. Mich. LCivR 7.2(d).

## II.  ANALYSIS

### A.  Motion Standards

**1.     Dismissal Standard**

Defendants' motion to dismiss is filed pursuant to Federal Rule of Civil Procedure 12(b)(1) for lack of subject-matter jurisdiction.  Defendants argue that Plaintiffs' claims are not ripe and that Plaintiffs lack standing to present their claims.  *See generally Norton v. Ashcroft*, 298 F.3d 547, 554 (6th Cir. 2002) ("A court lacks jurisdiction over the subject matter if the claim is not yet ripe for judicial review."); *State by & through Tenn. Gen. Assembly v. U.S. Dep't of State*, 931 F.3d 499, 507 (6th Cir. 2019) ("If no plaintiff has standing, then the court lacks subject-matter jurisdiction.").  Alternatively, Defendants argue that this Court should abstain from exercising

jurisdiction over Plaintiffs' claims where the appropriate entities have not yet determined how Michigan's civil rights law interface with constitutional rights involving religion.  *See generally Burford v. Sun Oil Co.*, 319 U.S. 315 (1943); *Cleveland Hous. Renewal Project v. Deutsche Bank Tr. Co.*, 621 F.3d 554, 568 (6th Cir. 2010) (describing *Burford* abstention, an exception to the exercise of federal jurisdiction).

"Rule 12(b)(1) motions to dismiss based upon subject matter jurisdiction generally come in two varieties"—a facial attack or a factual attack.  *Ohio Nat. Life Ins. Co. v. United States*, 922 F.2d 320, 325 (6th Cir. 1990).  "In a facial attack, a 'movant accepts the alleged jurisdictional facts as true and 'questions merely the sufficiency of the pleading' to invoke federal jurisdiction.'" *Polselli v. United States Dep't of the Treasury–Internal Revenue Serv.*, 23 F.4th 616, 621 (6th Cir.) (citations omitted), aff'd sub nom. *Polselli v. Internal Revenue Serv.*, 598 U.S. 432 (2023).  "In a factual attack, a movant presents evidence outside of the pleadings to contest jurisdictional facts alleged in the petitions."  *Id.*  In reviewing a facial attack, "a trial court takes the allegations in the complaint as true, which is a similar safeguard employed under 12(b)(6) motions to dismiss.  On the other hand, when a court reviews a complaint under a factual attack …, no presumptive truthfulness applies to the factual allegations."  *Ohio Nat. Life, supra.*  While Defendants describe the standard of review for a factual attack (ECF No. 23 at PageID.379), Plaintiffs accurately point out that Defendants have not contested the truth of the jurisdictional allegations in the Verified Complaint, only their sufficiency (ECF No. 29 at PageID.507).  Therefore, the Court likewise analyzes the Verified Complaint on its face.  *See, e.g., Memphis Biofuels, LLC v. Chickasaw Nation Indus., Inc.*, 585 F.3d 917, 919 (6th Cir. 2009); *Lovely v. United States*, 570 F.3d 778, 782 (6th Cir. 2009).

11

2. **Standard for Injunctive Relief**

Plaintiffs' motion for a preliminary injunction is filed pursuant to Federal Rule of Civil Procedure 65. "Preliminary injunctions are 'extraordinary and drastic remed[ies] ... never awarded as of right.'" *Platt v. Bd. of Comm'rs on Grievances & Discipline of Ohio Supreme Court*, 769 F.3d 447, 453 (6th Cir. 2014) (quoting *Munaf v. Geren*, 553 U.S. 674, 689-90 (2008) (examining a preliminary injunction that preserved the state-law status quo)). "[T]hat is why the plaintiff bears the burden to justify relief, even in First Amendment cases." *Id.* (citing *McNeilly v. Land*, 684 F.3d 611, 615 (6th Cir. 2012) (citing, in turn, *Granny Goose Foods, Inc. v. Teamsters*, 415 U.S. 423, 441 (1974)). Further, a plaintiff "bears the burden of showing that he has standing for each type of relief sought." *Summers v. Earth Island Inst.*, 555 U.S. 488, 493 (2009). *See also Town of Chester, N.Y. v. Laroe Estates, Inc.*, 581 U.S. 433, 439 (2017) ("[A] plaintiff must demonstrate standing for each claim he seeks to press and for each form of relief that is sought.") (citation omitted); *Fischer v. Thomas*, 52 F.4th 303, 307 (6th Cir. 2022) ("To establish a likelihood of success in a lawsuit, a plaintiff must, of course, have standing to bring it.") (citing *Vitolo v. Guzman*, 999 F.3d 353, 359 (6th Cir. 2021)).

## B.     Discussion

1. **Subject-Matter Jurisdiction**

In both their motion to dismiss and their response in opposition to Plaintiffs' motion for a preliminary injunction, Defendants argue that Plaintiffs' lack of standing prevents this Court from exercising jurisdiction over the subject matter of Plaintiffs' claims. Subject-matter jurisdiction is the threshold question. Without subject-matter jurisdiction, this Court lacks power to issue any order other than an order to dismiss the case. *Binno v. Am. Bar Ass'n.*, 826 F.3d 338, 344 (6th Cir. 2016); *see also U.S. Fid. & Guar. Co. v. Thomas Solvent Co.*, 955 F.2d 1085, 1087 (6th Cir. 1992)

(explaining that where a district court lacks subject-matter jurisdiction, its orders are "void").  If the plaintiff lacks standing, then the court "need not reach the other issues: ripeness, statutory preclusion, and failure to state a claim upon which relief can be granted."  *State by & through Tenn. Gen. Assembly*, 931 F.3d at 507.   Consequently, the Court turns first to analyzing Defendants' Rule 12(b)(1) standing argument, and the Court finds the argument dispositive.[2]

## 2.     Standing

Defendants argue that Plaintiffs cannot establish standing because their alleged injury-in-fact is entirely hypothetical (ECF No. 23 at PageID.393–408).  Defendants argue that Plaintiffs have not shown (a) that Defendants have taken—or will imminently take—action that will harm them, or (b) any injury in fact that is fairly traceable to any action of Defendants (*id.* at PageID.398, 404).  Specifically, as to Sacred Heart, Defendants point out that the EAA does not even apply to Sacred Heart's private educational facility and that there is nothing alleged in the Verified Complaint to indicate that Sacred Heart has been or is likely to be investigated or prosecuted by Defendants under the ELCRA (*id.* at PageID.400, 405).  Additionally, Defendants point out that Sacred Heart has the option of applying for a BFOQ under the ELCRA for its employment decisions and, under MICH. COMP. LAWS § 37.2208, may even have a BFOQ without having first obtained the exemption (*id.* at PageID.402).  As for Parent Plaintiffs, Defendants point out that

---

[2] While the Court has not separately addressed ripeness, the analysis would likely lead to the same result.  Ripeness "shares a foundation in Article III's case-and-controversy requirement," *Miller v. City of Wickliffe, Ohio*, 852 F.3d 497, 503 (6th Cir. 2017); *see also Doster v. Kendall*, 54 F.4th 398, 415 (6th Cir. 2022), and often "boil[s] down to the same question[,]" *MedImmune, Inc. v. Genentech, Inc.*, 549 U.S. 118, 128 n.8 (2007).  As the Sixth Circuit has held, "a claim does not become ripe at the first whiff of governmental insensitivity or whenever a government official takes an adverse legal position against someone, even if one potential response is to curtail protected activities." *Ky. Press Ass'n, Inc. v. Ky.*, 454 F.3d 505, 540 (6th Cir. 2006).

neither the ELCRA nor the EAA is enforceable against them as parents (*id.* at PageID.403–404, 408).

In response, Plaintiffs argue that any question about the justiciability of this case was "put to rest" when the Michigan Legislature voted to amend the Elliott-Larsen Civil Rights Act to add sexual orientation and gender identity while rejecting proposals in both the House and the Senate to include religious freedom protections (ECF No. 29 at PageID.504).  Plaintiffs argue that as evidenced by Michigan's reliance on future exemptions and other employers' reliance on defenses to application of the anti-discrimination laws, Michigan's laws currently prohibit Sacred Heart's desired activities, such as hiring employees who model the Catholic faith, requiring males and females to wear distinct uniforms, referring to students and employees by their biologically based pronouns, and advertising for open faculty positions (*id.* at PageID.512–517).

Additionally, Plaintiffs argue that Sacred Heart is entitled to a "presumption of a credible threat of enforcement"[3] because (1) "Sacred Heart is an object of Michigan's law," (2) the law arguably prohibits Sacred Heart from engaging in protected activities, and (3) Michigan engages in "hyper-active" public advocacy and enforcement of sexual-orientation and gender-identity issues (*id.* at PageID.517–522).  Plaintiffs point out that Defendants have not disavowed the laws in some binding way or committed to exempting Plaintiffs from the reach of the laws (*id.* at PageID.522–523).  According to Plaintiffs, the universe of potential complainants increases its risk of prosecutions that would have devastating consequences to Sacred Heart's mission (*id.* at PageID.523–525).  Last, Plaintiffs argue that because "courts do not presume the government will

---

[3] The Court notes that the phrase "enforcement presumption" appears to be one of Plaintiffs' own making.  Plaintiffs do not reference, and this Court did not locate, any cases issued by either the Supreme Court or the Sixth Circuit that use this phrase.  As discussed more fully *infra,* enforcement is not presumed; rather, Plaintiffs must show "a credible threat of prosecution" in order to establish a requisite injury-in-fact.

interpret and apply the law consistent with constitutional liberty," the threat faced by Sacred Heart is not negated by "speculative religious exemptions," which Sacred Heart opines it has no reason to believe Defendants will apply (*id.* at PageID.525–530).   Plaintiffs argue that Defendants' argument for dismissal "defeats the purpose of pre-enforcement suits" and that it would be "incongruous if self-censorship prevented courthouse access" (*id.* at PageID.537–538).   As for Plaintiff Parents, Plaintiffs argue that they also have standing because Michigan's laws "indirectly regulate their freedom to educate their children consistent with their religious beliefs," and they face a substantial risk that they will be deprived of an authentic Catholic education for their children "through enforcement against Sacred Heart" (*id.* at PageID.541).

Defendants' argument has merit.

Section 1983 makes "liable" "[e]very person" who "under color of" state law "subjects, or causes to be subjected," another person "to the deprivation of any rights, privileges, or immunities secured by the Constitution[.]"  42 U.S.C. § 1983.  Section 1983 does not confer substantive rights but merely provides a statutory vehicle for vindicating rights found in the United States Constitution.  *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982); *Dibrell v. City of Knoxville, Tenn.*, 984 F.3d 1156, 1160 (6th Cir. 2021).

The United States Supreme Court has "repeatedly reiterated" that "[a]llegations of *possible* future" constitutional violations are not a sufficient basis for federal jurisdiction.  *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 409–10 (2013) (emphasis in original) (citation omitted) (rejecting Article III standing when the plaintiffs relied on a "highly speculative fear" that the government would decide to target their communications in the future).  Article III, § 2 of the United States Constitution provides that the judicial power of the federal courts "extends only to 'Cases' and 'Controversies.'"  *Spokeo, Inc. v. Robins*, 578 U.S. 330, 337 (2016), as revised (May

24, 2016) (quoting U.S. CONST. Art. III, § 2).  "Standing to sue is a doctrine rooted in the traditional understanding of a case or controversy."  *Id.* at 338.  The doctrine "ensure[s] that federal courts do not exceed their authority" and "limits the category of litigants empowered to maintain a lawsuit in federal court to seek redress for a legal wrong."  *Id.*  "The standing doctrine delineates the boundary between justiciable cases and controversies and those disputes that are not appropriately resolved through judicial process."  *Kiser v. Reitz*, 765 F.3d 601, 606 (6th Cir. 2014).

The "irreducible constitutional minimum of standing" requires a plaintiff to show it has "(1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision."  *Daunt v. Benson*, 956 F.3d 396, 417 (6th Cir. 2020) (quoting *Spokeo*, 578 U.S. at 338).  For purposes of standing, an injury means the "invasion of a legally protected interest which is (a) concrete and particularized, and (b) 'actual or imminent.'"  *Id.* (quoting *Lujan*, 504 U.S. at 560).  Each of the standing elements "must be supported ... with the manner and degree of evidence required at the successive stages of the litigation."  *Lujan*, 504 U.S. at 561.  When a case is at the pleading stage, as here, the plaintiff must plausibly allege facts demonstrating each element of standing.  *Spokeo*, 578 U.S. at 338.  *See also Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561 (1992) ("The party invoking federal jurisdiction bears the burden of establishing the [standing] elements[.]").

"[A]llegations of '*possible* future injury' are not sufficient" to establish standing.  *Galaria v. Nationwide Mut. Ins. Co.*, 663 F. App'x 384, 388 (6th Cir. 2016) (quoting *Clapper*, 568 U.S. at 409).  Hence, "a recurring issue in [] cases is determining when the threatened enforcement of a law creates an Article III injury."  *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 158 (2014) (*SBA List*).  The Supreme Court has held that "[w]hen an individual is subject to such a threat, an actual arrest, prosecution, or other enforcement action is not a prerequisite to challenging the law."

*Id.* at 158–59 (citing, e.g., *MedImmune, Inc. v. Genentech, Inc.*, 549 U.S. 118, 128–29 (2007) ("[W]here threatened action by government is concerned, we do not require a plaintiff to expose himself to liability before bringing suit to challenge the basis for the threat.")).   Instead, the Supreme Court has permitted "pre-enforcement review under circumstances that render the threatened enforcement sufficiently imminent."   *Id.*   In the Sixth Circuit, "[t]he government's future enforcement of the law counts as an 'impending' injury if a court can answer 'yes' to two questions:  Does a plaintiff seek to engage in conduct that the law 'arguably' prohibits?  And has the plaintiff shown a 'credible threat' that the government will enforce it against the plaintiff?" *Doster v. Kendall*, 54 F.4th 398, 416 (6th Cir. 2022) (internal citations omitted).

The Court therefore turns to examining whether Plaintiffs have plausibly alleged facts demonstrating, for purposes of standing, that (1) their intended conduct is proscribed by either the ELCRA or the EAA, and (2) there exists a credible threat of prosecution under either state law.

### a.        Is Plaintiffs' Intended Conduct Arguably Proscribed by Either Statute?

As a threshold matter, neither of Michigan's anti-discrimination laws apply to the Parent Plaintiffs in their capacities as parents of children attending Sacred Heart or as members of the parish.  Plaintiffs do not argue otherwise, only that Michigan law "indirectly regulates" their freedom.

Sacred Heart, in turn, may fall within the purview of the ELCRA as an employer, MICH. COMP. LAWS § 37.2201(a); an educational institution, MICH. COMP. LAWS § 37.2401; and potentially a "place of public accommodation," depending on whether the full and equal enjoyment of services or facilities denied to a person are services or facilities that Sacred Heart extends "to the public," MICH. COMP. LAWS § 37.2301(a).  In contrast, as Plaintiffs themselves assert (ECF No. 29 at PageID.515, n.3), the EAA, MICH. COMP. LAWS § 750.146, et seq., does not apply to

Sacred Heart as a private school because the Act's nondiscrimination prohibition only applies to "public educational institutions."  *See* MICH. COMP. LAWS § 750.146.  As Defendants point out (ECF No. 32 at PageID.763–764), it is not clear that the EAA applies to Sacred Heart as a "religious" institution where portions of the text distinguish between "religious . . . nonprofit institutions or organizations" and "places of public accommodation[.]"  MICH. COMP. LAWS § 750.146.  As Defendants further point out, it cannot be presumed the EAA's reference to "sex" prohibits discrimination based on sexual orientation and gender identity, where no court has so held.

Assuming arguendo that Sacred Heart falls within the purview of the ELCRA and EAA, both anti-discrimination laws provide that they will be interpreted in accordance with other applicable laws.   The EAA provides that the nondiscrimination provision for public accommodations is subject to "the conditions and limitations established by law[.]"  MICH. COMP. LAWS § 750.146.  The amended ELCRA added civil rights protections for individuals based on sexual orientation and gender identity and expression, but the ELCRA likewise maintains the provisions that allow for consideration of other laws, including those guaranteeing religious freedoms.  Specifically, the construction provision of the ELCRA, in its current and amended form, provides that it "shall not be construed as preventing the commission from securing civil rights guaranteed by law other than the civil rights set forth in this act."  MICH. COMP. LAWS § 37.2705(1).  The ELCRA does not prohibit religious educational institutions like Sacred Heart from making admission decisions based on religion.  MICH. COMP. LAWS § 37.2403.  The ELCRA prohibits discrimination by a place of public accommodation "[e]xcept where permitted by law,"  MICH. COMP. LAWS § 37.2302, and expressly provides for BFOQs for religious exemptions related to

employment where "reasonably necessary to the normal operation of the business or enterprise," MICH. COMP. LAWS § 37.2208.

Plaintiffs argue that their "point is that the First Amendment exempts the school from certain aspects of the laws" (ECF No. 29 at PageID.526).  However, as the Supreme Court has indicated, "religious institutions [do not] enjoy a general immunity from secular laws[.]"  *Our Lady of Guadalupe Sch. v. Morrissey-Berru*, ___ U.S. ___; 140 S. Ct. 2049, 2060 (2020).

Conversely, citing *Dambrot v. Central Mich. Univ.*, 55 F.3d 1177 (6th Cir. 1995), Plaintiffs argue that "there is no reason to expect Michigan will apply its law to include a religious exemption" (ECF No. 29 at PageID.528).  *Dambrot* was an overbreadth challenge and is not on point.  In *Dambrot*, the Sixth Circuit rejected the university's argument that the plaintiff's concerns were abated simply because the university policy also contained language claiming not to reach constitutionally protected activity.  55 F.3d at 1182–83.   More to the point is the Michigan Supreme Court's repeated standard in reviewing statutes, that "'statutes are presumed to be constitutional, and [courts] have a duty to construe a statute as constitutional unless its unconstitutionality is clearly apparent.'"  *In re Certified Questions from United States Dist. Ct., W. Dist. of Michigan, S. Div.*, 958 N.W.2d 1, 7, 51 (Mich. 2020) (quoting *People v. Skinner*, 917 N.W.2d 292, 297 (Mich. 2018), quoting *In re Sanders*, 852 N.W.2d 524, 529 (Mich. 2014), in turn citing *Taylor v. Smithkline Beecham Corp.*, 658 N.W.2d 127, 130 (Mich. 2003)).

In the employment context, for example, Michigan courts have determined that the ministerial exception, a "nonstatutory, constitutionally compelled exception to the application of employment-discrimination and civil rights statutes to religious institutions and their 'ministerial' employees," with "roots in the Establishment and Free Exercise of Religion clauses of the First Amendment," "exists in Michigan" and "generally bars inquiry into a religious institution's

19

underlying motivation for a contested employment decision." *Weishuhn v. Cath. Diocese of Lansing*, 756 N.W.2d 483, 486 (Mich. Ct. App. 2008).  The ministerial exception is grounded in Supreme Court cases holding that "educating young people in their faith, inculcating its teachings, and training them to live their faith are responsibilities that lie at the very core of the mission of a private religious school." *Our Lady of Guadalupe*, 140 S. Ct. at 2064 (relying on *Hosanna-Tabor Evangelical Lutheran Church and School v. EEOC*, 565 U.S. 171 (2012)).  The Supreme Court has observed that "[a]mong other things, the Religion Clauses protect the right of churches and other religious institutions to decide matters of faith and doctrine without government intrusion." *Id.* at 2060.

Several employment-related cases demonstrate that courts have interpreted the ELCRA in conjunction with constitutional and statutory religious exemptions.  First, in *McLeod v. Providence Christian School*, 408 N.W.2d 141, 151 (Mich. Ct. App. 1987), the parochial school sought to have provisions of the ELCRA struck down as unconstitutional under the First Amendment's Free Exercise Clause as applied to the school, which had a policy of not employing on a full-time basis women with preschool age children.  The Michigan Court of Appeals accepted the defendant's claim that the ELCRA's prohibition against employment discrimination on the basis of sex has an effect on this belief.  The appellate court was "not persuaded, however, that the provisions of the act constitute an undue burden on defendant's religious beliefs." *Id.*  The panel reasoned that "[s]tatutes or regulations which unduly interfere with an individual's religious belief generally present the individual with a 'hard choice,'" but the ELCRA "does not, by its own terms, put defendant to such a 'hard choice.'" *Id.*  The panel pointed out that although the "defendant contend[ed] that its religious belief constitutes a bona fide occupational qualification, defendant has not applied to the commission for such an exemption." *Id.*  The panel concluded that the

defendant "seeks to have the statute declared unconstitutional as it applies to defendant without having first availed itself of the statute's available safeguards." *Id.* at 344–45.

In *Porth v. Roman Catholic Diocese*, 532 N.W.2d 195, 200 (Mich. Ct. App. 1995), the Michigan Court of Appeals held that the Religious Freedom Restoration Act, 42 U.S.C. § 2000bb *et seq.*, also barred the application of the ELCRA to a policy of the church-operated school to employ only Catholics as teachers.  In *Assemany v. Archdiocese of Detroit*, 434 N.W.2d 233, 238 (Mich. Ct. App. 1988), the Michigan Court of Appeals held that the Free Exercise Clause of the First Amendment barred the application of the ELCRA to the diocese's decision about which organist to employ.  In *Weishuhn*, 756 N.W.2d at 488–89, 500, the Michigan Court of Appeals remanded a math teacher's challenge under the ELCRA to his alleged retaliatory termination for the trial court to consider application of the "ministerial exception," an exception that the panel indicated has its "roots in the First Amendment's guarantees of religious freedom."  Last, in *Ciurleo v. St. Regis Parish*, 214 F.Supp.3d 647, 652–53 (E.D. Mich. 2016), the district court similarly concluded that the ministerial exception barred the plaintiff-teacher's ELCRA claim against her parish employer where her duties of giving daily religious instruction and leading morning prayers "are the hallmark of religious exercises through which religious communities transmit their received wisdom and heritage to the next generation of believers."

In summary, Plaintiffs have not plausibly alleged that the ELCRA and EAA apply to Parent Plaintiffs, and Plaintiffs have not plausibly alleged that Sacred Heart's intended conduct is arguably proscribed by either statute where both statutes provide that they are to be construed with other laws, and the ELCRA has been so interpreted.  As exemplified by the caselaw, neither statute "arguably" provides that religious freedoms will not be considered.  Additionally, the ELCRA expressly provides a form of redress for Sacred Heart's concerns about its hiring practices that

Sacred Heart has not utilized.  That either of these acts "might" be applied against Sacred Heart in the future is "the exact sort of hypothetical and speculative dispute that Article III proscribes from federal-court dockets."  *Miller v. City of Wickliffe, Ohio*, 852 F.3d 497, 507 (6th Cir. 2017) (holding that the business owners lacked standing under Article III to bring a pre-enforcement challenge to an ordinance).  "The mere existence of a statute, which may or may not ever be applied to plaintiffs, is not sufficient to create a case or controversy within the meaning of Article III." *Nat'l Rifle Ass'n of Am. v. Magaw*, 132 F.3d 272, 293 (6th Cir. 1997) (citation omitted).

   **b.      Does a Credible Threat of Prosecution Exist?**

   Even assuming arguendo that Sacred Heart's proposed conduct is proscribed by Michigan law, Plaintiffs must still show "a credible threat of prosecution" in order to establish a requisite injury-in-fact.  The Sixth Circuit has stated that "[t]o identify a credible threat of enforcement, the first and most important factor is whether the challenged action chills speech."  *Fischer*, 52 F.4th at 307 (citing *McKay v. Federspiel*, 823 F.3d 862, 869 (6th Cir. 2016)).  Again, as a threshold matter, Plaintiffs do not independently demonstrate how the Parent Plaintiffs face a credible threat of prosecution, only that Sacred Heart does and "[t]hus, Parent Plaintiffs do, too" (ECF No. 29 at PageID.542).  Plaintiffs have alleged how Sacred Heart has curtailed some activities in order to avoid investigation or prosecution.  *See, e.g.,* Verified Compl. ¶¶ 261, 277–81, & 310–13 (describing Sacred Heart's decisions to not communicate its "Statement on Catholic Doctrine" or post certain job notices).

   However, "allegations of a subjective chill are not an adequate substitute for a claim of specific present objective harm or a threat of specific future harm; 'the federal courts established pursuant to Article III of the Constitution do not render advisory opinions.'"  *Laird v. Tatum*, 408 U.S. 1, 13–14 (1972) (citation omitted).  The "chilling effect" associated with a potentially

unconstitutional law "'on the books'" is insufficient to "justify federal intervention" in a pre-enforcement suit. *Whole Woman's Health v. Jackson*, ___ U.S. ___, 142 S. Ct. 522, 538 (2021) (quoting *Younger v. Harris*, 401 U.S. 37, 51 (1971) (a chilling effect "has never been considered a sufficient basis, in and of itself, for prohibiting state action")).   Instead, the Supreme Court requires "proof of a more concrete injury and compliance with traditional rules of equitable practice." *Whole Woman's Health, supra.  See also Plunderbund Media, L.L.C v. DeWine*, 753 F. App'x 362, 366–67 (6th Cir. 2018) (holding that where "some other indication of imminent enforcement" is lacking, "mere allegations of a 'subjective chill' on protected speech are insufficient to establish an injury-in-fact for pre-enforcement standing purposes") (citation omitted).

In *McKay*, the Sixth Circuit held that when plaintiffs rely on allegations of subjective chill, they must also "point to some combination of the following factors" to show the potential of enforcement:  "(1) a history of past enforcement against the plaintiffs or others," (2) "enforcement warning letters sent to the plaintiffs regarding their specific conduct," and/or (3) "an attribute of the challenged statute that makes enforcement easier or more likely, such as a provision allowing any member of the public to initiate an enforcement action." 823 F.3d at 869 (internal citations omitted).  The Sixth Circuit noted that it had "also taken into consideration a defendant's refusal to disavow enforcement of the challenged statute against a particular plaintiff." *Id.*[4]

---

[4] In support of the proposition that Sacred Heart "and by extension, Parent Plaintiffs" have standing "regardless of any pending complaints or investigations" (ECF No. 38 at PageID.828), Plaintiffs point this Court's attention to the Fifth Circuit's June 20, 2023 decision in *Braidwood Mgmt., Inc. v. EEOC*, 70 F.4th 914 (5th Cir. 2023) (ECF No. 38-1).  There, the Fifth Circuit held that the plaintiff-employer faced a credible threat of enforcement where the employer knew "what the EEOC says violates its guidance and the law; [knew] what Braidwood's exact policies are; and [it had] admissions from the EEOC that Braidwood's current practices violate Title VII.  Per Harris, [it had] evidence that the EEOC has brought an enforcement action against a similar violator." *Id.* at 929.  The multi-factor analysis set forth in the Sixth Circuit's decision in *McKay*, not decisions

The Sixth Circuit has applied the *McKay* factors in three recent cases. First, in *Online Merchants Guild v. Cameron*, 995 F.3d 540, 550–52 (6th Cir. 2021), the Sixth Circuit applied the *McKay* factors and determined that the plaintiff had standing to bring its pre-enforcement action where (1) there was at least "some" evidence of past enforcement actions, (2) the defendant sent the plaintiff a subpoena and civil investigatory demand (CID), (3) the statute contains a citizen-enforcement provision, and (4) the defendant had not disavowed enforcement but "vigorously litigated enforcement" of the subpoena and CID in state court. Second, in *Fischer*, 52 F.4th at 307–09, the Sixth Circuit applied the *McKay* factors and likewise determined that the plaintiffs had standing to bring their pre-enforcement action where (1) the defendant previously investigated one of the two plaintiffs, (2) the defendant sent the plaintiffs warning letters, (3) the provision at issue contained a citizen-enforcement provision, and (4) the defendant had refused to disavow enforcement of the challenged provision.

Third, in *Doster*, 54 F.4th 398, the Sixth Circuit applied the *McKay* factors and determined that the plaintiffs-service members had standing to bring their pre-enforcement action to challenge the Air Force's future enforcement of a mandate to take a COVID-19 vaccine. The Sixth Circuit determined that the Air Force had a "history of enforcing" the mandate against "others" who refused to comply and had "administratively separated 236 active-duty Airmen" near the time of this suit. *Id.* at 416. Additionally, the secretary of the Air Force had issued a memorandum "warning" service members of the sanctions for not complying, indicating that those who refused to get vaccinated after the Air Force had denied an exemption would "be subject to initiation of administrative discharge." *Id.* Last, each of the plaintiffs in *Doster* had filed a written request for

---

from the Fifth Circuit, binds this Court. In any event, *Braidwood* is factually distinguishable from this case inasmuch as Defendants have not issued similar guidance, admitted that Sacred Heart's practices violate the ELCRA, or pursued an enforcement action against a similar violator.

a religious exemption.  While some of the plaintiffs' requests were still outstanding, the Air Force

had approved just 25 of the over 7,500 then-existing requests, and its approvals were limited to

individuals who agreed to leave the Air Force within a year.  *Id.*

The Court turns to examining whether Plaintiffs have likewise identified a combination of

relevant factors in this case that would support the conclusion that their challenge to these laws is

borne of a live controversy, and not an attempt to obtain an advisory opinion.

### (1)  History of Enforcement

The first *McKay* factor weighs against Plaintiffs.  Even though the Commission adopted

the relevant Interpretive Statement in May 2018, Plaintiffs have not alleged a history of

enforcement of either the ELCRA or the EAA against Sacred Heart or other similar religious

institutions.  In their Verified Complaint, Plaintiffs reference 73 investigations based on sexual

orientation or gender identity discrimination but do not allege that any of those 73 complaints were

leveled against a church or a religious school, like Sacred Heart.[5]  *See* Verified Compl. ¶¶ 333–

---

[5] In its May 8, 2023 Motion for Leave to File a Supplemental Brief (ECF No. 34), Plaintiffs point the Court's attention to the MDCR's investigation of Catholic Charities of Shiawassee and Genesee Counties ("the charity"), an investigation that is not referenced in Sacred Heart's Verified Complaint.  This Court may permit further briefing in support of a motion, *see* W.D. Mich. LCivR 7.2(c) & 7.3(c), but Plaintiffs' proposed supplemental brief is unnecessary to this Court's resolution of the issues before it.  The catalyst for the MDCR's investigation is a private individual's April 13, 2023 discrimination complaint against the charity (Proposed Ex. A, ECF No. 34-2 at PageID.803).  The charity is apparently affiliated with the Catholic Church, but the complaint otherwise bears no similarities to the case at bar.  First, the charity is neither a church nor a private religious school, like Sacred Heart.  Second, the complaint against the charity alleges gender identity discrimination in housing, an alleged violation of Article 5 of the ELCRA, MICH. COMP. LAWS § 37.2501 *et seq.*, and/or the federal Fair Housing Act, 42 U.S.C. § 3601 et seq., neither of which are at issue in this case.  Last, while Plaintiffs argue that the MDCR's order that the charity file a response to the complaint with any supporting documents demonstrates the "invasive" nature of the investigatory process (ECF No. 34 at PageID.790, referencing ECF No. 34-2 at PageID.800, 804–807), the MDCR's actions of providing the complaint to the charity and ordering the charity to provide a response to the complaint are consistent with its statutory mandate to not only "receive" but also "investigate, conciliate, adjust, dispose of, issue charges, and hold hearings on complaints alleging a violation of [the ELCRA]," MICH. COMP. LAWS § 37.2602(c).

34.  Additionally, Plaintiffs identify no Michigan cases interpreting Michigan law as prohibiting a religious employer who meets the BFOQ criteria from asking prospective employees about whether they can follow and effectively communicate certain beliefs; seeking, recruiting, and hiring employees who agree with certain religious beliefs; or posting employment opportunities that indicate a desire to hire employees who share certain beliefs.  Conversely, Defendants represent that no complaint has been filed with the MDCR against Sacred Heart and that neither Attorney General Nessel nor her predecessors have filed an action to criminally enforce the EAA (ECF No. 23 at PageID.384–385).  Indeed, Plaintiffs concede that for its hundred-plus year history, Sacred Heart has served its community without fear that the government would prevent it from operating by its religious beliefs (ECF No. 29 at PageID.505).

In a post-briefing notice directing this Court's attention to the Sixth Circuit's July 14, 2023 decision in *Block v. Canepa*, 74 F.4th 400 (6th Cir. 2023), Plaintiffs argue that it is "enough" that Michigan "prosecutes violations of the ELCRA" (ECF No. 42 at PageID.910).  In *Block,* two plaintiffs, an "active wine consumer" and an out-of-state wine retailer, filed a pre-enforcement constitutional challenge to Ohio's Transportation Limit statute, which prohibits individuals from transporting various types of alcohol, including wine, in excess of the prescribed statutory limits from another state.  *Id.* at 404–05.  The district court held that while the retailer had standing to sue, the wine consumer—Kenneth Miller—did not plausibly allege facts to support a credible threat of prosecution.  *Id.* at 409–10.  The Sixth Circuit held that the district court erred in

---

As Defendants point out (ECF No. 32 at PageID.774), the scope of an investigation, any determination that actionable discrimination occurred, and any determination regarding grounds to issue a charge, *see* Mich. Admin. Code R. 37.6, is dictated by the facts and applicable laws, including constitutional law which, again, the ELCRA incorporates.  The investigation simply does not support any present or imminent threat of enforcement of the ELCRA against Sacred Heart.  Therefore, the Court, in its discretion, denies Plaintiffs' motion for leave to file a supplemental brief.

determining that Miller had not plausibly alleged the injury-in-fact component of standing. *Id.* at 410–11 (declining to address the remaining components needed to establish Article III standing). The Sixth Circuit found that Miller met his burden where (1) Miller provided evidence that "Ohio does prosecute violations of the Transportation Limit"; (2) "neither [the defendants] nor the district court cite any authority supporting an argument that Miller was obligated to show that Ohio prosecuted people for transporting wine, rather than liquor"; (3) an interrogatory response from Ohio's attorney general provided examples where Ohio could, and potentially would, prosecute a wine consumer for violating the Transportation Limit; and (4) the defendants had not indicated that they, as a matter of policy, choose not to prosecute people engaging in Miller's desired conduct. *Id.* at 410.

Plaintiffs extrapolate from the *Block* decision that Sacred Heart likewise has standing in this case because (1) Plaintiffs have "shown evidence that Michigan does prosecute ELCRA violations generally," and (2) Plaintiffs are not obligated to show that Michigan has previously prosecuted "the exact same conduct" (ECF No. 42 at PageID.910).

Plaintiffs' analogy between Michigan's anti-discrimination statute and Ohio's Transportation Limit statute is not a good fit.  Ohio's statute proscribed the very conduct in which Miller wished to engage, whereas, as Defendants point out, Plaintiffs argue that "any enforcement of the ELCRA based on any protected category" would properly provide Sacred Heart with standing to bring this lawsuit (ECF No. 43 at PageID.928).  Additionally, Ohio had a history of enforcement of that statute for the same, specific conduct, whereas Plaintiffs have identified no evidence of past enforcement against a religious entity for the conduct in which Sacred Heart wishes to engage.  Last, and perhaps most importantly, there is no indication in *Block* that Ohio's statute requires consideration of other laws, whereas the ELCRA on its face and under caselaw is

construed in conjunction with other legal rights.  In sum, Plaintiffs' reliance on the holding in
*Block* is misplaced and does not alter this Court's assessment of the first *McKay* factor.

### (2)  Enforcement Warning Letters

Not surprisingly then, the second *McKay* factor also weighs against Plaintiffs.  Plaintiffs
have not identified anything akin to a warning letter to Sacred Heart regarding the conduct outlined
in their Verified Complaint.  Plaintiffs have not provided evidence of any comments by the
Commissioners or MDCR staff named as Defendants to establish that they have made any threat
of enforcement, let alone a credible threat.  And Plaintiffs' attempts to rely upon amicus briefs that
Attorney General Nessel has joined or her efforts on behalf of the LGBTQ+ community do not
demonstrate a "clear threat of prosecution" against Plaintiffs.  Indeed, the Attorney General has no
authority to enforce the ELCRA, only the criminal provisions of the EAA.  In any event,
Defendants do not deny that, consistent with current legal precedent, they have interpreted the
ELCRA's "because of sex" provision to include protection for gender identity and sexual
orientation.  The issue in this case is whether, in applying this provision, Defendants have refused
to concomitantly consider constitutional and statutory religious exemptions such that Plaintiffs
face a credible threat of prosecution.

### (3)  Statutory Attributes

The third *McKay* factor also weighs against Plaintiffs.  Plaintiffs opine that the ELCRA is
"easy to enforce" as "any person" is statutorily empowered to bring a discrimination suit under the
Act and may proceed simultaneously before the Commission and any state circuit court (ECF No.
29 at PageID.523), but these statutory attributes are not compelling where the ELCRA also
provides that such a suit may not be premised on discrimination that is "permitted by law."  MICH.
COMP. LAWS § 37.2302(a).  As previously described, both of Michigan's anti-discrimination laws

expressly provide that they will be interpreted in accordance with other applicable laws.  Hence, unlike the service members in *Doster* who faced a looming "Hobson's choice" between compliance with the Air Force vaccine mandate and adherence to their religious beliefs, Plaintiffs have not demonstrated that application of these statutes presents a hard choice.  Indeed, the Michigan Court of Appeals in *McLeod* determined that the opposite was true because religious freedoms must be weighed against governmental interests based on the particular facts of each case.  408 N.W.2d at 151 (holding that the ELCRA "does not, by its own terms, put defendant to such a 'hard choice'").  *See also Porth, supra*; *Assemany, supra*; *Weishuhn, supra*.

To the extent that the fourth "disavowing" question from *McKay* is relevant, the Court agrees with Defendants that it would be "impossible" for Defendants to disavow application of either statute to Sacred Heart, where the religious freedom inquiry would depend on specific facts (ECF No. 32 at PageID.775–777).  *See, e.g., Davis v. Colerain Twp., Ohio*, 51 F.4th 164, 174 (6th Cir. 2022) (determining that the fact that the police department had not "disavowed enforcement" of its Facebook Rule "does nothing to show that [the plaintiff] plans to engage in speech that might arguably fall within the rule").  In sum, application of the *McKay* factors powerfully supports the conclusion that Plaintiffs have not plausibly alleged a credible threat of enforcement against Sacred Heart, and by extension, against Plaintiff Parents.

### c.    Summary

In summary, neither the ELCRA nor the EAA facially fails to recognize religious freedoms like those asserted by Plaintiffs herein.  Even assuming arguendo that either of these acts "might" be applied against Sacred Heart's intended conduct in the future, Plaintiffs have failed to supply some indication of imminent enforcement, and mere allegations of a "subjective chill" are alone insufficient to establish an injury-in-fact for standing purposes.  Plaintiffs opine that Sacred Heart

29

is "in the crosshairs of both the law and enforcement officials" (ECF No. 29 at PageID.504), but the Court concludes that the allegations in their Verified Complaint do not make either proposition plausible.

In support of a contrary conclusion, Plaintiffs repeatedly reference a catalog of Supreme Court cases that generally supports pre-enforcement challenges.  *See* ECF No. 29 at PageID.518, 535, 537–539.  According to Plaintiffs, pre-enforcement challenges are "routinely allowed" and courts "often" find standing for plaintiffs who are the object of a law before the law is enforced (*id.* at PageID.535, 538).  The mere fact that pre-enforcement challenges are generally permissible does not improve the quality of Plaintiffs' specific allegations in their Verified Complaint.  The Supreme Court instructs that pre-enforcement review is permitted only "under circumstances that render the threatened enforcement sufficiently imminent."  *SBA List*, 573 U.S. at 159.  *Cf. Whole Woman's Health*, 142 S.Ct. at 539 (Thomas, J., concurring in part and dissenting in part) ("[T]here is no freestanding constitutional right to pre-enforcement review in federal court[.]").

Indeed, the Supreme Court has observed that the difference between an abstract question and a "case or controversy" is "one of degree."  *Babbitt v. United Farm Workers Nat. Union*, 442 U.S. 289, 297 (1979).  The facts of the cases upon which Plaintiffs rely for their general support are, in varying degrees, distinguishable from the quality of the factual allegations in Plaintiffs' Verified Complaint.  *See, e.g., Whole Woman's Health*, 142 S.Ct. at 537–38 (determining that the petitioners had plausibly alleged that the state law has "already had a direct effect on their day-to-day operations" and identified provisions of the state law that appeared to impose a duty on the licensing-official defendants to bring disciplinary actions against them if they violated the law); *MedImmune*, 549 U.S. at 128 (determining that there was "no dispute that the [Article III case-or-controversy] standards would have been satisfied if the petitioner had taken the final step of

30

refusing to make royalty payments under the 1997 license agreement"); *Steffel v. Thompson*, 415 U.S. 452, 459 (1974) (where the plaintiff was "twice warned to stop handbilling that he claims is constitutionally protected" and was "told by the police that if he again handbills at the shopping center and disobeys a warning to stop he will likely be prosecuted," the Court held that "in these circumstances, it is not necessary that petitioner first expose himself to actual arrest or prosecution to be entitled to challenge a statute that he claims deters the exercise of his constitutional rights").[6]

Plaintiffs accurately describe the issues herein as topics of ongoing national debate (ECF No. 29 at PageID.525), but "[m]atters of great public interest are precisely the kinds of issues that demand the federal courts to be most vigilant in this area—vigilant that the powers they exercise are powers the Constitution gives them and vigilant that they exercise those powers in disputes with the 'clear concreteness provided when a question emerges precisely framed and necessary for decision from a clash of adversary argument.'" *Fialka-Feldman v. Oakland Univ. Bd. of Trustees*, 639 F.3d 711, 715 (6th Cir. 2011) (citation omitted).  "Article III's case-or-controversy requirement provides a critical separation-of-powers check on the judiciary that we may not disregard simply because we think a legal question—'First Amendment or otherwise'—is important." *Davis*, 51 F.4th at 173.

---

[6] In one of its notices of supplemental authorities, Plaintiffs also point this Court's attention to the Supreme Court's June 30, 2023 decision in *303 Creative LLC v. Elenis*, ___ U.S. ___; 143 S. Ct. 2298 (2023) (ECF No. 40-1).  However, the Supreme Court's decision in *303 Creative* contains no discussion of standing, let alone any modification of the standing doctrine described in its prior cases.  The Supreme Court merely indicated that "no party" in *303 Creative* challenged the holding of the Tenth Circuit that Lorie Smith, the owner of 303 Creative LLC, had standing to sue.  143 S. Ct. at 2310.  Plaintiffs opine that the Supreme Court's effective "adoption" of the Tenth Circuit's standing analysis supports the conclusion that Plaintiffs likewise established standing in this case (ECF No. 40 at PageID.864), but the conclusion is not merited where the Supreme Court quoted the Tenth Circuit's finding that Colorado had "a history of past enforcement against nearly identical conduct," 143 S. Ct. at 2310, an allegation that Plaintiffs have not plausibly made here, for the reasons stated *supra*.

Because Plaintiffs have not demonstrated Article III standing sufficient to invoke federal-court jurisdiction, any decision from this Court regarding how the statutes might apply to Plaintiffs would be advisory.[7]  When a court lacks subject-matter jurisdiction, "the only function remaining to the court is that of announcing the fact and dismissing the cause."  *State by & through Tenn. Gen. Assembly*, 931 F.3d at 519 (quoting *Ex parte McCardle*, 74 U.S. (7 Wall.) 506, 514, 19 L.Ed. 264 (1868)).  *See also Davis*, 51 F.4th at 176 (indicating that dismissal for lack of subject-matter jurisdiction is without prejudice); FED. R. CIV. P. 58 (providing for entry of judgment).

### III.    CONCLUSION

Accordingly, for the foregoing reasons,

**IT IS HEREBY ORDERED** that Plaintiffs' motion for leave to file supplemental brief (ECF No. 34) is DENIED.

**IT IS FURTHER ORDERED** that Defendants' Motion to Dismiss (ECF No. 22) is GRANTED.  This action, including Plaintiffs' Motion for a Preliminary Injunction (ECF No. 4), is DISMISSED for lack of subject-matter jurisdiction.

Dated:  August 22, 2023                                   /s/ Jane M. Beckering
                                                        JANE M. BECKERING
                                                        United States District Judge

---

[7] Even if this Court were empowered to reach the merits of Plaintiffs' motion for a preliminary injunction, Plaintiffs would have failed to make the requisite showing for injunctive relief, for the same reasons stated herein.  *See generally D.T. v. Sumner Cnty. Sch.*, 942 F.3d 324, 327 (6th Cir. 2019) (irreparable injury must be both certain and immediate, not speculative or theoretical).